1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION


UNITED STATES OF AMERICA

   v.          CRIMINAL CASE NO.
               ELH-17-054
JOHN DOE
AKA CHEYENNE MOODY DAVIS,

   Defendant
_____/


(Motions Hearing)
Tuesday, September 5, 2017
Baltimore, Maryland


Before:  Honorable Ellen L. Hollander, Judge




Appearances:

  On Behalf of the Government:
   Zachary A. Myers, Esquire


  On Behalf of the Defendant:
   David J. Walsh-Little, Esquire
   Laura G. Abelson, Esquire




Reported by:
Mary M. Zajac, RPR, FCRR
Fourth Floor, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

(Proceedings at 10:07 a.m.)

MR. MYERS:  I'm here to call the matter of United States of America versus John Doe, AKA Cheyenne Moody Davis. This is Criminal Number ELH-17-054.  I'm Assistant U. S. Attorney Zachary Myers here on behalf of the government, along with Special Agent Jeff Tetrault of the Diplomatic Security Service and Special Agent Ryan Shanahan of the Social Security Administration, for this morning's motions hearing.

THE COURT:  All right.  Thank you, counsel.  Counsel?

MR. WALSH-LITTLE:  Good morning, Your Honor.  David Walsh-Little and Laura Abelson for Mr. Davis.  He's standing between us.

THE COURT:  All right.  Thank you, counsel.  You may have a seat as well.  The defendant is present.

We are here on two motions that were filed by the defense.  One is a motion to suppress warrant evidence, which is ECF 20.  And in the alternative in that motion the defendant seeks a hearing under Franks v. Delaware.  That motion pertains to two search warrants, both of the which were executed, I believe, on February 8 of 2017, one with respect to the defendant's residence in Columbia, Maryland, and the other with respect to his vehicle, a 2006 silver Mitsubishi Eclipse.

In addition, the defendant has filed a supplemental motion to suppress statements -- that's at ECF 36 -- pertaining to statements he made on the date of his arrest, which was also

February 8th of 2017.

And the government has filed a consolidated response at ECF 37.  The defendant has replied at ECF 43.

So counsel, with that, I'm ready.  What's our proceeding going to be today?

MR. MYERS:  Yes, Your Honor.  I note for the voluntariness hearing on the statements, the government has one witness it would put forth.  And I know we have the burden, I believe, on voluntariness for the custodial statements.  And I would defer to the Court --

THE COURT:  And is there any dispute as to whether he was in custody?

MR. MYERS:  No, there's not, Your Honor.

THE COURT:  Okay.

MR. MYERS:  And then as to the motion to suppress the search warrant, I believe that's on the defense.  And the government is prepared to proceed based on its written submission and including the copy of the search warrants issued by Judge Coulson that were attached to the government's response.

THE COURT:  Okay.  So do you want to go first on your voluntariness?

MR. MYERS:  Whichever the Court would prefer.  I'm prepared.

THE COURT:  It's your call.

MR. MYERS:  Okay.  Then, yes, we'll proceed.  I'd like

Case 1:17-cr-00054 ELH    Document 59    Filed 09/25/17    Page 4 of 167

to call Special Agent Ryan Wilson of the Diplomat Security Service.

THE CLERK:  Sir, please come forward.  If you would just stand to the side of the witness box, face me, and raise your right hand to be placed under oath.

AGENT RYAN WILSON, GOVERNMENT'S WITNESS, SWORN

THE WITNESS:  I swear.

THE CLERK:  You may have a seat, sir.  And if you would please speak directly into the microphone.  State your first and last name and spell your first and last name.

THE WITNESS:  Ryan Wilson.  R-Y-A-N.  W-I-L-S-O-N.

DIRECT EXAMINATION

BY MR. MYERS:

Q    Mr. Wilson, are you employed?

A    Yes, I am.

Q    And where do you work?

A    I work for the United States Department of State, Diplomatic Security Service.

Q    And what is your title with DSS?

A    Special Agent.

Q    And how long have you been a special agent?

THE COURT:  I'm sorry.  Did you say Diplomatic Security Service or Services?

THE WITNESS:  Service.

THE COURT:  Service.

BY MR. MYERS:

Q    And I know it's not -- I'll just ask.  What is it -- what is it that the Diplomatic Security Service does?

A    The Diplomatic Security Service provides security and law enforcement for the Department of State to include passport and visa fraud investigations, as well as close protection for foreign dignitaries.

Q    And as a special agent and your fellow special agents for Diplomatic Security Service, are you sworn federal law enforcement agents permitted under law to execute search and arrest warrants?

A    Yes, we are.

Q    And are you assigned to a particular group within DSS?

A    Yes, I'm assigned to the Washington field office.

Q    And do you participate in criminal investigations and execution of criminal warrants as part of your assignment?

A    Yes, I do.

Q    And were you involved in the execution of search and arrest warrants this year, on February the 8th, 2017?

A    Yes, I was.

Q    And were those warrants executed at the premises at ▇▇▇▇▇ ▇▇▇▇▇▇▇▇ in Columbia, Maryland, ▇▇▇▇▇▇▇▇?

A    Yes, they were.

Q    Approximately when were those warrants executed?

A    At approximately 6 a.m. on February 8th.

Q    And approximately how many agents or law enforcement officers were on the scene for the execution of these warrants?

A    To my recollection, 15.

Q    And what were you and your colleagues wearing during the execution of these warrants?

A    During the execution of the warrants, we were wearing external body armor with police placards, and we were armed with sidearms.

Q    And is both the wearing of the police identification placards, as well as carrying your firearms, pursuant to DSS policy?

A    It is.

Q    Did you have an assigned role on the warrant execution teams that day?

A    Yes.  I was assigned as the team leader for the entry team.

Q    And what responsibilities does that entail?

A    That responsibility is command and control the agents that are going to make the initial entry into the dwelling after the knock and announce.

Q    And --

THE COURT:  So it was a knock and announce?  You didn't break down the door?

THE WITNESS:  Correct.

BY MR. MYERS:

Q    And who did the knock and announce?

A     I did.

Q     And what sort of residence or building was this?

A     As I recall, it was a multi-story apartment building.

Q     And where was the defendant's apartment located?

A     To my recollection, the apartment building was, had two wings.  It had a center of that stairwell that went up to each floor.  And the apartment doors faced each other.  And his apartment was on the third floor.

Q     And when you knocked and announced yourself as law enforcement at the door, who answered?

A     The subject identified as Cheyenne Davis.

Q     And did you recognize this subject at the time he answered the door?

A     I did.

Q     And where did you recognize him from?

A     I recognized him from the pre-operational briefings and photographs that were disseminated to us prior to the operation.

Q     And were those briefings given to you by another agent?

A     Yes, they were.

Q     And who was that?

A     Supervisory Special Agent Jeff Tetrault.

Q     And was he the responsible agent for the criminal investigation itself?

A     He was.

Q     So is your role limited to the execution team for these

warrants?

A    Correct.

Q    So what you knew about the appearance of identification of the subject is based on briefings you received from other law enforcement officers?

A    That is correct.

THE COURT:  I'm sorry.  Can you repeat the name of the agent who briefed you?

THE WITNESS:  It was Special Agent Jeff Tetrault.

THE COURT:  Can you spell the last name?

THE WITNESS:  Yes.  T-E-T-R-A-U-L-T.

BY MR. MYERS:

Q    What did you do after the subject that you recognized opened the door in response to your knock and announce?

A    After knocking and announcing and the door opened, I pulled the subject to the threshold of the door out onto the stairwell landing.

Q    And what was he wearing?

A    I recall he was shirtless and wearing some, like, pajama pants.

Q    And again, this was approximately 6 in the morning, you testified?

A    Yes.

Q    Now, did you and your colleagues have your weapons drawn when you first opened the door?

A     Yes, we did.

Q     And is that pursuant to agency policy?

A     Yes, it is.

Q     And upon bringing, upon pulling the defendant subject out onto the landing outside the apartment, was he secured?

A     Yes.  He was, he was handcuffed.

Q     And while, while the entry team made entry, was he kept outside on the landing?

A     Correct.  It was simultaneous.  So as he was being handcuffed, the team made entry and did a protective sweep of the dwelling.

Q     And during the protective sweep of the dwelling, were any other individuals found to be inside the residence, to your recollection?

A     Yes.  I recall an adult female and three minor children.

        THE COURT:  How many?  Three?

        THE WITNESS:  Three.

BY MR. MYERS:

Q     And you've testified that the defendant was in his boxers. I should ask, the subject who answered the door when you knocked and announced, do you see him in the courtroom today?

A     Say it again.

Q     Do you see the subject who answered the door in the courtroom today?

A     Yes, I do.

Q    And could you describe where he's sitting and what he's wearing?

A    He's wearing a prisoner uniform, maroon, sitting on the defense table.

Q    And you had testified that this took place February 8.  He was in his boxers on the landing.

THE COURT:  No.  He said pajama pants.

Q    Pajama pants.  My apologies.  What was the weather like that day?

A    I recall it being unseasonably warm that day.

Q    So there wasn't any snow or any concern about him being shirtless at that point?

A    No, there wasn't.

Q    And you said that the entry team cleared the apartment after encountering the other individuals?

A    Yes.

Q    And at some point was the defendant taken away from the immediate area of the apartment?

A    Yes, he was.

Q    And where was he taken?

A    He was taken down to a Washington field office vehicle, a Ford Explorer.

Q    And do you recall if the defendant made any statements in your presence between being pulled out of the door and being taken down to the car?

Case 1:17-cr-00054-ELH    Document 59    Filed 09/25/17    Page 11 of 167

A    I do not recall him making any statements during that time.

Q    But were you with him for all of that period of time?

A    Yes.

Q    Well, did you participate in the protective sweep during the entry team or did you stay with the defendant?

A    I was out on the landing as the rest of the team went in.

THE COURT:  So you didn't participate in the protective sweep?

THE WITNESS:  No.  It was, it was simultaneous.  We controlled the subject and the entry team right on my heels went in to do the sweep.

BY MR. MYERS:

Q    So when you took him down to the police car -- and was that parked in the parking lot of the apartment building?

A    Yes, it was.

Q    So it wasn't far from where he had been?

A    No.

Q    Did you then place him inside of the car?

A    Yes.  He was placed in the back seat.

Q    And was he alone in the back seat?

A    He was alone in the back seat.

Q    And was there anyone else in the front seat of the car?

A    No, not at that time.

Q    And where did you stay or what was your role at that point?

A    I stayed outside the, the vehicle to keep an eye on the

Case 1:17-cr-00054-ELH    Document 59    Filed 09/25/17    Page 12 of 167

subject.

Q    And did you have any interactions with him during this time?

A    I did.  They were intermittent interactions, just checking on his health and welfare, making sure the handcuffs weren't too tight.  I did make one small adjustment.

Q    Did you ever ask him if he needed anything or if there's anything under the circumstances that you could do for him?

A    Yeah.  I do recall letting him know if he needed to go to the restroom, just to let us know, and we'd try and make it happen.

THE COURT:  Was he cuffed in the front or the back?

THE WITNESS:  He was cuffed in the back at that time.

BY MR. MYERS:

Q    And at some point did Special Agent Tetrault return and join you at the vehicle where the defendant was?

A    He did.  Approximately 6:25.

THE COURT:  And who is that?  I'm sorry.

Q    Special Agent Tetrault.  Is that the investigator you testified what the lead investigator who gave you the initial briefing?

A    Yes, I did.

Q    And when he came to the car, did you and Special Agent Tetrault participate in questioning of the defendant?

A    Yes.  At that time, as I recall it was right around 6:25.

Q    I'm going to show you what the government has marked as

Government's Exhibit 1, which is -- have you seen this document previously?

A     Is it supposed to be on on this monitor?  It's not showing.

Q     Yes.

A     Yes.  That -- I'm familiar with this form.

Q     And what, setting aside the specifics of writing on it, just the general form, what do you recognize this form to be?

A     This is the Diplomatic Security Service rights advisement form.

Q     And is this a form that you and your colleagues at the Diplomatic Security Service use during custodial questioning of subjects and defendants?

A     Yes.  This is the form that we use when we Mirandize subjects that are taken into custody.

Q     Was the defendant Mirandized in your presence?

A     He was.

Q     At, you said, approximately 6:25 a.m.?

A     Yes, sir.

Q     And the four bullet-pointed statements that have checkmarks next to them advising him that he, the advice that he has the right to remain silent, anything that you say can be used against you in a court of law, you have the right to consult with a lawyer before questioning or to have a lawyer present during questioning, and if you can't afford a lawyer one will be appointed to represent you free of charge prior to any

questioning, were each of those statements read to him aloud in your presence?

A    Yes, they were.

Q    And did the defendant indicate, upon the advised of those rights, that he did understand those rights?

A    He indicated that he understood his rights.

Q    Did he indicate that he wished to remain silent?

A    He did not indicate that he wished to remain silent or did he request an attorney.  Neither one.

Q    Now, do you recognize --

THE COURT:  Let me ask you this.  Why doesn't it say even if you want to answer questions, you can stop at any time?

THE WITNESS:  That I don't know, Your Honor.  I mean, this is the standard form that we've always used.

BY MR. MYERS:

Q    And did, and do you recognize the handwriting on this form?

A    Yes, I do.  That was special agent or Supervisory Special Agent Jeff Tetrault's writing.

Q    And was he writing on this form in your presence while the rights were being read to the defendant?

A    He was.

THE COURT:  Did you say he wanted to answer questions or he didn't say one way or the other?

THE WITNESS:  As I recall, Your Honor, he said that he understood his rights.  And he didn't request legal counsel,

didn't request an attorney.  So we did continue with questioning.

THE COURT:  So did he affirmatively say he was willing to answer questions?

THE WITNESS:  He didn't indicate either way, Your Honor.

BY MR. MYERS:

Q    At the time that his rights were read to him, was the defendant still handcuffed?

A    Yes, he was.

Q    At that point, do you remember if he was handcuffed in the front or the back?

A    He was still handcuffed in the back.

Q    And was, was he able to sign the form or was the form made available for him to physically sign?

A    Not at that time.

Q    And following being read his rights and indicating that he understood them, was the defendant asked what his name was?

A    Yes, he was.

Q    And what did he, how did he identify himself?

A    The subject identified himself as Cheyenne Davis.

Q    And was the defendant asked biographical information about his family?

A    Yes, he was.

Q    And what do you remember about that conversation?

A    I recall Special Agent Tetrault questioning the subject

about siblings that were known to DS, to Diplomatic Security

Service, but the subject was unaware or unfamiliar with these

siblings, as well as he was asked about his father, who he

claimed lived in Florida, but he --

THE COURT:  And he claimed what?

A    He was asked about his, the individual he claimed to be his

father, but he was unaware that this individual had recently

died.  And also the subject referred, made a reference, as I

recall, to being close to an aunt, but was unable to recall the

name of this aunt.

Q    And how did this conversation or interaction with you,

Special Agent Tetrault, and the defendant end?

A    Special Agent Tetrault stopped questioning.  It was an

impasse.

Q    Did he appear frustrated?

A    Yes.

Q    Special Agent Tetrault?

A    Yes.

THE COURT:  How do you know he felt frustrated?

THE WITNESS:  Well, I was present.  The subject was

unable to answer the questions that we were asking him and --

THE COURT:  Unable or unwilling?

THE WITNESS:  Unwilling.

MR. MYERS:  And --

THE COURT:  And so does that mean he said "I'm not

answering any questions" or did he just not answer them?

THE WITNESS:  He didn't know the, he was, he was unaware of the information that we were asking him.  And he kept saying that he was Cheyenne Davis through the whole entire questioning.  And we, we just stopped questioning.  It wasn't going anywhere.  So we, we just ceased the questioning at that time.

BY MR. MYERS:

Q    Special Agent Wilson, by saying he was unable to answer the questions, do you mean that he was unable to provide answers that comported with the information that you had learned about these facts through your briefing?

A    Yes, that would be a more accurate way to say it.

Q    Unable to provide answers that were correct, as far as you knew?

MR. WALSH-LITTLE:  Objection as to form.

THE COURT:  I'm going to sustain that.  Slightly leading.

BY MR. MYERS:

Q    Yes, Your Honor.  Were the questions -- were the answers that he provided, did they comport with the information that had been provided to you in the briefing?

A    They did not.

Q    About how long did this conversation take?

A    Approximately five minutes.

Q    And at any point in this conversation did the defendant indicate that he did not wish to speak to you any longer?

A    No, he did not.

Q    And did he ever ask to consult with an attorney?

A    No, he did not.

Q    During the course of the interview, did you or Special Agent Tetrault threaten the defendant in any way?

A    No.

Q    Did you raise your voices?

A    No.

Q    Did anyone promise him anything, whether or not you knew it to be false?

A    No.

Q    Did the defendant appear to be coherent through this conversation?

A    Yes, he appeared to be coherent.

Q    Did he seem to have his faculties about him, not under the influence of any substances?

A    Correct.

Q    Did he express any confusion about what was going on?

A    No real confusion other than maintaining the identity as Cheyenne Davis.

Q    And during this conversation, where were you and Special Agent Tetrault's firearms?

A    They were holstered, on our sides.

Q    Now, was this five-minute conversation recorded?

A    No, it was not recorded.

Q    Do you believe, during that portion of the conversation, that the defendant was in any way disrespectful to you or your colleague?

A    Not during that conversation.

Q    And do you feel, in your recollection, that you or Special Agent Tetrault were disrespectful towards him?

A    No.  We were not disrespectful.

Q    Who did the majority of the questioning?

A    Special Agent Tetrault.

Q    During the conversation, during this five-minute course in the conversation, did the defendant ask the two of you for anything?

A    He did not ask for anything during that conversation, no.

Q    Would you qualify that questioning as aggressive or accusatory?

A    No, not by any means.

Q    What happened after Special Agent Tetrault terminated that questioning?

A    Once the questioning was terminated, brought the subject back indoors to get some additional clothing.  And then I was, I'm aware of the cash that he had that was counted out in front of him.  And I believe it was left with the adult female in the residence.

Q    And after he was returned to the residence to get the clothing and the cash was counted out and given to the adult female, was the defendant returned to the DSS vehicle?

A    Yes.  He was brought right back to the vehicle.

Q    And was he then transported?

A    Yes.  And then we departed that residence for the US marshal's intake in Baltimore.

Q    And so during the ride from Columbia to Baltimore, were you in the car with the defendant?

A    Yes, I was.  I was sitting behind the driver's seat, in the back seat with the subject.

Q    And was the subject still handcuffed at this point?

A    He was.

Q    And do you remember if the cuffs were in the front or the back?

A    I recall that we, for the transportation, we moved his handcuffs to the front.

Q    And during the transportation, did the defendant make any statements to you or to the driver?

A    Yeah.  During the ride to the marshal's intake, the subject made inflammatory comments to Special Agent Tetrault and I about how we sleep at night and that we're responsible for breaking up families, and things like that.

Q    And what happened when you arrived at the intake facility for the US marshals?

A    When we arrived at the intake center and the marshals began the intake process, it was right around the time I was doing the mandatory DNA collection, the mouth swab, that the subject continued to make inflammatory and confrontational comments about Special Agent Tetrault and I breaking up families and how do we sleep at night, and that, were we part of the new Trump administration.  Following, following that remark, I asked the subject if he, if he voted in the last election.

Q    And what did he say?

A    And the subject stated that he did vote in the last election and that he voted for Trump.  He also answered, when I followed up with that question what identity he used to vote with, and he said he, that he was Cheyenne Davis and of course he voted using the identity of Cheyenne Davis.

Q    And about how long did that interaction during DNA processing take?

A    It was a matter, probably a matter of minutes.  I'd say three to five minutes at the most.

Q    And did you have any further sort of substantive contact with the defendant after that process was concluded?

A    I did not.

Q    No further questions from the government, Your Honor.

        THE COURT:  Okay.  Cross examine.

        CROSS EXAMINATION

BY MR. WALSH-LITTLE:

Q    Yes, Your Honor.  Good morning, Special Agent.  How long have you worked for the State Department?

A    I've been employed by the State Department since 2008.

Q    And was that always in the law enforcement capacity?

A    Correct.

Q    Were you working in law enforcement before being employed in the State Department?

A    Yes, I was.

Q    Okay.  Where were you working before you were employed by the State Department?

A    I was a US Border Patrol agent for approximately 10 years.

Q    Okay.  And during the time that you've been employed at the State Department, have you been trained on how to give Miranda warnings?

A    I have.

Q    Okay.  You're familiar with the State Department form that Mr. Myers asked you about?

A    I am.

Q    Okay.  I'm going to show you.  This is marked Defendant's 3. Do you recognize that to be the US department form that's used?

        THE COURT:  What's the number, counsel?

Q    Defendant's 3, Your Honor.

        THE COURT:  Is that the same as GX 1?

Q    I think it is, Your Honor, yes.

A    Yes, I recognize this form.

Q    Okay.  You were trained on how to use the form?

A    Correct.

Q    And what did that training consist of?

A    The training consists of asking the, when they're taken into custody, we read them and explain their rights to them right off the form.

Q    And were you trained to follow the form in asking the questions?

A    Yes.

Q    And were you trained in following the form in ascertaining whether the person you're questioning understood his or her rights?

A    Yes.

Q    And were you trained in using the form and discerning whether or not, for example, there was a witness to the questioning?

A    Can you repeat that?  I don't understand.

Q    Well, if I can move the form up.  There's a, there's a question under the long line across.  It says, do you understand your rights, correct?  And there's a yes or a no?

A    Yes.

Q    And that's for the person who's being questioned to sign and acknowledge whether they understand their rights, correct?

A    Correct.

Q    And then there's another question on the form that says, are

you willing to waive these rights and talk to me now without a lawyer being present, correct?

A     Correct.

Q     And there's a section which says yes or no.  And the purpose of that form is to ensure that the person you question has the opportunity to say yes or no and write it in there, correct?

A     Correct.

Q     And then there's a form that says there's a signature for someone doing the interviewing, correct, under that?

A     Yes.

Q     And under that, there's additionally a signature for somebody administering the form, correct?

A     Correct.

Q     And you were trained to follow, when you're doing these questions, use all of the form, is that right?

A     Correct.

Q     Okay.  That section, though, wasn't completed when you were, you and your colleague were questioning Mr. Davis, right?

A     Correct.

Q     Okay.

          THE COURT:  Why not?

          THE WITNESS:  Well, Your Honor, we can Mirandize people without the form and advise them of their rights without, without a form.  The form we usually use is, is a formality.  However, when we do make arrests, sometimes we just follow the Miranda

card and we can make note of the date and time that we've Mirandized them.  I've done it that way in the past as well, Your Honor.

BY MR. WALSH-LITTLE:

Q    But you're trained on using the form, correct?

A    Correct.

Q    Okay.  Who brought this particular form on February 8th to the                 address?

A    That would have been Special Agent Tetrault.

Q    Okay.  And on February 8th, did you yourself make any written notations about either the Miranda warnings that were made to Mr. Davis or his statements that were made to you?

A    What do you mean?

Q    Did you yourself ever write or type what occurred on that date regarding the questioning and answers that you testified to about Mr. Davis on February 8th?

A    No.

Q    Okay.  On February 9th?

A    No.

Q    When was the first time that you actually put in writing the questions that you asked Mr. Davis or -- sorry -- asked Mr. Davis and his answers?

A    I actually don't recall the date.  I know that I provided it when we were compiling the documentation.  I provided it to the case agent.  But I don't recall the exact date.  I'd have to --

Q    Was it before July of this year?

A    It could have been in July of this year.  If I can, can I reference my --

Q    Well, here.  I'm going to show you what's been marked Defendant's Exhibit 1.  Do you recognize that?

A    Yes.

Q    And what is Defendant's Exhibit 1?

A    That is the e-mail that I sent to Special Agent Tetrault.

Q    Okay.  And the date on the e-mail was Thursday, July 13th?

A    Yes, I believe so.  The top of it's cut off.

Q    I'm sorry.  Can you see it now?

A    Yeah.

Q    Is it July 13th?  Is that the date?

A    Yes, that's correct.

Q    Is this e-mail the first time you actually put in writing what occurred back in February, when you, you and Officer Tetrault questioned Mr. Davis?

A    Yes.  It was the first time I was asked to put it in writing, correct.

Q    Okay.  Are you familiar with an IMS case report made in this case?

A    I have seen it, yes.

Q    Okay.  If I can just show you what's been marked Defendant's 2.  Do you recognize --

          THE COURT:  I'm sorry?

Q     This is the top of defendant's, marked Defendant's 2.  Do you recognize that?

A     Yes, I do.

Q     And who prepared that form, that is Defendant's 2?

A     It would have been the case agent, Jeff Tetrault.

Q     Okay.  So when you arrived in February at the ▮▮▮▮▮▮▮ address, you testified, when Mr. Myers was asking questions, that the defendant answered the door, is that correct?

A     That is correct.

Q     He had pajama bottoms on, but no shirt?

A     That's what I recall, yes.

Q     And from the moment he answered the door, you were with him up until the time that he was processed by the US marshals?  Is that true?

A     Yes.

Q     Okay.  But you also indicated, if I understood what you're saying, that Officer Tetrault did most of the questioning, is that right?

A     Yes.

Q     Okay.  And he was handcuffed immediately, correct?

A     Yes.

Q     Okay.  And then he was taken, if I understood your testimony, to a government vehicle, is that right?

A     Yes.

Q     Is that where the questioning occurred?

A     Yes.

Q     Okay.  You didn't give him an opportunity to go put on a shirt before you questioned him?

A     There was no need for that.  We were serving a warrant.  We brought him out to the car how he was.

Q     Okay.  Where in the car was he when he was being questioned?

A     The back seat.

Q     And where were you in the car when he was being questioned?

A     I wasn't in the car.  We did it from the passenger, rear passenger door.  We were both standing outside the door, with the door open.

Q     Okay.  So you and your colleague were outside the door and he was inside the vehicle?

A     Yeah.

Q     And that's where the, that's when you advised him of the Miranda warnings?

A     Yes.

          THE COURT:  Was the door open or the window down?

          THE WITNESS:  The door was open, if I recall.

BY MR. WALSH-LITTLE:

Q     And at that point and during the questioning, Mr. Davis was handcuffed in the back, if I understood your direct testimony?

A     Yes, I remember it being in the back.  We had made an adjustment, loosened the cuffs.  But I believe he was still handcuffed in the back.

Q    Okay.  Do you recall before Officer Tetrault giving him the Miranda warnings, Officer Tetrault -- Court's indulgence.

THE COURT:  Sure.

Q    Do you recall Officer Tetrault advising Mr. Davis to be truthful in answering any questions or risk additional charges before being given Miranda warnings?

A    I know when we first started questioning the subject, Jeff, we did tell him, hey, you need to, you need to be honest and you need to tell us who you are.  And, yeah.  I remember that.

THE COURT:  Wait.  Let me get that right.  You said you told him he needs to tell you?

THE WITNESS:  Well, when we were talking to him, we said before, before we Mirandized him, just like the report says, you know, we did ask him, hey, who are you?  You know, are you Cheyenne Davis?  We did ask him that.  Yes.

BY MR. WALSH-LITTLE:

Q    Okay.  If I can just move the report up a little bit.  If I can direct your attention to the paragraph starting "upon the initial arrest."  Do you see that?

A    Yes.

Q    It says:  Upon the initial arrest, SSA Tetrault advised subject to be truthful in answering any questions or risk additional charges.  Correct?

THE COURT:  Where are you, counsel?  Which paragraph?

MR. WALSH-LITTLE:  Your Honor, it's Defendant's

Government's 2.  It's the third paragraph down on Page 1.

THE COURT:  Defendant's Government 2?

MR. WALSH-LITTLE:  I'm sorry, Your Honor.  Defendant's Exhibit Number 2.

THE COURT:  Right.  But I was just asking -- okay.  The third paragraph.

MR. WALSH-LITTLE:  The third paragraph starts with "upon the initial arrest."

THE COURT:  Got it.

BY MR. WALSH-LITTLE:

Q    Is that how it happened, agent Wilson?

A    Yes.  Ask that again just so I make sure I'm saying yes to the right thing.

Q    Sure.  So before Mr. Davis was given Miranda warnings, Special Agent Tetrault advised Mr. Davis to be truthful in answering any questions or risk additional charges, right?

A    Yes.  Normally, as federal agents, we advise people when we're talking to them, especially in criminal matters, not to make false statements to us because you can be charged with 1001, making false statements.  As I recall, that was, it was in line with that.

Q    Right.  But the report says that your colleague told him to be truthful, right?

A    Yes.

Q    He wasn't given an option at that point to remain silent,

right?  Nobody told him of that right at that point, correct?

A    That's before we Mirandized him, correct.

Q    Okay.  And nobody told him at that point that he had a right to a lawyer to be present, right?

A    Well, he hadn't been Mirandized yet.

Q    Okay.  And that's --

THE COURT:  Wait.  Let me make sure I understand this.  So it could be the way this is written, but I need to be sure I have the facts right.  So it says here that he was advised to be truthful in answering any questions.  Subject agreed.  Special Agent Tetrault asked subject what was his true and complete name.  Is there a period?  Is that question before he was Mirandized?

THE WITNESS:  We, Your Honor, we, the question that we were asking was the name.

THE COURT:  And that's the key question in the case.

THE WITNESS:  That's the key question, correct.

MR. MYERS:  Your Honor, excuse me.  If I may, to be clear.  This report was not prepared by Special Agent Wilson.  And I'm prepared to put Special Agent Tetrault on the stand afterwards, who did author the report, to clarify.

THE COURT:  Okay.  But he testified.  Obviously, he was there.

MR. MYERS:  I understand.

THE COURT:  So this is still something he can be asked about.

MR. MYERS:  Yes, Your Honor.

THE COURT:  So what his memory is, since he was present the whole time, that's what he said in his testimony.  So my question to you, sir, is, was he asked any questions before he was Mirandized?

THE WITNESS:  Yes, Your Honor.  And the question that was asked was his name.  That was the question key.

BY WALSH-LITTLE:

Q    Sir, how many times have you used the advisement of rights form before February 8th, 2017?

A    Many times.  I couldn't give you an exact number.

Q    Okay.  More than a hundred?  Is that fair?

A    I would say 50 to 75.

Q    Okay. And I'm not holding you to any specific number.  But of those times when you used the form before, did you give the person you were questioning an opportunity to read the rights and to be given the form physically and have an opportunity to indicate whether that person understands his or her rights as the form indicates?

A    I have had that opportunity, previous arrests, yes.

Q    Okay.  And in previous occasions, did you also have the opportunity to give the form physically to the person you were questioning and ask whether they were willing to waive those rights and either check yes or no, as the form indicates?

A    I have.

Q    And again, on the form at least, it indicates a line where there's a signature for the person being interviewed to sign, and a printed name, and then a signature for someone administering the form.  Have you yourself filled that out when you were administering the form?

A    I have in the past, yes.

Q    Okay.  None of those things were done in this case, right?

A    No.

Q    Okay.  And did anybody --

THE COURT:  I was going to ask just a follow-up, if I may.  Was the form ever given to the defendant to read for himself?

THE WITNESS:  It was held in front of his, in front of him.

THE COURT:  So it was held in front of him in order for him to be able to read it?  Is that what you mean?

THE WITNESS:  Yes, Your Honor.

BY MR. WALSH-LITTLE:

Q    Sir, if I understand your testimony, you're outside the vehicle during the questioning, correct?

A    Yes.  The subject was sitting in the rear passenger seat and Agent Tetrault and I were outside the door, facing him.

Q    Okay.  And this is some 20 minutes after he's been taken into custody at 6:15, 6:25 in the morning, correct?

A    Correct.

Q    Okay.  Did, did you or officer -- when Officer Tetrault gave the Miranda advisements, did he give the advisements that are on the top of that form?

A    Yes.

Q    Okay.  Did he ever tell Mr. Davis that at any point in time he could stop answering your questions and he had that right?

A    That's, that's the normal lingo that we use but I can't, all I can tell you is that we went directly off the form.  I don't recall either way.

Q    Going to show you Defendant's 3.  He asked, that is Officer Tetrault asked the questions, the four bullets that are on the top of that form, right?

A    Correct.

Q    Is there anywhere on there that says that even if you start answering questions, you can stop at any time?

A    No.

Q    Anywhere on there that says that at any point in time after being asked questions, the person being questioned can ask for an attorney?

A    Not on this form.

Q    Okay.  And on February 8th, nobody asked Mr. Davis those questions, right?

A    I don't recall.

Q    Okay.  You indicated that Officer Tetrault was, I think your term was, being frustrated with the answers that Mr. Davis was

giving?

A    Correct.

Q    That's because he just wasn't getting the answers that he wanted to get, right?

A    Well, we had the, we had the facts.  That's why we were there serving the arrest warrant and the search warrant.  And we had information.  It was frustrating that he wasn't providing the information.  Absolutely.  That's why we stopped questioning.

Q    Okay.  Because you weren't getting the answers you wanted?

A    I wouldn't word it that way, no.

Q    Why you were frustrated, then?

A    Because the questioning wasn't progressing.

Q    Okay.  You indicated there was approximately 14 officers at the scene, is that right?

A    I said 15.

Q    Fifteen?  Okay.  Court's indulgence.

THE COURT:  Sure.

Q    So before reading the Miranda rights, you asked Mr. Davis his identity, correct?

A    Correct.

Q    And you had been briefed before going to the ███████ location, correct?

A    Correct.

Q    And you understood the government's allegations in regard to this case, correct?

A    Correct.

Q    You indicated that the briefing was done by Special Agent Tetrault, is that right?

A    Correct.

Q    Okay.  After Officer Tetrault read the four rights that are listed on the form, what exactly did Mr. Davis say?

A    What I recall after we read the rights advisement form, he kept continually saying "I am Cheyenne Davis", "I am Cheyenne Davis" over and over again.  That's, that's all he would say, is "I am Cheyenne Davis" over and over.

Q    Did he say anything else?

A    No.  Not that I recall.

Q    He never said "I want to waive my rights and talk to you", right?

A    He continued -- he didn't indicate either way.  He just kept saying "I am Cheyenne Davis."

Q    Okay.  And he didn't indicate "I will waive my rights to an attorney and answer your questions", right?

A    He didn't indicate that he wanted an attorney or did he in the affirmative indicate that he wished to remain silent.

Q    Okay.  And, of course, if you'd given him the form and handcuffed him in the front, he could have answered one way or the other, right?

A    Well, we wouldn't have handcuffed him in the front yet. That wouldn't have been -- he was still handcuffed in the back

per our SOP.  So until we were able to move forward and then get him to a point where we could move his hands to the front, which we did as soon as we could.

Q    Okay.  So after the, after the four rights that are listed on the form are read to the defendant, then the questioning began, right?

A    Yes.

Q    Okay.  Nobody asked him "Do you understand your rights", right?

A    After we -- we did ask him.  We asked the four questions. Do you understand your rights?  And there was no affirmative yes or no.  There was no "I want an attorney."  There was no "I wish to remain silent."

THE COURT:  Wait.  I'm sorry.  I must have misunderstood.  I thought you said earlier that he said he did understand them.

THE WITNESS:  He did.

THE COURT:  So he did say he understood?

THE WITNESS:  Yes.  But there was no affirmative "I want an attorney" or "I wish to remain silent."  That's what, that's what --

BY MR. WALSH-LITTLE:

Q    Was he ever given an opportunity to fill out the form himself?

A    Not during the time that I had interaction with him, during

that brief time from the arrest to the marshal's intake.

Q     And you were with him that whole time, right?

A     Correct.

Q     Now, you indicated, when Mr. Myers was asking you questions, that he, that he additionally made statements to you during the transport to be processed, correct?

A     Yes.

Q     Okay.  And then if I understood your testimony, additionally, while you were processing him?

A     Both occasions.

Q     And you, you inquired as to who he voted for in the last election?

A     I didn't inquire unprompted, if that's -- is what I told Zach was that he kept making inflammatory statements about Jeff and I separating families, how do we sleep at night.  And he insinuated that we were part of the new Trump administration. Following that I asked him if he voted in the last election.  And he stated yes, that he voted in the last election and that he voted for Trump.  And then I followed up that question by asking what identity did you use to vote with?  And he said Cheyenne Davis.

Q     Okay.  And when you asked those, before asking those two questions, either during the transport to the marshals or during his processing, did you ever give him his Miranda warnings again?

A     He was not re-Mirandized.

Q    Okay.  It was the one time when he was in the vehicle back at the Tamar Drive?

A    Upon taking him into initial custody, correct.

Q    Okay.  And then you don't put in writing any of these conversations until July, correct?

A    I was not asked to provide my interaction regarding the inflammatory comments or the voting comments until July.

Q    Okay.  Your Honor, can I have one moment to confer with co-counsel?  Officer, you indicated you had firearms on your person when Mr. Davis was being questioned?

A    Yes, it was in my holster.  I'm right handed, so it would have been on my right hip.

Q    Your right hip.  Okay.  Thank you, Your Honor.  No further questions at this time.

        THE COURT:  Redirect.

        REDIRECT EXAMINATION

BY MR. MYERS:

Q    Briefly, Your Honor.  Special Agent Wilson, were any questions asked of the defendant prior to Miranda other than what his name was, to your recollection?

A    To my recollection, no.

Q    I guess what his name was or if he needed anything?

A    Those, yes.  Correct.

Q    Could Special Agent Tetrault have asked any questions at the initial, at the landing when he was first pulled out?

MR. WALSH-LITTLE:  Objection.  Hypothetical question.

Q    Did Special Agent Tetrault ask any questions that you recall at the landing when he was pulled out?

A    I recall the biographical information regarding the name being the question that was asked.  That's all I can remember.

Q    Okay.  And the first time you were asked to reduce your recollections to writing was on July, or approximately July the 12th of this year?

A    Correct.

Q    And you sent them in an e-mail on July the 13th of this year?

A    Correct.  I sent them as soon as I -- I was outside the country, I was in Pakistan, and I provided that as soon as I returned.

Q    You weren't in Pakistan continuously from February till July?

A    No.  It was May, May through the end of June, into the beginning of July.

Q    Had you participated in the preparation of any reports or in this case in any way sort of between February 8th and when you were contacted in July and asked to write down your recollections?

A    No.

Q    Nothing further for this witness, Your Honor.

THE COURT:  So in other words -- just curious about the

procedure that your agency employs.  If you have contact with a defendant in a case that includes statements made by a defendant, you don't write a report confirming that?  Routinely, I mean.

THE WITNESS:  Under normal circumstances, Your Honor, I would have.  However, I was with, with the case agent when, and he was present during these statements as well.  So I assumed that he was the head case agent, that he was documenting it.

THE COURT:  Is that the same --

THE WITNESS:  But I provided additional documentation, is the way I understood it.

THE COURT:  But was Agent Tetrault with you during the intake process?

THE WITNESS:  Yes, Your Honor.

THE COURT:  So you were never alone with --

THE WITNESS:  I was never alone.  He was with me for the statements in the car because he was the driver of the car on the way to the intake and he -- so we were essentially together the entire time.

BY MR. MYERS:

Q    Special Agent Wilson, between the time that the defendant was first brought to the car and when Special Agent Tetrault returned from the search, you were the only one standing outside the car while the defendant was in the car, is that correct?

A    Correct.  That was, that was my duty, was to watch the subject.

Q    But you weren't interacting with him at that time?

A    No, I was not.

Q    Other than the time you mentioned where you asked if he needed anything or needed to go to the bathroom?

A    Yeah.  Outside the health and welfare, yes.

MR. MYERS:  Nothing further, Your Honor.

THE COURT:  Any recross?

MR. WALSH-LITTLE:  No, Your Honor.

THE COURT:  All right.  Thank you, sir.  You may step down.

MR. MYERS:  Your Honor, I'd like to call Special Agent Tetrault.

THE COURT:  All right.

THE CLERK:  Sir, if you would please come forward. Stand to the side of the witness box, face me, and raise your right hand to be placed under oath.

AGENT JEFFREY TETRAULT, GOVERNMENT'S WITNESS, SWORN

THE WITNESS:  I do.

THE CLERK:  You may have a seat, sir.  Sir, if you would please speak directly into the microphone.  State your first and last name and spell your first and last name.

THE WITNESS:  My name is Jeffrey Tetrault.  First name is spelled J-E-F-F-R-E-Y.  Last name is Tetrault, T-E-T-R-A-U-L-T.

THE CLERK:  Thank you.

MR. WALSH-LITTLE:  Your Honor, could I just ask, I don't know if the government intends to call Special Agent Wilson, but I believe he's in the first row.  So I was going to ask if he has any intention of recalling him.

MR. MYERS:  I hadn't planned to recall him, but I have no problem having him be excused during Special Agent Tetrault's questioning.

THE COURT:  All right.  Sir, if you would step outside.  Thank you.  Okay.  Let's go.

DIRECT EXAMINATION

BY MR. MYERS:

Q    Where do you work, sir?

A    I work for the US Department of State, Bureau of Diplomatic Security.

Q    And how long have you been employed with DSS?

A    Since October of 2005.

Q    What's your title with DSS?

A    I'm a supervisory special agent.

Q    And are you assigned a particular group?

A    I am assigned to the Washington field office where I supervise a unit of criminal investigators.

Q    And what type, what types of crimes do you and your agents that you supervise investigate?

A    Primarily, our nexus is passport fraud, visa fraud, identity theft cases.

Q    And were you the lead or are you the lead criminal investigator in the investigation of the John Doe using the identity of Cheyenne Moody Davis?

A    I am.

Q    And when was this case first assigned to you?

A    This case was first assigned to me in approximately 2014. This case has been ongoing since 2006.

Q    And during your involvement as the lead investigator, prior to the execution of the warrants on February the 8th, 2017, have you had an opportunity to speak with the subject, John Doe?

A    I had not spoken with the subject prior to the arrest on February 8th.

Q    Had other agents spoken with him, to your knowledge?

A    Yes, they did.

Q    And can you describe -- well, first, when was the first time DSS agents interacted with the John Doe?

A    Well, as it refers to the current investigation, it would be June of 2015.  Now, there was an additional investigation on his first passport application that was not accepted for prosecution, and I do not have all the facts for that case.  I only have the facts for the case that one was referred to me, for his second attempt at a passport application.

Q    So during the first investigation, after his first passport application under the name of Cheyenne Moody Davis -- I guess I should clarify now the Court has read the papers -- but just

briefly, how did this investigation first initiate?

THE COURT:  Which one are you talking about?  The original?

Q    How did the use of the identity of Cheyenne Moody Davis to obtain fraudulently US passports first come to the attention of DSS?

A    Absolutely.  In 2006, there was an individual who was incarcerated on the island of Antigua.  It is a foreign country.  It is not a US territory.  And as such, it was a US citizen who was incarcerated.  Our consulate is obligated to go and visit prisoners of US nationality to make sure that there's health and welfare checks being done and that they're being treated fairly based on the Geneva Convention and other conventions that apply for prisoners.  This particular prisoner was asked several questions about his identity.

THE COURT:  How does the Consulate Office know a US citizen is incarcerated?

THE WITNESS:  Well, there's a notification system that's in play for those that participate with treaties and convention for incarceration of foreign nationals.  The United States is a mandatory informed country.  So if you're arrested in any participating country in these conventions, then you have to notify the US consulate that, yes, I have arrested a US citizen.

At that time, we have a department in the consulates, which is American Citizen Services.  What they do is they will go

out to local prisons.  They will check on the welfare of the US nationals, to make sure that they are, A, being treated properly, and also that the sentences are commensurate with the crimes that they've committed.

This particular individual who was incarcerated in Antigua had been arrested for several thefts, including vehicles, and he was given a pretty lengthy sentence of about 11 years.  As normal procedure, they went out to interview this individual, asked him basic biographical questions, his name, where he was born, what kind of identification he had, does he have a passport.  He answered everything affirmatively except for the passport question.  He says, no, I don't have a US passport.

The consulate officer who was interviewing them did record checks prior to his visit, or her visit -- excuse me -- and she noticed that there was a US passport that was issued in the State of Maryland for a resident in the State of Maryland. And the consulate officer proceeded with the normal questioning of did you know you have a passport in Maryland?  Have you ever lived in Maryland?  Well, the prisoner answered negatively, saying, no, I've never been to the United States except for when I was a child, and I didn't need a passport at that point.

So at that point they called in our regional security officer.  And they also went to the jail and interviewed the subject, this person who was incarcerated in Antigua.  He confirmed with him that, no, I never applied for a passport.

They showed him some documentation.  That's not my license. That's not my image.  I've never been to Maryland.

At that point, the regional security officer referred that case to the Washington field office.  And this is in 2006. That application for the passport was actually processed and the defendant did receive that passport in 2001.  So we weren't even notified about it until five years later.

At that point, the initiation, an investigation was initiated.  It was a thorough investigation.  We presented it for prosecution in this district.  However, it didn't meet a threshold for prosecution at that time.

And what was the concern was the amount of fraudulent credit card activity and other financial losses that the true identity may have suffered.  They didn't believe it was worthwhile in prosecuting it at that point.

At that point, we simply made notifications in our system so that he could not get another passport or renew it, and then also revoked the 2001 passport, as well as other law enforcement databases.

Lo and behold, in 2011, the defendant again applied for a, he applied for a renewal of that original passport.  We were notified promptly since there was a lookout in the system.  The case was worked for about two to three years before I was able to, before it transferred over to my unit.  And we saw that there really hadn't been a lot of interviews and that the subject may

still be local.  We didn't know.

That's when I assigned two, two agent to begin a new investigation.  I did not want this to go without a thorough investigation again.  And at that point, I was supervising it.

The two agents that worked the case did a very good job.  They ran several interviews.  They ran as many leads as we could possibly get in our foreign countries to see if we can find the true identity of the individual who's at the defendant's table.  But, unfortunately, in the Department of State, they rotate every two years.  Now I'm a criminal investigator supervisor --

THE COURT:  Who rotates every two years?

A    It's our agents that are in the foreign service.  They have assignments that last for two years at a time, so I have a very limited window for assignments on cases.

Well, this one, they did a substantial job of uncovering a lot of information we did not have on the initial case.  So then I took on the case myself and I said I'm going to talk to the U.S. Attorney's office and see if there is a reason, if there is a way that we can get this case accepted for prosecution because, unfortunately, that was the only way to get resolution, either through an immigration enforcement action if the defendant turns out to be a foreign national, and also to bring justice to the true identity in Antigua, who was getting out of jail at the time, who was going to use his identity to

obtain some credit, which he couldn't at this point because his credit was too bad based on the actions that we observed from the defendant.

At this point, a conversation was had with the U.S. Attorney's office.  And they advised us, AUSA Ayn Ducao, she said, well, one thing we can do at this point, if you can find the true ID -- I said I could because we were notified that he was released from prison -- and also a close relative, mother, father, sibling, aunt, uncle.  I was able to find both -- the true identity and the mother of the true identity.  We had them flown up here for testimony that they provided to the grand jury.

At that point, we were able to develop a significant amount of probable cause that the individual at the defendant's table is not Cheyenne Moody Davis.  And subsequently, we began the investigation with the enforcement actions, which resulted in a search warrant and the arrest.

Q    Special Agent Tetrault, before you were the lead investigator, you mentioned that you had assigned other agents of yours to conduct the investigation.  You said that during their investigation following the second passport application, that an interview was done of the subject?

A    That's correct.

Q    And to your knowledge -- have you seen the reports that those agents wrote of those interviews?

A    I have it in front of me.

Q    And during the course of these interviews, did, did they take place in custody?  Was the defendant arrested?

A    He was not in custody.

Q    And was he read his rights by the agents at those times?

A    He was --

MR. WALSH-LITTLE:  Objection.  Relevance.

THE COURT:  Well, I think it's relevant.  I don't know when it took place.  I don't think you've asked for the date yet.

BY MR. MYERS:

Q    I'm about to, Your Honor.  When did the first interview of the defendant by the special agent take place?

A    The first interview -- and this is based on the report I'm looking at.  There may have been other times prior to this that there may have been some contact.  But the first sit-down interview in his residence was June 20th of 2015.

Q    And during that interview were --

THE COURT:  You say the defendant's residence.  Is that the same apartment on ▊▊▊▊▊▊ in Columbia?

THE WITNESS:  I'll be able to verify that.  One moment, please.  I'm sorry.

Yes.  It was at ▊▊▊▊▊▊▊▊, Columbia, Maryland, zip code 21045.

BY MR. MYERS:

Q    And based on the reports and the conversations that you've had -- and which agents conducted that interview?

A    This was Agent Eric Molitors and Agent Jason Santiago.

Q    Have you talked with those agents about their investigation in this case?

A    Extensively.

Q    As well as reviewed their reports?

A    Yes, I have.

Q    These are two agents that you supervised at the time?

A    I did.

Q    And did, based on that information that you've obtained from them, were Mr., were John Doe's rights read to him during that initial interview?

A    Yes, they were.

        MR. WALSH-LITTLE:  Objection.  Objection, Your Honor.

        THE COURT:  On relevance?

        MR. WALSH-LITTLE:  On relevance.  What is an interaction in 2015 between two officers, other than the witness, what does that have to do with what happened on February 8, 2017?

        THE COURT:  Overruled.

BY MR. MYERS:

Q    You may answer the question.

A    Yes.  He was read his rights.

Q    And he agreed to speak to those agents at that time?

A    If I may read from the report.

Q    Please.  And this is a report that you provided to me to provide in discovery?

A    Correct.  SA Santiago took out two pieces of paper each with a black and white DSS logo.  The first form was entitled Your Rights, period.  SA Santiago, in the presence of SA Molitors, presented subject Davis lines 1 through 4 with reference to before we ask you any questions, you must understand your rights, period.  Subject Davis understood these rights, read them, and signed the form.

        Next, SA Santiago provided subject Davis with a DSS form number 7687 entitled False Statement Warning.  SA Santiago, in the presence of SA Molitors, presented subject Davis lines 1 through 4 with reference to Title 18 United States Code Section 1001, false statements.  Subject Davis understood these rights, read them, and signed the form.

Q    And by "subject Davis", then you're referring to the defendant, who was using the identity of Cheyenne Moody Davis?

A    That is correct.

Q    And was -- and following those advisements, he agreed to speak to the investigators?

A    He did.

Q    And that, and after that conversation, they left him and left the home?

A    They did.

Q    And was there any indication during that conversation that they'd like to speak to him again?

A    Yes.

Q    And did he understood, was he made aware of the nature of the investigation, that the DSS believed that he had applied for a passport using the identity of an American citizen that was not him?

A    He was advised fully.

Q    And was a follow-up interview done after that initial interview?

A    I believe there was a second interview that was conducted. And it was in the parking lot of a Sears department store that was close to the ████ ██████████ address.

Q    And based on your participation in this investigation, was at that time the subject working at that Sears?

A    I don't believe he was.

Q    Working near the Sears?

A    He was working at a Weis supermarket near, within the same, within the vicinity, but not very close.

Q    Had he previously worked at Sears, I guess is maybe where I'm getting confused.

A    Our investigation indicated he did work at Sears. And that was also confirmed with the testimony of a mother of one of his children.

Q    And during this second interview, did he, the interview in the parking lot, did he again persist in the identity of Cheyenne Moody Davis?

A    Yes, he did.

Q    And did he make statements about whether he could provide documents to support that claim?

A    I don't recall the specifics in that report without it being in front of me, but there was --

THE COURT:  What was the date, did you say?

Q    Do you have your search warrant affidavit in front of you, Special Agent Tetrault?

A    I have it in my notebook.  At the prosecution's table.

Q    If I can bring the witness his notes, Your Honor?

THE COURT:  Sure.  But do you know the date of the second interview?

THE WITNESS:  It was shortly thereafter the June 20th interview, within the same year.  I would estimate, guesstimate within 60 to 90 days from that initial interview.

BY MR. MYERS:

Q    Now, did you -- you previously heard testimony from Special Agent Wilson about the execution of search warrants at his residence on February 8th.  Were you the affiant for the affidavit in support of those search warrants?

A    Yes, I was.

Q    And the information that you testified about previously today summarizing the investigation, is that information also in your search warrant affidavit?

A    It is.

Q    Sum and substance?

A    The probable cause argument is in there, correct, as I stated it.

THE COURT:  Including, as I recall, that the first investigation did not culminate in approval for prosecution.

THE WITNESS:  That is correct, Your Honor.

BY MR. MYERS:

Q    So you made sure that the judge who was making a determination as to whether or not there's probable cause was made aware of the fact that my office previously decided that, at that point, it didn't meet our standards for prosecution?

MR. WALSH-LITTLE:  Objection.

A    That --

MR. WALSH-LITTLE:  Your Honor, what does this have to do with whether or not the statement --

THE COURT:  Well, you asked for a <u>Franks</u> hearing.  So one of the glaring things I thought was, when I read, first, your memo, and then looked at the search warrant, was that I thought you were going to argue that they didn't disclose that there had been a rejection of the first application.  So it's, in fact, in the search warrant application.

MR. WALSH-LITTLE:  Yes, Your Honor.  I didn't realize we were now moving on to the --

THE COURT:  We're not, but I'm just asking the question.

MR. WALSH-LITTLE:  I mean, I think our argument at that

stage --

THE COURT:  I don't know what your Franks argument is, actually.

BY MR. MYERS:

Q    Sorry.  I didn't mean to cross the streams there, Your Honor, between the two different motions to suppress.

To refresh your recollection, I'd like to direct your attention to Paragraph 20 of your search warrant affidavit, which is on Page 8 of the affidavit.

A    Give me one moment to get to it.  Paragraph 8?

Q    Paragraph 20 on Page 8.

A    Yes, I have it.

THE COURT:  For the record, this is ECF 37-1.  Are you offering it, counsel?

MR. MYERS:  I am because I was going to have to offer it, anyway, for when we were talking about the motion to suppress.

THE COURT:  Okay.

BY MR. MYERS:

Q    So I would offer ECF 37-1 as Government's Exhibit 2.  And I guess, stepping back a second, if you go back a page to Paragraph 18, is that the paragraph summarizing what you previously testified to about the June 2015 interview of the subject at his home?

A    That is correct.

Q    And then --

A    That is Paragraph 17.

Q    And at that time, the questions that you asked then or the questions that he was asked then in terms of his biography, his family, his identity, are those similar to the questions that you asked him again at the time of his arrest?

A    They were more intrusive than the questions I asked him at his arrest.

Q    And so at that time, the defendant, at the time of his arrest, the defendant had twice been interviewed by DSS agents about these same topics before?

A    That is correct.

Q    And had twice been advised of his rights -- well, December 29, 2015, is that a correct date of the second interview?

THE COURT:  I'm sorry.  What's the date?

Q    December 29th of 2015.  Six months after the prior one?

A    That is correct.  It was longer than the 90 days I initially gave the Court's answer.  So yes, December.

Q    And your statement in the affidavit is based on your review of the reports, knowledge of the investigation by the agents you're supervising, and conversations with them?

A    That is correct.

Q    And so at that second interview with DSS, he was again asked about his identity and about evidence he could provide supporting it?

A    That is correct.

Q    And he stated that he wanted to relocate the -- did the defendant ask to relocate the interview, the second one?

A    He did.  He, he indicated that he wanted the presence of his current wife to be present during the interview, which my agents agreed to and allowed him to relocate.

Q    And at some point during that question, during that questioning the second time, did the defendant become uncooperative?

A    It originally was reported to me through my agents that his wife became combative, at which point they withdrew.

Q    The agents withdrew?

A    Absolutely.

Q    And so that questioning was terminated?

A    It was terminated.

Q    And again, he was not arrested?

A    He was not arrested.

Q    And that was more than a year prior to the execution of the warrants in this case?

A    Yes.

Q    And more than a year prior to his indictment and arrest?

A    Yes.

Q    Now, the initial indictment that was returned against the defendant, you testified -- you were involved in bringing that indictment to the grand jury, were you not?

A    That is correct.

Q    What were the charges in the initial indictment?

MR. WALSH-LITTLE:  Objection.

THE COURT:  What's the relevance of this, counsel?

MR. MYERS:  So what I'm getting to here, Your Honor, is the question that was raised with the prior witness as to why the statements made during processing and during transportation were not in the initial report and were not added to the report until it was amended in July, soon before the defendant's superseding indictment was brought.  Because the subject matter of the charges of the superseding indictment, I would proffer to the Court, is what prompted memorializing those statements and making sure they were disclosed to the defense so they could have the opportunity to suppress them here, as they have done.

THE COURT:  All right.

BY MR. MYERS:

Q    So what were the charges in the initial indictment?

A    The charges in the initial indictment were Title 18 United States Code Section 1542, one count for false statements in a passport application, and one count of 18 United States Code 911, false claim to US citizenship.

Q    And at some point this summer was this case, you testified earlier that you had been working with Special Agent Ayn Ducao (sic), at some point this summer was this case transferred from AUSA Ayn Ducao to myself?

A     Yes, it was.

Q     And in meeting with each other to talk about a potential superseding indictment, did you raise the statements that the defendant had made with regards to voting in the election?

A     Only at that time.  I did not even initially even consider any charges regarding voting fraud prior to our first conversation.

Q     And after you and I discussed the information that was obtained during the execution of the search warrant and then you disclosed to me those statements with regards to his voting in the 2016 election, at my direction did you then update the report to include the additional statements by the defendant?

A     Yes, I did.  And I spoke with Special Agent Ryan Wilson at the time in the presence of my supervisor, ASAC David Walsh, and I told him to produce a statement to the best of his recollection of statements made during the processing at the US Marshal Service on February 8th.  Special Agent Wilson complied and he sent me the e-mail that was already exampled as an exhibit.

Q     And as you testify here to the Court today, understanding that everyone has their only memory of the events, and you heard Special Agent Wilson's testimony, is his testimony with regards to the statements made in transportation of the defendant and during the processing at the Marshal's comport with your recollection?

A     They do.  They do.  There's nuances, obviously.  People

recollect things differently.  And he's in a different position than I am in the car.  I'm driving.  I'm focusing, making sure that the defendant gets to processing center safely.  So things that he heard I did hear.  But I let him make his statement independently from any, any inference that I had or my memories of what happened at the processing center or what we spoke about during his initial reading of <u>Miranda</u>, which he was there.  And that actually comports exactly with what I remember as well.

Q   Now, turning back before the reading of <u>Miranda</u> on February the 8th of 2017.  Were any -- what questions -- sorry.  Let me put it this way.  Were you present on the landing outside the apartment when Special Agent Wilson pulled the defendant out and handcuffed him?

A   Yes, I was.

Q   And did you ask the defendant any questions at that time?

A   I asked the defendant one question right off the bat as we were entering the apartment.  We had indications that there was a firearm.  And this evidence came to our, our attention as we reviewed previous arrests of the subject.  And at one point his wife made a statement to the Montgomery County Police Department that there was a firearm involved or he may have owned a firearm. We couldn't confirm that.  So we asked him, I asked him personally is there a gun in the house, where's the gun.  And he answered negatively, saying there is no gun.

Q   And were you asking this question in the context of the

protective sweep of the apartment?

A     Yes, I was.

Q     And for the purpose of officer's safety as this search warrant was executed, with other civilians in the home?

A     Absolutely, as a standard operating procedure for us clearing a residence.

Q     And at that initial interaction with him, did you ask the defendant what his name was or to identify himself?

A     I did ask him to identify himself.

Q     And how did he identify himself?

A     Cheyenne Davis.

Q     And besides the question about where the firearm was located as you're executing a search warrant, and what his identity was, did you ask any further questions or did anyone in your presence ask any further questions of the defendant prior to you reading him his Miranda rights?

A     No.

Q     Turn your attention to what the government has introduced as Exhibit 1.  You recognize this form?

A     I do.

Q     And do you recognize the handwriting on this form?

A     Yes, I do.  That is my handwriting.

Q     And the form indicates 062500 hours.  What does that time indicate?

A     That is 6:25 in the morning.

Q     And is that on February 8th of 2017?

A     Yes, it was.

Q     Now, the checkmarks that are next to the four bulleted-point rights, who you made those checkmarks?

A     I made those checkmarks.

Q     Can you explain to the Court the context in which you were making those checkmarks?

A     As I'm talking to the defendant, as he's sitting toward the edge of the vehicle in the passenger seat, the door is open, Agent Wilson is to my left, and I am looking directly at the defendant with this piece of paper in my hand, I read off these four bullet points with him in plain sight of this document, looking at it.

I say:  You have the right to remain silent.  I check that off.  I ask:  Anything you say can be used against you in a court of law.  I check that off.  As the defendant is watching, you have the right to consult with a lawyer before questioning and to have a lawyer present during questioning.  I check that off.  If you cannot afford a lawyer, one will be appointed to represent you free of charge prior to any questioning.  I check that off as well.

I asked him does he, does he understand these rights. And he answered in the affirmative yes.

Q     Now, the other question that is on the form, are you willing to waive these rights and talk to me now without a lawyer being

present, did you explicitly ask him that question?

A    I did not.

Q    And do you recall why you did not?

A    Subject was handcuffed in the back for transport.  We had no intention of doing a formal interview of the subject at that point since he was not going to give me the identity, that we weren't aware of but we know he is not Cheyenne Davis.  We are firm on that and our probable cause argument does prove that.

We were not going to get into a full conversation of questioning at that point.  We're simply transporting him to the Marshal Service to make his initial appearance.  And the only questions we asked were simply to determine his identity.

Q    And --

THE COURT:  Isn't that the heart of the case?

THE WITNESS:  Yes, it is the heart of the case.  And it's unfortunate for us that if we cannot ask a subject's identity, then I cannot determine he's Cheyenne Davis or somebody else who just looks like Cheyenne Davis at the point of his arrest.  Could he have a twin brother?  Says, no, no, you're looking for my twin brother.  I don't know that.

I'm not familiar, if we can argue that he has the right not to self-incriminate because my charge is that he's making a false claim on his name?  No.  My claim is that he illegally applied for a US passport using somebody else's identity and that he's not a US citizen.  It wasn't that he's not Cheyenne Davis.

My, my complaint is based on his passport application and his claim to US citizenship.

BY MR. MYERS:

Q    And did you, during the initial interview following his Miranda rights, did he indicate to you that he did understand his rights?

A    He did.

Q    And was he -- did you ask him again about his family, his siblings?

A    I asked him again his name.  What is your name?  I'm Cheyenne Davis.  Can you tell me your brothers' and sisters' names?  First question I asked.  Yes.  Please tell me your brothers' and sisters; name.  He answered in the affirmative that he could answer that question.  He then began to say Mack or Mackey, which is the brother of the true identity.  But he was failing to answer the question about his other siblings that we already knew about, the sisters.

We also asked, I asked him specifically, where is your father?

THE COURT:  I though Mackey was the father.  Is he also a brother?

THE WITNESS:  Excuse me, Your Honor?

THE COURT:  I thought I remembered that Mackey was the father.

THE WITNESS:  You're correct.  It's the name he gave

one of his sons as well.

THE COURT:  Okay.

BY MR. MYERS:

Q    And the name of the father, Mackey Moody Davis, is that on the birth certificate of the true identity?

A    It is.

Q    And that birth certificate, what jurisdiction is it from?

A    That is from the US Virgin Islands.  I believe it was issued out of St. Thomas.

Q    And does that birth certificate indicate the true name of the father and mother of the actual Cheyenne Moody Davis?

A    It does.

Q    And when you questioned the defendant or when the defendant was questioned previously, did he know those names?

A    He did know those names.

Q    Was a copy of that birth certificate recovered from his home during the execution of the search warrant?

A    It was.

Q    Did the defendant, in response to your question, provide any of the names of his brothers or sisters other than the one that matches the father that's on the birth certificate?

A    He was unable to answer those questions correctly based on the knowledge that we had.  As a matter of fact, he did not answer with the names at all.  There was no names given.

Q    Did he, did he -- was he able to identify any other

relatives of his?

A    He mentioned that he was closest with one of his aunts.  And I asked:  Are you able to provide the name of your aunt?  Yes.  But then he was unable to answer that question.  He didn't give us an answer to that question.

Q    When you say he was unable to, do you mean he said yes, he could, and then didn't further speak or --

A    Yes, he could.  Excuse me.  He said yes, he could, and then remained silent.

Q    Did he speak any more after that?

A    No.  At that point I terminated the questions.  And I, we asked him again about his comfort and that we'll be going to the US Marshal's for processing at that point.

Q    Before asking him about his aunt and then terminating the interview, did he, did you ask the defendant about the father of the true Cheyenne Davis?

A    We did.

Q    What did you ask him?

A    I asked him where his father was.  The defendant answered that he was in Florida.  At that point, I gave a statement.  Are you aware that your father is deceased?  This is the true ID's father.  I know it's not his father.  And he did not answer that question.

Q    And he did not answer it or he did not answer it correctly?

A    He didn't answer it at all.  I simply made the statement:

Are you aware?  Yes, it's in the form of a question, but it was rhetorical.  He did not answer that.

Q    During the course of all these discussions, did he ever, did the defendant ever indicate to you that he wished to remain silent?

A    No.

Q    Did he ever indicate to you that he wished to consult with a lawyer before his questioning?

A    No, he did not.

Q    Now, you testified that you terminated the questioning.  Did the defendant ever indicate to you that he wished to terminate the questioning?

A    No.  He did not.

THE COURT:  Did he know that he could?

THE WITNESS:  I cannot answer that for the defendant, Your Honor.

BY MR. MYERS:

Q    You mentioned that previously he had been advised, you referred to as a form that gives the 1001 advisement about false testimony with a federal law enforcement officer.

A    That's correct.  Form number 7687.

Q    Now, did you use that form during this interaction on the day of the arrest?

A    No, I did not.

Q    But are you very familiar with that advisement?

A    I am.

Q    And during, in the course of providing the advisement of rights to the defendant, did you also advise him as to the potential additional charges should he make false statements?

A    I simply provided him the information that a false statement to a federal agent could result in a charge of 18 USC 1001.

Q    And during -- you said this conversation lasted approximately five minutes?

A    Less than five minutes.

Q    During that conversation, did you ever raise your voice at the defendant?

A    No.

Q    Did you make him any promises of anything?

A    Absolutely not.

Q    Did he appear to you to be coherent or not under the influence?

A    He did.  He was very calm.

Q    Did he appear to be confused about what was going on?

A    He was asking about the charges.  We explained them.  But he was very cooperative.  He did not resist at all.  And he seemed very calm through the entire process.

Q    And were your weapons holstered?

A    Yes, they were.

Q    And were you or Special Agent Wilson disrespectful to the defendant?

A    Absolutely not.

Q    Were you aggressive in your questioning to him, from your point of view?

A    No, not at all.

Q    During transportation of the defendant, Special Agent Wilson -- well, setting aside for his testimony.  When you were transporting, when you were driving, were you aware of the defendant making any additional statements?

A    I am not.  I couldn't hear over the sound of the air conditioner or the blower that was on.  So I wasn't aware of any conversation that was had with them in the back seat.

Q    When did you first learn about the conversation or the statements that the defendant had made in the back seat of the car during transport?

A    As we arrived in the processing center, the sally port.

Q    And did he continue to -- and Special Agent Wilson told you about those statements at the time?

A    Yes, he did.  Yes, he did.

Q    Did the defendant, during processing, continue to make similar statements?

A    He did.  He was attempting to initiate conversation with us. And the initiation was with me as I'm standing in front of him, telling the US Marshal to enter his arrest record as a John Doe. I wanted that specifically on the record to know that do not put him in as Cheyenne Davis for the reason is that there is a

Cheyenne Davis with an arrest record out there for the true identity. And this would help us in our IAFIS search of his fingerprints when they're entered in.

At that point, the defendant looked at me and he says, "How do you feel about breaking up families?" I simply looked at the defendant and I said, "Sir, please do not take this personally at all. It's simply enforcement of the law and this is my job." And at that point he began the back and forth with myself, and Agent Wilson as well, about working for the new administration, and if this was an initiative that the president was aware of, or something to that effect. I could not say it specifically, which we really did not engage him on those conversations.

Until he invoked the president's name, that's when Agent Wilson asked him, "Did you vote in this election?" And the defendant freely stated, "Yes, I did." He asked him, "Did you vote under the Cheyenne Davis name?" He goes, "Of course, because that's who I am." And then he asked him who he voted for. And he says, "I voted for Trump, of course."

Q    And you said that that conversation was initiated by the defendant?

A    It was initiated by the defendant.

Q    And when did that take place?

A    At the proximate time -- we left at, it was about 9:15. I'm going to make an estimate without looking at my arrest report,

because the office opened up at about 9:00.  So we were one of the first groups there to process our prisoner.

Q    And how long would you say that interaction and processing took?

A    Less than five minutes.  The marshals were very efficient. We did our DNA test.  And he was back in a cell or talking with Pretrial Services within 10 minutes of arriving at the sally port.

Q    And at that time, what is the policy with regards to memorializing your reports and getting them into the system?

A    Within 24 hours of any activity -- surveillance, arrests, anything along those lines, interviews -- we have 24 hours to type those reports up and then enter them into our Investigative Management System.

His arrest report was compiled and put within the system within the time frame allotted.

Q    And the initial arrest report that you drafted, did that include reference to the statements that were made in the back of the car or in processing?

A    I believe the initial arrest report did have a mention of the statements that he made in the Marshal's processing.  I would have to look at it exactly.  But I know I mentioned it because I felt it had some relevance.  At this time, we had not charged him with anything related to voter fraud.  We simply found a voter identification card, a voter ID, in the search of his residence

and we entered it as a piece of evidence into our DSEP system as we would anything else, simply in my mind was just to further his, his involvement in the Cheyenne Davis, Cheyenne Moody Davis identity.

Q    Sorry, sir.  Stepping back to my prior question.  Take a moment to review your initial IMS report before the addendum if you need to.

A    Can you put that on the screen for me, sir?

Q    Sure.  I mean, this is the same report, although it has some handwriting on it, that was introduced as a defense exhibit.  So on page, at the bottom of Page 2 of that report, on discovery it's R-085, bottom of second page of Defense Exhibit 2, see at the very bottom there that line, addendum to original arrest report?

A    Yes, I typed that in myself.

Q    So then everything on the next page starting with, starting with "upon briefing AUSA Zach Myers regarding the statements", so everything that's after that, both the summary of your recollection as well as the e-mail and Special Agent Wilson's recollection, that was added in after our first initial conversation?

A    The first two paragraphs are mine.  I authored those verbatim.  The line prior to "on February 8th", I also authored that line.  And that line from that -- from that on February 8th down is just a cut and paste from the e-mail that Ryan Wilson

sent to me per my request.  The report was amended and it was also approved by my Assistant Special Agent in charge, my boss, Dave Walsh, and he knew exactly what we needed it for, per the request of the U.S. Attorney's office for the consideration of an additional charge.

Q    Now, when you read the defendant his rights when he was in the back of the car, why didn't you have him complete the rest of the form?

A    The subject was handcuffed for transport.  It was not conducive to conducting any kind of interview, for the defendant's benefit or ours, because it was an uncomfortable position.  I could imagine being arrested in front of your residence and be transported.  My goal was to get him to the processing center as soon as possible, not to answer questions about specifics on this case.  We simply asked the questions of identity to determine, A, we had the right person, and B, if he was going to come out and say that, yes, I'm this person, then we would have immediately at that point sat down for a full interview if he was willing to give a statement with the Miranda warnings filled out exactly as they were on the previous interview that he did sit down to, and he did want to talk to the agents, but he wasn't being truthful on that initial interview back in June of '15.

        So, no, we did not sign that because it was not conducive to take his handcuffs off in the middle of the street,

bringing him out of a vehicle in which he was secured, a few minutes before transport.

Q    No further questions.

THE COURT:  Why didn't you sign it, though?

THE WITNESS:  I put the initial notification on the top of it as an indication to me for my arrest report.  Now, I'm going to stand behind the arrest report before I would a Miranda card that's separate from my actual case file.

The Miranda files that we have had with Diplomatic Security over the years, they've evolved.  Maybe they need further evolvement.  But as I read those rights, I've also had the same rights printed on a card previous to this arrest and several other arrests I've done where we didn't have the fill-out form before.  So that is something that the Department of State has introduced but it hasn't been a formalized SOP.  And I know that Agent Wilson stated that it was.  But as a supervisor, I can attest to it that, no, it is not a formalized SOP.

We have to understand when Miranda is appropriate.  And if it's cops questioning in custody -- in this case it was -- I did read him the verbiage that was approved for my department to begin at least a minimal conversation, which was to prove identity.  Anything more involved than that, of course, we would have sat down, we would have involved the other form as well, the false statement form, when we had something, an environment that was more comfortable.

The defendant did not indicate that he wanted to talk other than to say that he was Cheyenne Davis.  At that point, I'm giving it as a formality, saying, you don't have to say anything to us.  Here are your rights.  I'm going to check them off as I read them to you.  And I simply indicated with Ryan Wilson, Agent Wilson, next to me, saying, Ryan, "I'm reading him his rights at 6:25."  He says, "Copy that."

BY MR. MYERS:

Q    Now, to be clear, because you had said about him not talking.  Is it that he was refusing to talk or refusing to provide answers that, based on your investigation, you knew to be truthful?

A    Providing any answers to his identity other than the name Cheyenne Davis.

Q    Thank you.  No further questions.

THE COURT:  All right.  Counsel and court reporter and courtroom deputy, defendant, does anyone need a break?  We'll take a brief recess.

(Recess at 11:46 a.m. Resume at 11:54 a.m.)

THE COURT:  Cross examine.

CROSS EXAMINATION

BY MR. WALSH-LITTLE:

Q    Thank you, Your Honor.  Agent Tetrault, when Mr. Myers was asking you questions, you mentioned I think it was Form 7687, is that correct?

A    It would be form -- you may be correct.  I think it's a different form number.

Q    You're referring to your case report?

A    I'm referring to the interview report that was completed by my two agents back on June 20th.

Q    Okay.  There's a -- I guess my question is there is a form within the State Department in which an agent can use to notify a person being questioned that if they give false statements to a federal officer, that's a crime, is that right?

A    Yes.  And you're correct.  It is Form 7687.

Q    Okay.  And that's a form that a federal officer could bring with him and use to make those advisements, is that right?

A    Yes, they could bring that with them, yes.

Q    Okay.  Did you have that with you on February 8th, 2017?

A    No, I did not.

Q    Okay.  And Mr. Myers asked you about Defendant's Number 2, which is a three-page IMS case report.  Here's Page one1.  If that refreshes your recollection.  I am not ready to put this -- see if I can move it out for you.  Are you familiar with that form?

A    I am.  That's my arrest report, with the addendum for the statements made in the US Marshals' presence.

Q    Okay.  And that's a three-page form, is that right?

A    I believe it's three pages, yes.

Q    Okay.  And you filled that out?

THE COURT:  It's not a form, is it?

A    It's simply a report, Your Honor.  I believe it's three pages in length.

Q    Okay.  And you filled that out?

A    I did, yes.

Q    And everything in there is truthful and accurate about what happened on February 8th and your investigation of the case?

A    Absolutely.

Q    Okay.  Your Honor, I have no further questions of this witness.

THE COURT:  Any redirect?

MR. MYERS:  No, Your Honor.

THE COURT:  Thank you, sir.  You may step down.

THE WITNESS:  Thank you.

MR. MYERS:  At this point, I don't know how the Court wants to proceed in terms of either argument on this motion or if you want to proceed to consideration of the defendant's motion to suppress the fruits of the warrant.

THE COURT:  Well, I think the first thing would be, while we're on this motion, to find out if there's a defense case.

MR. WALSH-LITTLE:  No, Your Honor.  We aren't calling any witnesses on the motion to suppress the statement.

THE COURT:  Okay.  And would you like to advise your client?

MR. WALSH-LITTLE:  Yes, Your Honor.  Stand up, Mr. Davis.  So as you know, we're here, and Her Honor's going to make a decision whether your statements are admissible when we have the trial in this matter.  You have the right to testify if you wanted to.  Okay?  If you chose to testify, then Mr. Myers could ask you questions about the issues that are relevant to the hearing.  You also have the absolute right not to testify.  Do you understand that those two rights are opposite, but you have both of those rights?  Do you understand?

THE DEFENDANT:  Yes.

MR. WALSH-LITTLE:  Okay.  And do you wish to testify in this hearing?

THE DEFENDANT:  No.

MR. WALSH-LITTLE:  Okay.

THE COURT:  Well, I would just add --  and, counsel, if this is inaccurate, please correct me -- but in regard to your right to testify, sir, anything that you say at this hearing could not be used against you at a trial in this matter unless it were determined that you were to testify falsely.  Then your statements could be used to impeach you.

MR. WALSH-LITTLE:  Yes, Your Honor.

MR. MYERS:  Your Honor, my understanding is if he chooses to take the stand at this hearing, then we could use his statements against him.

THE COURT:  That's not my understanding.

80

MR. MYERS:  I could be wrong, Your Honor, without having to chance to look --

THE COURT:  Maybe I'm wrong.

MR. WALSH-LITTLE:  My understanding is it would be limited to the issues on the motion.  I think either way, I don't think Mr. Davis wishes to testify.

THE COURT:  Okay.  Well, it's important that I get it right, though, because I wouldn't want a problem down the road.

MR. WALSH-LITTLE:  Yes, Your Honor.

MR. MYERS:  I defer to the Court, Your Honor.

THE COURT:  I need to have an answer to that question.  It's always been my understanding that unless he were deemed to testify -- for example, what I mean -- and if this isn't accurate, correct me.  If he doesn't testify at the trial, the government cannot get a transcript of this, of his statements here and try to introduce them at the trial.  Are you saying the government could do that?

MR. MYERS:  No, I'm not, Your Honor.

THE COURT:  That's what I thought you were saying.

MR. MYERS:  My apologies.

THE COURT:  Okay.  So it's only if this case went to trial, sir, and you had chosen to testify here today, if you took the stand at the trial, the government could, if appropriate, attempt to impeach you with something that you might have said at the hearing today that is inconsistent with what your testimony

81

is at trial.  Is that accurate, counsel?

MR. WALSH-LITTLE:  I believe so, Your Honor.

MR. MYERS:  I believe so, Your Honor.

THE COURT:  But the government cannot order a transcript, for example, of today's testimony.  If you chose to testify today but chose not to testify at the trial, the government can't, for example, get a transcript of what you say today and then introduce it in its case in chief at the trial itself.  That's what I meant by it can't use it against you at the trial.  Is that accurate, counsel?

MR. WALSH-LITTLE:  Yes, Your Honor.

MR. MYERS:  That's my understanding, Your Honor.

THE COURT:  Did you understand what I said, sir?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, with what your lawyer said and what I added, do you wish to testify?

THE DEFENDANT:  No.

THE COURT:  Okay.  All right.  Well, then, just for expediency, I think just to make sure I have any, if there's any evidence, that I have it all in and then we can go to argument. I think that would make the most sense.  We can argue, that is to say you all can argue on the motions after all evidence is in.

So is there any evidence with respect to the search warrant?

MR. WALSH-LITTLE:  No, Your Honor.

MR. MYERS: No, Your Honor. The government would rely on the four corners of the warrant.

THE COURT: Okay. And the defense as well?

MR. WALSH-LITTLE: Yes, Your Honor.

THE COURT: Okay. Well, then, I guess we are at the point of argument. Since you have the burden on the statement, counsel, would you like to go first on the statement?

MR. MYERS: Yes, Your Honor.

THE COURT: I think, and just for convenience, it probably would be easiest for me if we take the arguments one at a time. So in other words, before you go into your search warrant argument, let's finish the argument on the statement. Then we'll go to the search warrant.

MR. MYERS: Yes, Your Honor. With regards to the statements made by the defendant in custody, of course, the government, there's no question that these were custodial statements following his arrest on a search warrant.

THE COURT: And I'm sort of thinking of them, just for convenience as well and organization, in three separate components. There's the -- and it may be everyone else thinks this makes sense, it might be useful to break it out this way. I think we have statements at the car, statements in the car, and statements at intake. There's sort of three separate groups. And they probably all need to be addressed separately.

MR. MYERS: Yes, Your Honor. That's exactly how I've

been analyzing it in preparing for this.

THE COURT:  And can I just ask you one other thing, Mr. Myers?

MR. MYERS:  Yes, Your Honor.

THE COURT:  Is the government actually intending to use what Agent Wilson called the inflammatory statements made in the car?  I mean, I don't want to spend time addressing something that's irrelevant.  For example, it would seem to me that at a trial, those statements would just not be pertinent.

MR. MYERS:  They're not, Your Honor.  They would be cumulative to the statements that he continued to make along the same lines in processing.  So in terms of the actual statements that we would intend to introduce at trial, aside from the non-custodial statements, which the defendant hasn't moved to suppress, it would be the statements, the five-minute conversation in the car and the three-minute conversation at processing.

THE COURT:  So you're not actually intending to use the ones in the car, but more as a backdrop to what happened at processing?

MR. MYERS:  Exactly.  And if questions came about in the trial about, you know, this just came out of nowhere, then testimony was elicited, well, he was making similar statements in the car, that's why I wanted to make sure to introduce those for this hearing so that if, in the context of a trial, it went

there, but I don't intend to affirmatively introduce those because sort of the fact of that pattern of conversation will be established just by what happened at processing.

THE COURT:  Okay.  All right.  Thank you.

MR. MYERS:  With regards to the five-minute conversation at the car at approximately 6:25, during the execution of the search warrant, I'll take sort of separately the issues of whether he was advised appropriately of his rights and then whether, following that advisement, his statements were voluntary.

I don't think the defendant has made any real argument as to lack of voluntariness of his statements.  There was no force or coercion applied to the defendant to get him to speak. No one had their firearms out.  No one told him that he was required to speak to them.  No one promised him anything falsely.

I think, in the totality of the circumstances of that interview, which was custodial, which was in the car, outside of his home, during the course of the arrest, that the setting of that interview and the questioning in that would not rise anywhere close to the level of offensive to the, shocking the conscience and offensive to the notions of justice.  I think that that very high bar of voluntariness, of making the statement involuntary just is not what we're dealing with here.

The real question is if the defendant was advised of and knowingly waived his rights to provide a statement while in

custody.  I think that it's important just as we analyze when someone has repeated interactions with law enforcement, that sort of helps us determine if they were knowing and voluntary.  The fact that the defendant had twice been, in a non-custodial setting, given his rights and questioned on the same topics by the same agency is important background to the Court determining whether, at the time of the arrest, his statements or his waiver was made knowingly and voluntarily.

I think that you've heard the testimony that Special Agent Tetrault read him the rights as they were set forth on the form.  I understand the Court's concern that the form doesn't specifically advise of his right to terminate questioning at any time.

THE COURT:  Although I'm not actually sure Miranda requires that.

MR. MYERS:  I'm not sure that Miranda requires that, either.

THE COURT:  It's just that I've seen that many times.

MR. MYERS:  As have I.  And we always like to see more as prosecutors.  But I do think that the form itself is legally sufficient to give the defendant notice of his rights under Miranda.  I think that the evidence shows that the defendant did, in fact, indicate that he understood and agreed to speak in response, or following being read these rights and understanding them.

THE COURT:  Well, he didn't expressly agree to speak, did he?  It would have to be an implied waiver, wouldn't it?

MR. MYERS:  Your Honor, Special Agent Tetrault's testimony, as well as his report, which was introduced by the defense and which Special Agent Tetrault adopted, specifically says --

THE COURT:  Can I have a copy of that report?

MR. MYERS:  If I might approach Your Honor.

THE COURT:  Sure.  I don't think anyone gave me any exhibits.

MR. MYERS:  My apologies, Your Honor.

THE COURT:  This is a defense exhibit, right?

MR. MYERS:  Yes, it is, Your Honor.

THE COURT:  This is Defense Exhibit 2, right?

MR. MYERS:  Yes, Your Honor.  And the very last line of Page 1 of that report says that at approximately 625 hours, the defendant was read the Diplomatic Security advisement of rights, which he indicated he understood his right to remain silent, which Special Agent Wilson witnessed, and that the subject agreed to answer questions, but maintained he was Cheyenne Moody Davis. The defendant knew his rights.  He understood his rights.  And he knowingly and voluntarily waived them, and agreed to provide the five-minute statement.  And that to the extent that that waiver of his rights, the government would argue that that should continue through the process.

THE COURT: Well, Agent Wilson testified, I thought --

MR. MYERS: He did, Your Honor.

THE COURT: -- that the defendant didn't say one way or the other whether he was willing to answer questions.

MR. MYERS: That's correct, Your Honor. And Special Agent Tetrault, who prepared the report, was the lead case agent, testified that he did explicitly say that he agreed. I think that the agents' recollections do diverge on that. But as the Court heard during Special Agent Wilson's testimony, that between February 8th, which was the execution of the search warrant, was his first and only involvement in this case until preparing for this hearing.

So I think that with regards to that, you know, small, but important, discrepancy between the testimony and report, contemporaneous report of Special Agent Tetrault, and today's recollection by the agent who was not intimately involved with the case and who was not relying on for this point any contemporaneous notes or reports, I would say that the government --

THE COURT: But even if the Court credited Wilson's testimony, he doesn't say the defendant declined to answer questions.

MR. MYERS: That's correct, Your Honor.

THE COURT: He says the defendant didn't say one way or the other, and then the defendant answers questions. So that

would theoretically bring us to a possible implied waiver.

MR. MYERS:  You're exactly right, Your Honor, that either way there's a waiver of the right, whether it's explicit or implied.

And I think that with regards to that immediate interview in the car, which was terminated by the agents, which the testimony and evidence shows there was no attempt by the defendant to end the conversation, there was no even suggestion of counsel, let alone indication of the right of counsel, that if the Court finds, as I believe the Court should, that the advisement of rights was sufficient to give him notice of his rights per Miranda, and that the waiver was knowing and voluntary, that those statements are not subject to suppression.

And then the question would become what about the statements in processing?  Now, the statements in processing were about an hour and a half prior and he was not re-Mirandized. However, he was continuously in custody.  And he, as you've heard from both agents, the defendant initiated and engaged in these conversations of his own volition.  That only in response to the provocative statements of the defendant about the agents breaking up families and working on behalf of the new administration, only then did they ask him or did Special Agent Wilson ask him about the 2016 election and his voting and the name he voted under.

I'm sure that should the Court find those statements admissible, there will probably be a future motion in limine.

But at the time that those statements were made, the defendant was fairly recently advised of his right to remain silent, knew he was in custody, and engaged these agents in these questions, or in these statements, anyway.

So I think that those statements are not subject to suppression, either, and that both the three-minute conversation at processing and the five-minute conversation at the car should be permitted to be introduced at trial.

THE COURT:  Are you taking the position that asking the defendant his name before he was Mirandized in the context of this case -- I mean, in some other case it might even have been a so-called sort of routine-type booking question, let's say.  But in this case with the issues that are in play, what would be your comment as to that?

MR. MYERS:  I understand that, Your Honor.  And while it is my position that officers, and I believe the case law supports it, officers are entitled to ask someone, particularly someone they're arresting, who they are in order to ensure they're arresting the right person and executing the warrants correctly, I do understand in the context of this case the legal jeopardy the defendant creates for himself every time he makes a claim to an identity that is not his.

That being said, because the defendant repeats those statements after he is Mirandized and repeated, and maintains, continues to maintain that he is Cheyenne Davis, the government

wouldn't necessarily intend to admit the initial statements unless, in the context of trial testimony, he was asked, well, what happened when you arrived at the door. But the statements are repeated again, that he is Cheyenne Davis, post-<u>Miranda</u>. So I think that any potential harm as to admitting the pre-<u>Miranda</u> identification of him, even if there is some sort of <u>Miranda</u> violation for just identifying yourself, is cured by the fact that he repeats it again. And so there's no harm.

THE COURT: And I wanted to ask about that and I was going to ask this of defense counsel. But leaving aside the "did you vote in the election" question, which spawned additional charges, he was interviewed twice before he was arrested.

MR. MYERS: Yes, Your Honor.

THE COURT: I mean, the argument at least sort of cuts both ways. The last time he was interviewed was December of 2015 so that is more than a year before the events that occurred at the time of his arrest. So, I mean, maybe it's relevant, maybe it's not. But leaving that aside for the moment.

In terms of the defendant's claim as to his identity, there's been no challenge to those interviews. And at those interviews he claimed he was Cheyenne Moody Davis, at least as far as I understand.

MR. MYERS: Yes, Your Honor.

THE COURT: Is all of this much ado about nothing? I mean, you already have information obtained from the defendant in

which he has identified himself as Cheyenne Moody Davis.  I mean, what difference does any of this make, regardless of how I rule?

MR. MYERS:  So, Your Honor --

THE COURT:  And this is a question, really, for both sides.

MR. MYERS:  There are a handful of points that the five-minute conversation in the car and the three-minute conversation in processing add that we don't already have at that point in the investigation from the other interviews and other actions that were taken.

First is it is between the second interview, sort of in the parking lot --

THE COURT:  The December 2015 one?

MR. MYERS:  Yes, the December 2015 interview.  The real father of Cheyenne Davis passed away, I believe, in 2016.  So he wasn't deceased yet.  And so the defendant's lack of knowledge that that individual was dead did not come up because it wasn't ripe to be asked about.  So the fact that he didn't know that his purported father was dead is something that was never asked or known in any other context.

His failure to identify the names of siblings and numbers of siblings, while I believe touched upon in the prior interviews, it was more explicitly or possibly, without re-reviewing the other interviews, I believe that may be more fulsome than before.  But also in the context of the arrest, the

claim that he was raised by an aunt whose name he doesn't know is a new claim.

And then with regards to processing, obviously, the agents knew at the execution of the search warrant, they recovered the, and it's in the affidavit or it's in the agent's report and it's in the government's motions response, that in the execution of the search warrant, they recovered the voting, the voter identification card, which includes the date of registration, and that they were aware of that when he started talking about the election. So when he did make those statements about voting in the election under the name of Cheyenne Moody Davis, obviously, that was something, you know, all the prior interviews were before the election.

And given the charges, you know, following further investigation, and confirming records with Howard County, those statements then became newly relevant because of the additional charges that, and the superseding indictment, which I want to not forget to ask the Court to do the arraignment on, which we had talked with chambers about before -- just as a note to myself. But those, you know, the agents were aware of that potential additional issue for the first time upon executing the search warrant. So all of those statements are entirely new to the investigation.

So those are the reasons why it's not really much ado about nothing. It's a small piece, small pieces that advance the

government's evidence that it would intend to introduce at trial.

THE COURT:  Okay.  Thank you.  Anything else?

MR. MYERS:  Nothing from the government, Your Honor.

THE COURT:  Counsel.

MR. WALSH-LITTLE:  Your Honor, you have Defendant's Exhibit 2.  I apologize for not giving it to the Court.

THE COURT:  Oh, that's the only copy?

MR. WALSH-LITTLE:  No, no.  I was going to give you copies of 1 and 3 as well.

THE COURT:  Okay.  Great.  Thank you.  Thanks a lot.  So Defendant's 1 is the advisement, right?

MR. WALSH-LITTLE:  Defendant 3 is the advisement, Your Honor.

THE COURT:  Oh, Defendant's 3.  I'm sorry.

MR. WALSH-LITTLE:  And then the e-mail from Ryan Wilson was Defendant's 1.

THE COURT:  And this e-mail from July 13, that's -- what number is that?

MR. WALSH-LITTLE:  Defendant's 1, Your Honor.

THE COURT:  Defendant's 1.  Thank you.  Okay.

MR. WALSH-LITTLE:  Your Honor, I would suggest, based on the testimony that Your Honor has heard, that the government has not met its burden that Mr. Davis knowingly and voluntarily waived his rights under Miranda on February 8th, 2017.

He was taken into custody when officers came to his

home.  He was shirtless, in pajama bottoms, taken to a vehicle. And as I understand the testimony, was read the four rights that are on the advisement of rights forms, which is Defendant's Exhibit Number 3.  And I think, given the circumstances, with two officers standing outside the car, with potential problems, and even Mr. Davis hearing what they say or understanding what they say, much less voluntarily waiving his rights under the Fifth and Sixth Amendment, that is not enough for the government to meet its burden.

The form itself that the State Department uses provides a vehicle for which, if it had been used, the Court would have more reliance on the fact that Mr. Davis himself took steps to indicate himself in writing that he understood his rights and that he willingly waives those rights.

THE COURT:  Would you agree, counsel -- two questions. Even though the Court raised the concern, if you will, about the failure to advise that when he starts an interview, can he stop it at any time, would you agree that's not legally required?

MR. WALSH-LITTLE:  Yes, Your Honor.  I would agree that's not legally required.  But what is legally required, of course, is that Mr. Davis knowingly and voluntarily waives his rights.

THE COURT:  Sure.  I get that.  But my first question was, since I raised the issue, is there any legal challenge to the sufficiency of that particular portion of the form?

MR. WALSH-LITTLE:  No, Your Honor.

THE COURT:  Okay.  And my other question is, is there a legal requirement that a form even be used or completed?

MR. WALSH-LITTLE:  No, Your Honor.  I don't believe there's a requirement.  I just think that if the form had been completed, it would give --

THE COURT:  Sure.

MR. WALSH-LITTLE:  -- assurance that Mr. Davis understood --

THE COURT:  I understand.  I just wanted to make sure that I wasn't missing something.

MR. WALSH-LITTLE:  I also, Your Honor, just referencing Defendant's 2, which is Special Agent Tetrault's report, which reads, I would suggest, the narrative form of what happened on February 8th from Agent Tetrault's perspective, there's -- and I asked Officer Wilson about it -- but there, in the third paragraph on Page 1, as the report reads:  Upon the initial arrest, SSA Tetrault advised subject to be truthful in answering any questions or risk additional charges.

I think, as I understood the testimony from Special Agent Tetrault, there is a form for that, what I believe Officer Tetrault was trying to do, which was to advise Mr. Davis that he, if he made a false statement to a federal officer, that would be a crime.  But that statement is very, very different, Your Honor. It suggests that there isn't anywhere in that language, as I read

it, that Mr. Davis could simply remain silent and that would not be a crime.

In reading the report in full, which I believe Officer Wilson testified to, or relying on the narrative form in the report, that's, that's given initially to the defendant before the Miranda warnings are given and I think obscures the fact that he is then, in a few minutes later, read the rights that are on the Diplomatic Security Service form.

So I think Your Honor should have pause, even given that statement, which is, you know, you must be truthful in answering any questions or risk additional charges, and then you hear this right to remain silent. Nobody says that remaining silent doesn't subject you to additional federal charges. And given the way that this questioning occurred, I don't think the Court should, should have confidence that Mr. Davis knowingly and voluntarily waived his rights.

THE COURT: Well, sometimes hindsight being 20/20, maybe if when it was written it had said to be truthful if answering any questions. But whether it says to be truthful in answering any questions or if, or if answering any questions, at the end of the day, you suggest pause. But the last thing the defendant would have heard or -- I shouldn't say the last thing -- but subsequent to that he does hear the advisement, which tells him that he has the right to remain silent. So I guess I'm questioning whether your challenge to the phraseology

here really would carry the day.

MR. WALSH-LITTLE:  Well, yes, Your Honor.  I'm referencing the report.  And obviously, you're right.  It could be just language.  It's just that the way to solve that problem, of course, is use the form.  And the form's not required.  But it would give the Court further assurances about what actually occurred.

I mean, additionally, in looking at the report, the last paragraph on the first page of Defendant's 2, it reads:  At approximately 6:25, subject was read the Diplomatic Security advisement of rights, in which he indicated he understood his right to remain silent, SSA Ryan Wilson as a witness.  And then subject agreed to answer questions.  As Your Honor knows, it's not just simply him understanding his right to remain silent, it would also be his right to have counsel if he so chose.

So if Your Honor accepts that language in the report, which officer -- pardon me -- Agent Tetrault testified was true and accurate, I don't know where in the facts that were presented or, specifically, the report, which I think is the best summary of what occurred because it was prepared soon after the event, what facts the Court has to rely on, whether implicitly or explicitly, that Mr. Davis ever waived his right to counsel before continuing to answer these questions while he's in the back of a government car, handcuffed in the back, without a shirt on, having been orally advised of the rights on the form, but

additionally having just been, you know, taken into custody and outside his house.

Additionally, Your Honor, as Agent Tetrault said, if I understood his testimony when Mr. Myers was asking him, he said if he had, that is my client, had indicated another identity, they would have taken him somewhere else and given him his full Miranda rights.  And I don't think there's anything in Miranda or the advisement that suggests simply because it's outside of a location in which a warrant is being served or that he was just in custody, that there's a Miranda light, that somehow they get by with somehow doing a truncated version of the rights and ensuring that Mr. Davis knowingly and voluntarily waives them.  I believe Special Agent Tetrault said he would have handled it differently if it was back in the office.  But, of course, Miranda is the same either way.

Additionally, the testimony that Mr. Myers elicited from the prior questioning of my client suggests that there was a full protocol taken to ensure that Mr. Davis, in those two instances, had been given his rights at that time.

So again, I think given the totality of the circumstances in this matter, that the government has not met its burden as to the questions in the car, he has, that is Mr. Davis, if I understand the testimony, there was no testimony that he was re-Mirandized before the event at processing or given additional rights at that stage.  The testimony is that, I believe,

99

additionally, as Your Honor pointed out, I think the government could maybe effectively suggest that it was a blurt on his part, this language about how do you break up families or how do you continue to do your job or somehow, I guess I would characterize it, I believe the agents testified that it was --

THE COURT:  Inflammatory.

MR. WALSH-LITTLE:  -- "inflammatory" would be their word.  But I don't think that would cover the issue with the questioning.  Again, as I understand Agent Wilson, he did question him about the election and who he voted for.  Of course, as Your Honor knows, that is an element.

So I don't think that merely the fact that if Your Honor concluded that the first part was a blurt by my client, and maybe that's an issue for relevancy at trial, but the second part, which I do think is relevant for Mr. Myers to prove his case, is --

THE COURT:  Really, the question is, it seems to me, was there a need to re-Mirandize him because I frankly tend to agree with you that having those statements made would not necessarily warrant the question, well, did you vote in the election and, by the way, in what name?  I mean, to me that's questioning.

So the question really legally is -- beside the need to pile on the charges, which is out there -- did you vote?  And then, in whose name?  I don't see that as responsive to "how do

you break up families" and "how do you sleep at night." It's a question. And look, it added to the charges against him.

So the real legal question for me is in the period of an hour and a half or so that it took from the car at 6:25 a.m. to get to the Marshals for intake processing, did he need to be re-Mirandized? The other statements may well have been volunteered and, most likely, in my view, completely irrelevant, other than it led Agent Wilson to pose what is a very damning question because it led to additional charges.

So is that something that anyone's looked into? I mean, how much time needs to go by before someone needs to be re-Mirandized? Is an hour and a half too long or not too long?

MR. WALSH-LITTLE: I mean, I think the standard, again, I think, obviously, the first question is was he effectively Mirandized initially. And, of course --

THE COURT: Well, let's assume he was.

MR. WALSH-LITTLE: Then, then I think I would simply just -- I think the legal standard is still the totality of the circumstances.

THE COURT: I'm sorry. Totality?

MR. WALSH-LITTLE: Yes. I'm unaware of a specific length of time. It's 45 minutes later, it's three hours later. I would just -- what Agent Tetrault said was that if they were intending to do a further interrogation of some kind, that they would have given these further warnings.

THE COURT:  Yes, I think that's a fair summary.

MR. WALSH-LITTLE:  And I guess I would rely on that for the statements, I guess, that we're calling while he's in processing.  I mean, I also believe that the standard for Miranda would require those same warnings for all statements, including the statements in the car, which I do -- I mean, I agree with Mr. Myers except I think it, I think it helps the government's case, the comments about the siblings and the aunt.  I mean, that's why we, you know, made the motion.

So I don't think it's much ado about nothing, at least on those other issues.  I do believe that there were other statements where my client in the two prior interviews that Agent Tetrault referenced, where he did identify himself as Mr. Davis.

THE COURT:  Okay.  Anything else that you wish to tell me?

MR. WALSH-LITTLE:  No, Your Honor.

THE COURT:  Any rebuttal?

MR. MYERS:  Briefly, Your Honor.  First of all, just to clarify.  I believe it's two-and-a-half hours between the initial conversation and processing.

THE COURT:  Okay.  That doesn't help you.

MR. MYERS:  No, it doesn't, but I want to make sure that you know.

THE COURT:  Thank you.

MR. MYERS:  But I do think that it's all in the course

of, it is the same arrest.  He's arrested, he's taken to processing.  They had to wait to get through the Marshal's.

THE COURT:  You're right.  I could do the math.  His advisement was 6:25 and the intake was sometime after 9.

MR. MYERS:  Your Honor, I believe that in the totality of circumstances in this case, that a new Miranda warning was not necessary here where the defendant was not the one who ceased the prior conversation.  The agents terminated the questioning and began processing.  So it's not --

THE COURT:  Well, how does that help?  The agents terminated the questioning at the car.

MR. MYERS:  So it's not as though he invoked his rights at the end of the other conversation.

THE COURT:  Okay.

MR. MYERS:  You know, they ended the questions before he said, you know, I don't want to talk to you any more, I want a lawyer, I want to remain silent.  Those statements were never made by him.  So he was still under that advisement and he hadn't invoked any of his rights.

I do agree and would concede to the Court that the questions by Special Agent Wilson were questioning, and even though they were prompted by the reinitiation of conversation by the defendant, that the government wouldn't argue that those were not questioning.  So if the Court finds that the continuing waiver of Miranda rights is insufficient, then the government

doesn't have much to argue in terms of getting the defendant's answers to those questions.  But our position is that it is sufficient, that he was sufficiently Mirandized, that while the, from a procedural standpoint, Special Agent Tetrault may have wanted to fill out all the forms and have all the signatures if he had sat him down for a full interview, which is what he would have done had the defendant started to provide new information that they hadn't already been given, or at least in terms of his actual identity.

But I agree with the defense, there's no such thing as Miranda light, that either the rights are sufficient or they're not.  That maybe procedurally you want to do more, you want to document it better, but the question that the Court has to decide doesn't change.  And the fact that he might have done more to document things doesn't change the fact that his initial advisement either has to be sufficient or it's not.  And the government believes that reading the rights as they did, and the testimony that you had where he was advised of his right to remain silent, he was advised of his right to counsel, he was, he was confirmed to understand his rights --

THE COURT:  How much time would be too much time?

MR. MYERS:  I think, Your Honor, that --

THE COURT:  Actually -- and correct me if I'm wrong in my memory -- but I don't remember any questions being elicited about his -- the voluntariness-type questions that you asked

about at the scene really weren't probed in the questioning of how it came to be that he was asked about voting in the last election.

MR. MYERS:  No, they weren't, Your Honor.  The context was that he was being DNA swabbed, was going through the marshal's process.  Of course, he's in custody.  He's in the marshal's processing.  I don't think that the voluntariness analysis changes much at that point if the initial statements are found to be involuntary.  I think that nothing has changed along those lines.

THE COURT:  But I guess since the context is different. Now we're at the Marshal's intake processing, and the duress of that experience possibly, and being swabbed for your DNA, and those sorts of things, without another advisement, I guess my question is, does that change the calculus for voluntariness in any way?

MR. MYERS:  I don't think so, Your Honor.  I think that he knowingly, he was read all the rights that -- you know, if the Court finds that the advisement was sufficient, then he knowingly waived after being given that advisement, and that the passage of this period of time in the course of processing for this same instant arrest.  It's very different from keeping him in a dark holding cell by himself for days and continuing to come at him again and again.

This is, they're taking him to court.  And I think --

there's no indication that any sort of force or anything to overbear his will was being done. And a bit of context from the continuing assertions he was making about, you know, the confrontational claims about breaking up families. So the defendant was sort of in constant communication and contact with them between, you know, during the processing, even though those statements aren't ones the government seeks to admit. I think that's relevant in this analysis because, essentially, the conversation is ongoing on and on from that initial five minutes when Special Agent Tetrault terminates the conversation to during processing. He's continuing to say things to Special Agent Wilson to -- excuse me. During transport he's continuing to say things. Then in processing, he's continuing to say the same sorts of things that he's saying.

So it's not as though everything stopped and they started again two-and-a-half hours later. He had continuous communication with them. The government's just seeking to introduce what was said --

THE COURT: Well, what one could say, the kinds of statements he made, which Agent Wilson characterizes as inflammatory, I don't know if that's the right description, but they, they suggest on the face of them someone who I think was rather cogent. I mean, I'm not saying I agree with what he was saying, but I am saying that's pretty astute comments. Like "you break up families", "how do you sleep at night." They certainly

suggest that this is a person who had his wits about him to be that offended by what was taking place and the way he perceived this happening to him.

Here, he's married and he has children.  There are implications, obviously, with these accusations.  So for what little that might be worth, I throw it out there because I think it's an interesting way to look at it, that somebody who calmly made those criticisms -- I would call them more "criticisms", than "inflammatory statements" maybe.  But I guess if you're the agent at whom they're directed when it is your job to do it, you might think it's inflammatory.  I don't mean it as a criticism at all of Agent Wilson's perception of them.  But on the other hand, they do show I have before me a person who's a very, who's a thinking person.

MR. MYERS:  That's correct, Your Honor.  I this it goes to he is aware of what was happening and he knew the process that he was going through.  And that in that context, having --

THE COURT:  The other thing I think is noteworthy is the arrest may have been a surprise, but the matter wasn't a surprise.

MR. MYERS:  That's very much correct, Your Honor.  Even though it was a different agent that talked to him about it before, you know, given this --

THE COURT:  He was alerted to this problem --

MR. MYERS:  Yes.

THE COURT:  -- previously.

MR. MYERS:  He was confronted in June of 2015.  They came back again in December of 2015.

THE COURT:  Right.  December and June.

MR. MYERS:  So he knew that the government, that he was on the government's radar, they hadn't gone away.  So I think that's correct, Your Honor, that this wasn't a surprise and he was fully aware of what was going on.

THE COURT:  Okay.  Thank you.  Do we want to turn now to the search warrant?

MR. WALSH-LITTLE:  Yes, Your Honor.

THE COURT:  Okay.  Let's do that.

MR. WALSH-LITTLE:  Yes, Your Honor.  Just to clarify it.  It is the defense burden on the warrant.  And we're not raising a Franks argument.  We're just arguing under Leon that there was no probable cause in the warrant that the magistrate judge could rely on.  And, additionally, that it was such a bare bones warrant that the good faith exception under Leon doesn't apply.

In our papers we cited United States v. Wilhelm, which is 80 F.3d 116.  And I would just submit on the papers that we submitted to Your Honor in that regard.  And in the end, of course, it is Your Honor's analysis of the affidavit.

THE COURT:  Thank you.  The response, then, of the government?  I just want to make sure I have that cite again,

counsel, before I turn to Mr. Myers, that case you were relying on in your motion. It's in the reply that you cited, right?

MR. WALSH-LITTLE: Yes, Your Honor, it's in the reply. 80 F.3d 116.

THE COURT: Thank you. Okay.

MR. MYERS: Your Honor, I would say that the affidavit presented to Judge Coulson was far from bare bones, that the eight, nine-page affidavit set forth, you know, an investigation that went on and off for years. The agents made every effort to put important information more than sufficient to find probable cause that the offenses listed in the warrant were committed. And the Court is well familiar with the probable cause standard.

I think the Court also keyed in on one important fact showing the good faith of the officers, which is that even though it in no way defeats the finding of probable cause based on the facts, the officer, Special Agent Tetrault made the affirmative step of making sure the Court knew that my office had previously declined the matter based on its allocation of resources, in view of the prosecution standards at that time.

I think that a common sense reading of the affidavit issued, supporting the warrant that was issued here by a neutral and detached magistrate, the affidavit sets forth the passport applications submitted by the John Doe, law enforcement records showing pictures and arrest records of both the true Cheyenne Davis, who was interviewed while he was in custody in Antigua,

and who was also prepared or who was also brought before the grand jury in Maryland prior to this affidavit being sworn out, the indictment was returned.  And the affidavit summarizes the grand jury testimony of both the real Mr. Davis, as well as his mother.

The affidavit sets forth the interview of the late Mackey Moody Davis, in which he like his, like the mother of his child, both affirmatively identify the true Cheyenne Moody Davis in jail in Antigua as being their son and are not aware of who the defendant is based on his picture.

The defendant who previously, in I believe his June 2015 interview as set forth in the affidavit, was unable to recognize a picture of the true identity of his father.

I think that when you take all of those facts into consideration, that there's ample probable cause for Judge Coulson to find in order to issue the warrants to search his home and recover evidence of the violations listed in the warrant.

THE COURT:  Okay.  Any rebuttal?

MR. WALSH-LITTLE:  No, Your Honor.

THE COURT:  All right.  Counsel, I was thinking maybe I would just -- well, we could do it a number of ways.  We can take a brief lunch and then come back and I could rule, let me just read everything over, make sure I didn't miss anything.  That probably would work best for me.  Maybe if we met, let's say, 1:30.

MR. MYERS:  Yes, Your Honor.

THE COURT:  Or 1:45 if people want an hour, roughly an hour.  What's your pleasure?

MR. WALSH-LITTLE:  Whatever the Court prefers, Your Honor, is fine with me.

THE COURT:  Why don't we say 1:45?

MR. MYERS:  Yes, Your Honor.

THE COURT:  Okay.  The Court will stand in recess and we will reconvene at 1:45.

(Luncheon recess at 12:39 p.m.  Resume at 1:48 p.m.)

THE COURT:  Just preliminarily, I do want to reserve the right to add citations and make minor style corrections in the event a transcript is ordered as to these proceedings.  And I thank counsel on both sides for their submissions.

Let me begin by outlining the case.  In a six-count superseding indictment filed on August 15 of 2017, which is ECF 40, the defendant, John Doe, also known as Cheyenne Moody Davis, has been charged with multiple offenses.  These include passport fraud, in violation of 18 USC Section 1542; making a false claim to U.S. citizenship, in violation of 18 USC Section 911; Social Security account number fraud, under 42 USC Section 408(a)(7)(B); aggravated identity theft, under 18 USC Section 1028(a); and voter fraud -- I believe that's 52 USC Section 10307(c); as well as aiding and abetting.

I note that the original indictment was filed on

January 31 of 2017. It only contained two counts. It did not include the voter fraud charge.

As I noted when we began this morning, the Court now has two motions pending before it: One, the motion to suppress warrant evidence, at ECF 20. And the defendant in that motion had initially asked in the alternative for a Franks hearing, but that has been withdrawn by the defense. In addition, the defendant has filed a supplemental motion to suppress statements. That's at ECF 36.

The motion to suppress warrant evidence pertains to two search warrants issued by United States Magistrate Judge J. Mark Coulson on February 7 of 2017. So they were post the indictment. Those search warrants were executed on February 8 of 2017. One was with respect to the defendant's residence, which is Apartment ▓ at ▓▓▓▓▓▓▓▓▓ in Columbia. And the other is as to a 2006 silver Mitsubishi Eclipse, which is the defendant's vehicle.

I'm going to focus on the search warrant first because I think it is the easier of the two motions. Before I do so, though, just to recap. In connection with these motions the Court held an evidentiary hearing today, and the Court heard testimony from two witnesses, both of whom are now in the courtroom: Special Agent Ryan Wilson of the United States Department of State, Diplomatic Security Service, and also the lead agent, Special Agent Jeffrey Tetrault, with the same agency. I find both agents to have testified credibly. Several exhibits

were also introduced.

Also by way of background, at the heart of the case is the government's contention that the defendant is an impostor with respect to the individual with the real identity of Cheyenne Moody Davis, who is a U.S. citizen born in the Virgin Islands, I believe. And according to the government, the defendant has lived in Maryland, using Davis's identity, for some 15 or so years.

As I mentioned, the searches occurred on February 8 of 2017. They were pursuant to two search warrants. The defense contends that these search warrants were not supported by probable cause and also that, if they were not supported by probable cause, they are not rescued by the good faith exception to the warrant requirement.

Looking now to the submissions which outline the argument, the defense argues that the warrants lack the indicia of probable cause and, therefore, it was unreasonable for law enforcement officials to rely on the issuance of the warrants. And I believe that's ECF 43 at 1.

In particular, the defense asserts that the information in the affidavit provides probable cause to believe that another Cheyenne Moody Davis exists, but not that this defendant is the one who used the false identity. So according to the defense, the information in the affidavit in support of the search warrants did not adequately establish that the defendant is not

who he represents himself to be.  And that is taken from ECF 43 at 4.

I have reviewed the search warrant affidavit very carefully and I am readily satisfied that it establishes probable cause.  I don't believe I need to reach the good faith issue, but if I were to do so, I would also readily conclude that the good faith exception or the good faith principles under U.S. v. Leon, 468 U.S. 897, (1984), would rectify any shortcomings in the affidavit.  Let me just review briefly with everyone how I reach this conclusion.

A judicially authorized warrant is the cornerstone of the Fourth Amendment, and a constitutionally valid search warrant must describe with particularity the place to be searched and the items to be seized.  There are many cases that say this.  I'll just cite United States v. Davis, just coincidence as far as the name is concerned, as far as I'm aware.  That's 690 F.3d 226, 241 is the pin cite for the decision of the Fourth Circuit in 2013.

So the application must be supported by probable cause that contraband, evidence, fruits, or instrumentalities of a crime or a fugitive will be found at the location to be searched. I cite Rule 41(c), as well as United States v. Grubbs, 547 U.S. 90, 96, a 2006 Supreme Court case, and United States v. DeQuasie, which is a 2004 Fourth Circuit case, 373 F.3d 502, 520.

The concept of probable cause cannot be defined with precision.  That is obviously a very well settled principle.  In

114

Ornelas v. United States, 517 U.S. 690, 696, 1996, the Supreme Court said it "exist(s) where the known facts and circumstances are sufficient to warrant a man", I would say a person, "of reasonable prudence in the belief that contraband or evidence of a crime will be found in a particular place."  As I read the affidavit, I think it satisfies that standard.

Many cases stand for the proposition that the probable cause standard is not defined by bright lines and rigid boundaries.  It does require a common sense determination as to whether, under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  As I said, many cases support that proposition.  I'll just name a few:  Illinois v. Gates, obviously, at 462 U.S. 213, 238, 1983; Maryland v. Pringle, 540 U.S. 366, 370, 2003; United States v. Williams, which is the Williams that's the Fourth Circuit decision in 1992, at 974 F.2d 480, 481; a 2011 decision of the Fourth Circuit in U.S. v. Wellman, 663 F.3d 224, 228; as well as U.S. v. Grossman, a 2005 4th Circuit decision, 400 F.3d 224, 228.

The issuing judge is confined to the averments contained in the four corners of the search warrant application. That is also a well settled principle.  And on review, the reviewing court's responsibility is to ensure that the magistrate had a substantial basis for concluding that probable cause existed.  That was my task and that's the review I undertook.

Just to highlight a couple of points that lead me readily to this conclusion. The search warrant application was introduced into evidence. I'll refer to the ECF site as ECF 37-1. And it consists of many pages so I'm obviously not going to read every single page. But I think there are a couple of points worth noting.

The affiant was Agent Tetrault, and he recounted that he has had specialized training and has led many investigations. That's ECF 37-1 at 1. He also has specific experience with examining documents relating to passport fraud. That's ECF 37-1 at 2. He avers that records and items are often maintained where the perpetrator of fraud can have ready access to them in secured locations within their residences and vehicles. And I looked for that because particularity is always obviously of concern. So it's not just that we have reason to believe that there's probable cause for a crime, but a justification to go to those two places that were named in the warrant. And I point to that portion of the search warrant for that reason.

The affidavit then recounts the status, if you will, of the investigation and the connection of the defendant to the premises and the vehicle. And I'll just refer specifically to Paragraph 3, not to the exclusion of anything else, but that is one paragraph that is pertinent.

And then I have to say I was impressed with reading this, that to learn when I did read it that, in fact, this issue

as to the defendant's true identity surfaced a long time ago and efforts were made many years ago to investigate and ascertain whether the defendant had committed a federal crime by using the personal identifiable information of someone else.  And the magistrate judge was made aware that this case was previously presented with less information than is now available, but whatever the standards were for prosecution, it didn't satisfy those standards.  And the magistrate judge was aware that in 2007 this investigation was declined for prosecution by the U.S. Attorney's office in the District of Maryland.  And I refer there in particular to Paragraph 13.

And then it recounts how the issue surfaced again.  And as I said, I'm not going to review every single paragraph.  But it is laid out here in detail.  And it includes that an individual whose name is Cheyenne Moody Davis, and his biological mother, testified before the grand jury in January of 2017 and attested to their identities.  That is obviously a significant piece of information.  And that I reference as Paragraph 21.

Also, it refers to the interviews in 2015 of the defendant, one on June 20 of 2015 at Paragraph 18, one in December of 2015, referenced in Paragraph 20.

And looking at the one from Paragraph 18, the defendant signed a false statement warning form.  These were non-custodial interviews.  At that time, he claimed he was Cheyenne Moody Davis, born and raised in St. Thomas.  And he didn't recognize

the photo of the person who is the father of the true Cheyenne Moody Davis.

I can go on and on, but I think my point is made. I appreciate the effort to challenge the search warrant, but I think it is unfounded when I look at what the case law requires of the issuing judge and of the reviewing court. So I must deny the motion to suppress the search warrants. Also, there is a link to the car as well that is contained in the affidavit in support of the search warrant. So that motion is denied.

Now I turn to the statements. Several of the exhibits that were introduced at the hearing are also pertinent to the statements. And as I mentioned when counsel presented final arguments, I think it's easy, at least for me, to compartmentalize the statements into three categories. One would be statements made by the defendant at the scene at the time of his arrest. We know that this occurred in the early morning hours of February 8 of 2017. The next category, if you will, would be the statements made in the law enforcement vehicle while the defendant was being transported to the Marshal's Office for processing. And the third category would be the statements made at intake at the U.S. Marshal's Office, all on February 8.

The span between the advisement -- whether it's legally sufficient, I'll leave that to the side for one moment -- but the span is about two-and-a-half hours from the time of the advisement to the time of the statements made at the intake.

As I mentioned, I find the agents were credible.  Their testimony diverges at some points, but I don't know that they are irreconcilably inconsistent.  In fact, I don't think they are.

Let me review briefly some of the pertinent parts of the testimony.  And I will begin in chronological order with Special Agent Ryan Wilson.  He was the team leader of about 15 agents who arrived at the defendant's apartment on the morning of February 8, 2017, at approximately 6 in the morning.  He did the knock and announce.  After knocking, the defendant appeared without a shirt on, and also in pajama bottoms.  The agent testified that it was unseasonably warm for February.

He pulled the subject to the stairwell, where the defendant was handcuffed, in pajama bottoms, without a shirt.  I note that the weapons of the agents were drawn at the time of the knock and announce.

Also present in the apartment, which is Apartment 301, were three minor children and an adult female, who I believe is the defendant's wife.

Agent Wilson did not recall any statements at that point in time.  He did not participate in the protective sweep.  He placed the defendant in the back of the law enforcement vehicle.  The defendant was alone in the vehicle.  He, that is Agent Wilson, stayed outside the vehicle, watching the subject, but he did check on the health, welfare, and well-being of the defendant, even adjusted the defendant's handcuffs, although he

was handcuffed in the back at that point.  Agent Wilson also told the defendant to let him know if he needed to use the restroom at some point.

At about 6:25 in the morning, the lead agent, Agent Jeffrey Tetrault, who was also a witness, appeared and, using what is marked as Government Exhibit 1 and also, I believe, Defendant Exhibit Three -- is that right, counsel?

MR. WALSH-LITTLE:  Yes, Your Honor.

THE COURT:  They're the same.  It's an advisement of rights form used during the custodial questioning.  And I should point out there's no dispute the defendant was in custody.  The government concedes as much.

But Agent Tetrault, in the presence of Agent Wilson, used that form.  I personally would prefer that there was a fifth bullet point on that form.  But the defense concedes, as well it must, that that question that I think should be included, that is to say you can stop answering questions at any point, isn't legally required on the form and it's not on the form.

The form is not completed.  And the defense points to that, as well it should.  It's not signed by the defendant.  It's not signed by the agents.  However, it does contain Agent Tetrault's handwriting at the top of the form, noting 625 hours for the advisement.

There are checkmarks on the form.  And I said I was going to go chronologically, but I'm going to skip ahead now to

120

say that those checkmarks were placed on the form by Agent Tetrault, who testified to that effect, as he read each particular advisement.  So the advisement corresponded to the warnings contained on the form.

Agent Wilson testified the defendant indicated he understood his rights, and he didn't ask for an attorney. According to Agent Wilson, the defendant didn't say one way or the other whether he was going to answer questions.  During this time, he was handcuffed, as I indicated, in the back.  Agent Tetrault testified later that it would have been ill advised -- and these are not his words, these are my words -- but the bottom line is, to have removed the defendant from the vehicle at a public street under those circumstances.  Also, I should add, it was not the intent of the agent to engage in a full-blown interview.

The defendant did not sign the form.  He wasn't asked to sign the form.  He wasn't given the form to hold and read for himself.  However, Agent Wilson said that -- and it might be challenging to envision exactly how this happened -- but with the car door open, the form was in front of the defendant.  Nobody asked any questions about whether we even know if the defendant is able to read.  But he was shown the form.  So I can say that much.  He was also orally advised.

And I want to note, as I pointed out during my discussion of the search warrant, to the extent it's relevant, I

think it's important in my view to point out that this arrest did follow the investigation of the defendant, which was known to him because he was interviewed twice, six months apart, in 2015. Those were not custodial, but the testimony was this would not have been his first advisement. He was advised on both of those occasions, one in June and one in December of 2015.

Also, I should point out -- and I'm sorry for being a little, if this isn't a perfect presentation because it's obviously one for which I've had only 45 minutes to think through -- but he also previously, in June and December of 2015, was advised that it was his obligation, if he answered questions, to answer them truthfully because failure to do so could lead to prosecution for false statement to a federal agent.

But in any event, on this occasion, now focusing on February 8, 2017, according to the testimony of Agent Wilson, the form was put in front of the defendant. And there is a history of prior advisement. The defendant was asked his name. And the statements themselves at this point I don't think I need to review.

The interview, to the extent it was an interview, the questioning, whatever label you wish to attach to it, was rather brief, seems about five minutes in length. The agents are the ones who stop the questioning. That's noteworthy. The defendant did not invoke his right to remain silent at any point, did not say he didn't want to answer questions. But there were times

when asked a question, he simply didn't answer at all, which is probative of the fact that he understood he didn't have to answer. So I think that's relevant. On more than one occasion, Agent Wilson stated that the defendant never said he didn't want to answer questions.

Focusing on voluntariness, the testimony of the agent is that the defendant was never threatened and no promises were made to him. He appeared coherent. He did not appear to be under the influence of any substance. The agents had their firearms, but they were holstered. No one was disrespectful one way or the other. The defendant never asked for anything that was denied to him. And that, according to Agent Wilson, pretty much summarizes what happened at the scene.

The next component would be the ride to the Marshal's Office. There were comments by the defendant that Agent Wilson described as inflammatory, when the defendant made remarks such as, "How do you sleep at night breaking up families?" I don't see the relevance of these statements, and if I were presented with a motion in limine, I can't imagine that I would allow these statements because they're not probative of anything. But they are probative of voluntariness, in my opinion. For that reason, I wish to comment on them.

They suggest to me that the defendant was alert and oriented and understandably would be -- I'll just use this word for lack of a better one -- frustrated, angry, upset, that he was

in the position he was in.  And these statements are, I think, revealing in that way.  This is an intelligent person who got it.  Also worth noting is this isn't the first the defendant learned of the predicament because he was alerted in 2015 through two interviews by the same agency that he was being investigated.  So this hardly came as a surprise, I would say, although, of course, I don't know him.  After more than a year, if nothing had happened to him, maybe he thought it went away, the problem, that is.  But in any event, I think the comments are very telling.

The third component occurred during intake when there was more of what I'll call unsolicited, volunteered statements by the defendant, I think "castigating" would be a good word, castigating the agents for what they were doing, for the fact that they were breaking up families and how could they live with themselves.  Those are not the defendant's exact words but the thrust, the message he was trying to convey.

As a result of that, Agent Wilson then posed a question to the defendant, which was not responsive to the comments.  But the agent asked the defendant if he voted in the last election and the defendant said he did.  And then the agent said, who did you vote -- rather, in what name did you vote?  And the defendant once again implicated himself by saying he voted as Cheyenne Moody Davis.  Then there was a discussion of who he voted for, and he voted for President Trump.

So those questions were not responsive to the

volunteered statements.  And there was discussion and argument as to whether the defendant needed to be re-Mirandized before the agent could pose that question.  And I'll get to that as I go forward.

On cross examination -- and so I'm apologizing that this is more in chronological order than a real story -- but the agent testified, and this is a little bit at odds with what his direct testimony was, but on -- this did not come out on direct testimony.  Agent Wilson said that the defendant was asked his name before having been advised of his constitutional rights and he said he was questioned before being Mirandized and that, he acknowledges, was a key question.

Then he went on to talk about how, at the scene, the form was held in front of the defendant so he could read it, although there's no evidence that the defendant is able to read. And then again the agent said, "We asked the defendant his identity before his Miranda rights."  But then after being advised of his Miranda rights, the defendant said he understood his rights, and he did not ever say that he wished to remain silent.  He did not ask for a lawyer.  And he didn't say he didn't want to talk.

On redirect, it was established that the only question of the defendant before the Miranda advisement was as to his name.  Ordinarily, in almost any case that I've had, that question would be of no moment whatsoever.  Of course, in this

case it's of significant moment because the whole case is about whether the defendant is, in fact, Cheyenne Moody Davis or an impostor.  So in the context of this case, that is significant.

Now I turn to Agent Jeffrey Tetrault's testimony.  It's largely the same.  There are some differences.  And he recounted, and I don't need to repeat here, that the agency has a history of investigating this defendant.  Most recently things surfaced after 2011 when the U.S. consulate happened to be visiting a US citizen incarcerated in Antigua whose name is Cheyenne Moody Davis.  And I don't need to recount here what happened in terms of the investigation.  But it led to two interviews of the defendant, as I've said already, both in 2015, six months apart, June and December, in which, in a non-custodial setting, the defendant was interviewed by the same agency under Agent Tetrault's supervision, where he was advised of his rights and advised of the consequences of lying to a federal agent.  So he was aware that he was on the government's radar at least by that point in time for this matter.

The agent testified that he was involved in the protective sweep of the residence, and he asked the defendant to identify himself.  He identified himself as Cheyenne Moody Davis.  And according to the agent, there were no further questions prior to the advisement.  That is consistent with what Agent Wilson said.

He then reviewed how he conducted the advisement -- so

I have alluded to that already -- using the form that's in evidence, hitting the bullet points, checking them off as he read them to the defendant.  He asked the defendant if he understood.  The defendant said yes.  He did not expressly ask the defendant if he was willing to waive his rights.  He explained they were not intending to conduct a full interview.  And he explained the reasons why he didn't want to take the defendant out of the car for that purpose, in the setting where they were situated.  But the defendant did indicate he understood his rights.  He did not invoke any rights, such as the right to a lawyer.

Then the questioning took place.  Very briefly, there were times when the defendant remained silent, not answering questions at all.  And I think that's significant because it does suggest to me the defendant understood he didn't have to answer at all, and he could pick and choose, for that matter.

For example, the defendant mentioned an aunt with whom he was close.  But when he was asked the name of the aunt, he remained silent.  He didn't answer when he was asked if he was aware whether his father had died.

The demeanor of the defendant was described as calm, coherent, cooperative.  He was asking about the charges.

Agent Tetrault corroborated that the weapons of the two agents were holstered.  He didn't hear what transpired in the car on the way to the Marshal's Office because the defendant was in the back seat with Agent Wilson and he was preoccupied with

127

driving. Those are not his exact words, but that's the gist of what I think he said.

As to the Marshal's intake processing, the agent testified to the comments, unsolicited, made by the defendant regarding the defendant asking something along the lines of how the agents could be doing this, how do they sleep. And the agent responded it's his job. And that prompted the question from Agent Wilson, asking the defendant if he voted in the last election and, if so, under what name, etc., which I've already recounted.

I want to just also add that the agent mentioned, in explaining what his goals were, he said that his goal was to get the defendant to processing. And he needed to be sure, number one, that he had the right person and, number two, if he was willing to give a statement, they would do it. But given the fact that the setting wasn't conducive to an interview, he had not anticipated a genuine interview. He didn't want to take the defendant out of the car, which is what would have been the practice if there was to be an interview, because it was a public street. And the defendant never indicated he wished to remain silent.

So I think that covers the testimony. Now I want to try to arrive at an answer -- this is the challenge, of course -- to the statements, as I mentioned.

There is no dispute, as I already indicated, that the

128

defendant was in custody at the time, whether we're talking about the ones at the scene, the ones in the car en route, or at the Marshal's intake facility. So I don't have to resolve that issue.

Statements obtained from a defendant during custodial interrogation are inadmissible in the government's case-in-chief unless the government can demonstrate, by a preponderance of the evidence, that the defendant was adequately advised of his Miranda rights and knowingly and voluntarily waived them. The seminal case, obviously, is Miranda. But there are so many others, it would be impossible to recite them all. I've never known how to pronounce this case, but one is Berghuis v. Thompkins, a 2010 decision of the Supreme Court, at 560 U.S. 370, 382-83; Dickerson v. United States, 530 U.S. 428, 441, (2000); Moran v. Burbine, 475 U.S. 412, 421, (1986); and Berkemer v. McCarty, 468 U.S. 420, 429, (1984), just to name a few.

The inquiry into whether a defendant has waived his Miranda rights has two distinct components. Also, there are many cases that say this as well. The government has the burden to show that the waiver was voluntary, that is the product of a free and deliberate choice, rather than intimidation, coercion or deception, and it must be made knowingly, meaning it was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. And I cite Moran v. Burbine for that, as well as North Carolina

v. Butler, 441 U.S. 369, 373, (1979), and the Berghuis case. Again, there are really quite a number of cases for this proposition.

In the context of this case, of course, I'm mindful that the voluntariness inquiry under the Due Process Clause and the Miranda custody inquiries are not the same. So let us talk first about the content of the warnings.

There were four warnings that were given. In Florida v. Powell, 559 U.S. 50, 60, (2010), the Supreme Court said the four warnings Miranda requires are "invariable." So while I might have preferred that there was that fifth warning, it's not legally required. And, the Fourth Circuit "has rejected attempts to add additional warnings to the time-tested Miranda formulation." That is a quote from United States v. Clenney, 631 F.3d 658, 668, which is a 2011 decision of the Fourth Circuit. And there are other cases to the same effect.

The warnings, we know, may be oral or written. So even if there was a form and it wasn't completed, it's not required that it be completed. Maybe it would have been more airtight, but it's not required. And I believe the agents when they say they gave those warnings.

I cite for the proposition that the warnings may be oral or written the Fourth Circuit's decision in 2012 of United States v. Dire. That's D-I-R-E, 680 F.3d 446, 474, 4th Circuit, (2012), cert denied, 133 S.Ct. 982, (2013).

130

Also, I think relevant to this case is the fact that there is -- and this comes from Dire as well as other cases -- "'no precise formulation of the warnings'" in order to satisfy Miranda. That's important. Also, as I mentioned, quite a number of other cases stand for that proposition.

So I have to focus here on whether the warnings were provided, and I find that they were. I am not going to repeat what I've said already, but I think the testimony of the two agents makes clear that those warnings were provided. And they satisfy the dictates of Miranda.

The real question, I think, is when and whether the defendant knowingly and voluntarily waived his Miranda rights. As far as the pre-Miranda statement is concerned, I cannot -- let me restate it. I must suppress any pre-Miranda statement. So the pre-Miranda statement that occurred asking the defendant for his name at or about the time of the protective sweep either at the landing or as the sweep was going on -- I'm not exactly sure where this occurred -- but anything pre-Miranda is suppressed. According to the testimony, it was only the one statement asking the defendant his name.

So there's no way I can uphold that because Miranda wasn't given. In this case, that's hardly an innocent question. The whole case turns on whether this defendant is really Cheyenne Moody Davis.

I mentioned earlier that the waiver of rights -- well,

131

let me restate it.  I mentioned earlier the rights can be oral or written.  A waiver of rights also can be oral or written.  We have no written waiver here.  And I've explained that from the testimony of the two agents.  The defendant never signed that form.  The agents never signed that form saying the defendant waived his rights.  But the uncontroverted testimony is that the defendant said he understood his rights and then, in response to questions about his identity, he answered them.  And case law supports the proposition that a waiver may be implied from the defendant's actions and words.  And that's what I find to have occurred at the scene after the defendant was advised of his rights.

I cite Berghuis v. Thompkins.  I've already mentioned that case.  The pin cite would be 560 U.S. at 384.  And U.S. v. Cardwell, 433 F.3d 378, at 389, a Fourth Circuit decision from 2005.

In Berghuis, at 560 U.S. at 387, the Court recognized that a court may "infer a waiver of Miranda rights 'from the actions and words of the person interrogated.'"  That court was citing North Carolina v. Butler, 441 U.S. at 373.  The Court, however, must consider all of the circumstances to determine if there is a waiver, whether it be express or implied.  And the Berghuis Court says this at 560 U.S.  at 389.  And it does this in the context of stating that Miranda "does not impose a formalistic waiver procedure that a suspect must follow to

132

relinquish those rights."  Id. at 385.  The law, said the Court, "can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."  Id.

Many cases make clear that the court must look to the totality of the circumstances to arrive at an uncoerced choice and the requisite level of comprehension.  And the U.S. v. Cristobal decision of the Fourth Circuit is one case in particular, 293 F.3d 134, 140, 4th Circuit, 2002.

From the evidence that is before the Court, I reach that conclusion, that the defendant understood his rights, he said he did, the rights that were read were clearly stated based on the content of the form.  Obviously, any arrest is going to be stressful.  And 6, 6:30 in the morning, I mean, it's not the middle of the night.  Many people are up at that hour already, especially if you have three children who are -- I don't know their ages, but I know they were children.  That was the evidence.

And there wasn't anything unduly harsh about the conditions being placed in the back of a car with handcuffs, is what the evidence showed.  The handcuffs were behind the defendant's back.  But I cite the case of United States v. Seni, 662 F. 2d 277, at 281, which is not the most recent of cases, Fourth Circuit, 1981, for the proposition that neither a drawn

weapon -- and the weapons here were not drawn, except at the time of the knock, not at the time of the questioning. Neither a drawn weapon, nor the use of handcuffs, standing alone, establish involuntariness. So the fact that the defendant was in the car with his hands in handcuffs behind his back does not on its face necessarily render his statements involuntary. That's important to me.

I have to determine whether, from what transpired, "the defendant's will [was] 'overborne' or his capacity for self-determination critically impaired." Lots of cases state that test. U.S. v. Pelton, 835 F.2d 1067, 1071, 4th Circuit, (1987)(quote Schmeckloth v. Bustamonte, 412 U.S. 218, 225, (1973). There is no evidence that he was unable to comprehend what was occurring. He was cooperative. He was calm. That's another description. Coherent. He did not appear to be under the influence. No threats were made. The agents were asked if they regarded themselves as being aggressive in their questioning, and they answered that they weren't. There was nothing about their conduct that was inappropriate. Their weapons were holstered. So, apart from the fact that the defendant was under arrest and in the back of a police car, there was nothing about this particular setting that was unduly coercive in and of itself.

The defendant had been alerted -- I think it's significant, even if it was more than a year earlier -- to the

fact that he was on the government's radar.  So I think that's important.  He'd heard the rights before as well.

And by his conduct in choosing to answer the questions, I think that signifies a voluntary decision.  In fact, he chose to answer only some questions and not others, which supports my view that he comprehended what was transpiring.  So I'm satisfied that he relinquished his right to remain silent as the result of a free and deliberate choice, not intimidation, coercion, or deception.

There's no brutality that was used.  There's no physical force that was used against him, apart from arresting him and putting him in the back of the car with handcuffs.  Nothing to suggest that his will was overborne.  And he was advised of his rights, as I said, and did not invoke any.

I think it's also significant that the period of time between when the defendant was brought to the police car and the questions were posed and the time of the knock was rather brief.  He wasn't held for a really long period of time.  He wasn't incommunicado for an extraordinary amount of time.  He was alone in the back seat of the police car for upwards of, at most, about a half hour, because the knock was around 6 and the interview was around 6:25.  There's nothing about his mental status that suggests there was an inability to comprehend.

So as far as the statements at the scene are concerned after the advisement, I find that they satisfy both Miranda and

due process voluntariness.

With regard to the statements in the car, the defendant was still under that advisement.  The statements were volunteered.  And they were completely irrelevant.

So what to make of that?  I mean, I'm not suppressing them but I'm sure there will be a motion in limine.  And I can't understand any grounds where they would be relevant to anything.

As to what occurred at the processing point, the question is whether the defendant needed to be readvised.  And I did try to do some research quickly at the lunch break.  I don't know if I actually brought the case out.  Let me see.  I might have left it.

But I do want to, before I turn to that case, just set the facts out, as I've already said.  From the point in time when the defendant was advised, which was 6:25 a.m. in the morning, to the time of processing, I believe it was about two-and-a-half hours.  I'm not giving that to the minute.  In Berghuis, which, again, is 560 U.S. 370, at 386, the Court said:  "The fact that Thompkins made a statement about three hours after receiving a Miranda warning does not overcome the fact that he engaged in a course of conduct indicating waiver.  Police are not required to rewarn suspects from time to time."  And that is the Supreme Court.

Then at lunch I read the case of United States v. Frankson, F-R-A-N-K-S-O-N, 83 F.3d 79, which is a Fourth Circuit

decision from 1996. In that case, the defendant contended that *Miranda* required the police to readvise him of his rights because the interrogation did not immediately follow the *Miranda* warning. In that case, the delay was two-and-a-half hours between the warnings and the statement. And the Fourth Circuit said, and I quote: "The mere passage of time, however, does not compromise a *Miranda* warning. Courts have consistently upheld the integrity of *Miranda* warnings even in cases where several hours have elapsed between the reading of the warnings and the interrogation." And then it goes on to cite cases for that proposition. And as I said, in that case, *Frankson*, it was a two-and-a-half hour delay.

So in this particular case, the inquiry from Agent Wilson asking the defendant if he had voted and, if so, in whose name, I said earlier it wasn't responsive to volunteered statements by the defendant. But to the extent it's relevant, I do want to point out that the inquiry followed volunteered statements. It wasn't Agent Wilson who began questioning the defendant. It was the defendant chastising the agents for what they were doing. And then that led to Agent Wilson asking the question that he did about the voting.

Now, it's a question, nonetheless. But, having found that the defendant was adequately and legally advised, properly advised of his *Miranda* rights at the scene at 6:25 in the morning, I don't think the law supports the argument that so much

time elapsed that the defendant should have been readvised before Agent Wilson posed that question.

So that's my ruling. That means I deny the motion to suppress, with the exception of any statement made by the defendant prior to the Miranda advisement.

Did I fail to address something that I needed to address? As I said, I reserve the right to add citations and make minor style corrections in the event the transcript is ordered.

MR. WALSH-LITTLE: No, Your Honor.

MR. MYERS: No, Your Honor. I just want to make sure that I'm not remiss in asking you about arraignment on the superseding indictment, as well as a couple of other housekeeping matters.

THE COURT: Okay. So the defendant has never been arraigned on the superseding indictment, to my knowledge. Is that right?

MR. MYERS: That's correct, Your Honor. The parties have conferred in advance, and instead of bringing him before the magistrate again, checked with your chambers and asked to do the arraignment at this proceeding.

THE COURT: That's fine. Probably should have done it at the beginning. Okay. So can we go to the arraignment, Madam Clerk?

THE CLERK: Sure. Will the defendant please rise?

Raise your right hand to be placed under oath.

JOHN DOE, AKA CHEYENNE MOODY DAVIS, DEFENDANT, SWORN

THE DEFENDANT:  Yes.

THE CLERK:  Thank you, sir.  You may put your hand down.  Will you please state your full name for the record?

THE DEFENDANT:  Cheyenne Moody Davis.

THE CLERK:  And what is your age and what year were you born?

THE DEFENDANT:  I'm 42.  I was born ███/73.

THE CLERK:  1973?

THE DEFENDANT:  Yeah.  ████████████, 1973.

THE CLERK:  Have you received a copy of the superseding indictment and have you read this, this document?

THE DEFENDANT:  Yes.

THE CLERK:  Do you understand the charges placed against you, sir?

THE DEFENDANT:  Yes.

THE CLERK:  Mr. Walsh-Little and Ms. Abelson, as counsel for the defendant, are you satisfied the defendant understands what he has been charged with?

MR. WALSH-LITTLE:  Yes, we are.

MS. ABELSON:  Yes.

THE CLERK:  Mr. Davis, you have been charged in Counts One, Two, Three, Four, Five, and Six of the superseding indictment.  What is your plea, sir?

THE DEFENDANT:  Not guilty.

THE CLERK:  Thank you.  To confirm, the plea is not guilty as to Counts One, Two, Three, Four, Five and Six of the superseding indictment.  Is this correct?

THE DEFENDANT:  Yes.

THE CLERK:  Thank you.

THE COURT:  Anything else that we need to do?

MR. MYERS:  Your Honor, we're currently, according to your scheduling order, scheduled for trial to commence I believe November 13th.  However, I believe the Court indicated that it has multiple matters scheduled at that point.  And we have a backup date of, I believe, December 4th.  I want, and the parties both want to know if the Court at this point knows whether we will be going forward in November or December?

THE COURT:  I'm going to get my calendar and check.

MR. MYERS:  Okay.  Thank you.

THE COURT:  It's possible that the one set for the 13th has pled out.

MR. MYERS:  Yes.  We're holding off on serving our witnesses.

THE COURT:  Okay.

MR. MYERS:  I guess while he's getting your calendar, I also wanted to confer with the Court.  Obviously, the parties haven't filed any motions in limine at this point, but we don't expect a huge amount of motions in limine, if any.  So I think

that anything that comes from that can probably be addressed at the November 3rd pretrial conference which, without having a scheduling order, I think is after the date of the motions in limine briefing, anyway. I just wanted to check to make sure that that works for the Court as well.

THE COURT: So I still another trial for November 13 that has not pled out. Seven-day trial. So I think we're looking at December 4 on this case.

MR. MYERS: Yes, Your Honor. Then I will advise my witnesses that trial will commence December 4th.

THE COURT: I mean, as you know better than I, anything can happen around here. But so far, that case is still in. I had two and one is out. But I'm still, I still have the other one.

MR. MYERS: If it's acceptable to the defense and to the Court, then, Your Honor, the government would prefer to just lock in that December 4th date to have a date certain.

THE COURT: Does that work for the defense?

MR. WALSH-LITTLE: Yes, Your Honor, if Your Honor is telling us there's no way we can do it on the 13th. I think I did schedule one sentencing on December 4th, but I'll try to move it.

THE COURT: Okay. The problem is I guess everybody would like to know a date certain. And unfortunately, that one was set first and it's still in.

MR. WALSH-LITTLE:  Yes, Your Honor.

THE COURT:  Hang on one second.  Let me doublecheck something.  Counsel, can you give me one minute?

MR. WALSH-LITTLE:  Yes, Your Honor.

THE COURT:  Let me take a brief recess.  I might be able to do it.

(Recess at 2:45 p.m. Resume at 2:46 p.m.)

THE COURT:  Counsel, I could do November 13.  The question I have is I have it down for seven days.  I'm participating in a trial advocacy program on Friday, November 17, so we can't sit Friday.  We should finish before Thanksgiving. But I just want to make sure that we're not going to bump up against the holiday in a way that --

MR. MYERS:  No, Your Honor.  Depending on whether I'm able to get through my first witness on the first day or not, I anticipate the close of the government's case no later than Wednesday of the first trial week, maybe Tuesday.  So I expect this to be a four or fewer day trial.  I don't think we need to worry about sitting on Friday or into the following week.

THE COURT:  Counsel?

MR. WALSH-LITTLE:  I think that estimate seems to be about right, Your Honor.

THE COURT:  I mean, you're not obligated to answer this.  But if there were, if you know if there's going to be a defense case, how many days would it take?  That would be

helpful.

MR. WALSH-LITTLE:  Yes, Your Honor.  If there's a defense case, I don't think it's going to be extensive.

THE COURT:  Okay.  I doubt, to be honest, that we're going to pick a jury and get through opening statements and that you're going to get through your first witness on the first day.  But miracles happen.  So I would, my educated guess would be that the testimony wouldn't really start until Tuesday.  But if you all are comfortable with that, I can do the 13th.

MR. WALSH-LITTLE:  Yes, Your Honor.

THE COURT:  If that'd what you prefer.

MR. WALSH-LITTLE:  That's what we prefer, yes, Your Honor.

MR. MYERS:  Yes, Your Honor.

THE COURT:  Okay.  We're on for November 13th.  And we have, all of our dates were geared to that, right?

MR. MYERS:  That's correct, Your Honor.  Our pretrial conference is scheduled for Friday, November the 3rd.

THE COURT:  Okay.  So did I, in my scheduling order, set a date for motions in limine?

MR. MYERS:  I don't think you did, Your Honor, without having it in front of me.

THE COURT:  So not like me.

MR. MYERS:  I think because the trial dates were in the alternative, you didn't set the rest of the dates between motions

and trial yet.

MR. WALSH-LITTLE:  I don't think you did set a date for that, Your Honor.

THE COURT:  Okay.  Let's do it now because I don't want to have them filed at the last minute.  Also, I want to make sure -- I don't have the court file in front of me so I don't have that letter.  But did we say, in sending out the information, I need the defendant to arrange for a Lafler hearing on the morning of the 13th?  So I always ask that.

You make arrangements with the magistrate judge.  The government needs to be there to put its plea offer on the record.  And then, you know, every now and then somebody comes back and says they didn't get one.  So I do want to make sure that you make those arrangements.

How soon can everyone file motions in limine, because we don't have that much time.  If there were to be any that are contested, they need to be briefed, and it's theoretically possible I need a hearing.

MR. WALSH-LITTLE:  Your Honor, I didn't have my, I don't have the scheduling order in front of me, and I apologize for that.  I wrote down that jury instructions were due on October 13th.  I'm not sure if Your Honor ordered that day as a day for in limine motions.  But if not, I would suggest that.

THE COURT:  I have it as October 13.  Shockingly, they don't say motions in limine.  What I would want them, I need them

to be ready for me to rule.  I'd like to have, be able to provide an answer to you by November 3rd, so I've he got to work backwards.  I need a response, time to look it up, if I need to, research it.  I've got other trials.  I can't necessarily do it at the last minute.  And so it's almost like I need them soon. We're already in September.

MR. WALSH-LITTLE:  Yes, Your Honor.

MR. MYERS:  Yes, Your Honor.

THE COURT:  So each side, I mean, the question I have is if you know, is it unreasonable for me to ask you to submit them in two weeks?

MR. WALSH-LITTLE:  No, Your Honor.

MR. MYERS:  No, Your Honor.

THE COURT:  Okay.  So that means they would be due by the 19th.  And then everything else I think is fine.  I just want to remind you about the Lafler hearing.

MR. MYERS:  Yes, Your Honor.  We'll work with the magistrates to, the magistrate judges on duty that week to make sure that -- you would want the morning of the pretrial conference to do that?

THE COURT:  Well, I think it's, I mean, it doesn't have to be the absolute last minute, but it should be close to the time of the trial in case, you know, he might claim he wanted to change his mind and didn't get a chance.  So it's just my practice to say right before we start, there needs to be a record

of what the offer was, that he was aware of it, chose to reject it.

MR. WALSH-LITTLE:  Yes, Your Honor.

MR. MYERS:  Yes, Your Honor.

MR. WALSH-LITTLE:  We will arrange that, Your Honor.

THE COURT:  I think that's just prudence.

MR. MYERS:  Yes, Your Honor.

THE COURT:  Okay.  Anything else?

MR. MYERS:  Nothing from the government, Your Honor.

MR. WALSH-LITTLE:  No, Your Honor.  Nothing.

THE COURT:  All right.  Then we'll stand in recess. Thank you.

(Conclusion of Proceedings at 2:52 p.m.)

INDEX


                                                              PAGE


GOVERNMENT WITNESSES

WITNESS: AGENT RYAN WILSON
DIRECT EXAMINATION BY MR. MYERS                                  4
CROSS EXAMINATION BY MR. WALSH-LITTLE                           21
REDIRECT EXAMINATION BY MR. MYERS                               39

WITNESS: AGENT JEFFREY TETRAULT
DIRECT EXAMINATION BY MR. MYERS                                 43
CROSS EXAMINATION BY MR. WALSH-LITTLE                           76

<u>REPORTER'S CERTIFICATE</u>

I, Mary M. Zajac, do hereby certify that I recorded stenographically the proceedings in the matter of USA v. John Doe aka Cheyenne Moody Davis, Case Number(s) ELH-17-054, on September 5, 2017.

I further certify that the foregoing pages constitute the official transcript of proceedings as transcribed by me to the within matter in a complete and accurate manner.

In Witness Whereof, I have hereunto affixed my signature this _____ day of _____, 2017.


                              Mary M. Zajac,
                              Official Court Reporter

**'**

**'15** [1] - 74:23
**'from** [1] - 131:18
**'no** [1] - 130:3
**'overborne'** [1] - 133:9

**/**

**/73** [1] - 138:9

**0**

**062500** [1] - 62:23

**1**

**1** [18] - 13:1, 22:23, 26:5, 26:7, 30:1, 52:4, 52:10, 62:19, 86:16, 93:9, 93:11, 93:16, 93:19, 93:20, 95:17, 112:19, 115:9, 119:6
**10** [2] - 22:11, 72:7
**1001** [4] - 30:19, 52:12, 68:19, 69:6
**101** [1] - 1:24
**1028(a** [1] - 110:22
**10307(c** [1] - 110:23
**1067** [1] - 133:11
**1071** [1] - 133:11
**10:07** [1] - 2:1
**11** [1] - 46:7
**116** [2] - 107:21, 108:4
**11:46** [1] - 76:19
**11:54** [1] - 76:19
**12:39** [1] - 110:10
**12th** [1] - 40:8
**13** [5] - 93:17, 116:11, 140:6, 141:8, 143:24
**133** [1] - 129:25
**134** [1] - 132:10
**13th** [10] - 26:9, 26:13, 40:10, 139:10, 139:17, 140:20, 142:9, 142:15, 143:9, 143:22
**14** [1] - 35:13
**140** [1] - 132:10
**15** [5] - 6:3, 35:15, 110:16, 112:7, 118:6
**1542** [2] - 59:19, 110:19
**17** [2] - 57:2, 141:10
**18** [10] - 52:11, 56:22, 59:18, 59:20, 69:6, 110:19, 110:20, 110:22, 116:20, 116:22
**1973** [2] - 138:10,

138:11
**1973)** [1] - 133:13
**1979** [1] - 129:1
**1981** [1] - 132:25
**1983** [1] - 114:14
**1984** [2] - 113:8, 128:16
**1986** [1] - 128:15
**1987)(quote** [1] - 133:12
**1992** [1] - 114:16
**1996** [2] - 114:1, 136:1
**19th** [1] - 144:15
**1:30** [1] - 109:25
**1:45** [3] - 110:2, 110:6, 110:9
**1:48** [1] - 110:10

**2**

**2** [15] - 26:24, 27:1, 27:4, 30:1, 30:2, 30:4, 56:20, 73:11, 73:12, 77:16, 86:14, 93:6, 95:13, 97:9, 115:11
**20** [7] - 2:17, 33:23, 56:8, 56:11, 111:5, 116:20, 116:21
**20/20** [1] - 96:17
**2000** [1] - 128:14
**2001** [2] - 47:6, 47:18
**2002** [1] - 132:10
**2003** [1] - 114:15
**2004** [1] - 113:23
**2005** [3] - 43:16, 114:18, 131:16
**2006** [6] - 2:22, 44:7, 45:7, 47:4, 111:16, 113:22
**2007** [1] - 116:8
**2008** [1] - 22:3
**2010** [2] - 128:13, 129:9
**2011** [4] - 47:20, 114:17, 125:8, 129:15
**2012** [2] - 129:23, 129:25
**2013** [1] - 113:17
**2013)** [1] - 129:25
**2014** [1] - 44:6
**2015** [20] - 44:18, 50:15, 51:16, 56:23, 57:14, 57:16, 90:15, 91:13, 91:14, 107:2, 107:3, 109:12, 116:19, 116:20, 116:21, 121:3, 121:6, 121:10, 123:4, 125:12
**2016** [3] - 60:11, 88:23, 91:15
**2017** [22] - 1:11, 2:20, 3:1, 5:19, 32:10, 44:9,

51:17, 61:10, 63:1, 77:14, 93:24, 110:16, 111:1, 111:12, 111:13, 112:10, 116:16, 117:17, 118:8, 121:15, 147:6, 147:11
**20th** [3] - 50:15, 54:12, 77:5
**21** [2] - 116:18, 146:6
**21045** [1] - 50:22
**21201** [1] - 1:24
**213** [1] - 114:14
**218** [1] - 133:12
**224** [2] - 114:18, 114:19
**225** [1] - 133:12
**226** [1] - 113:16
**228** [2] - 114:18, 114:19
**238** [1] - 114:14
**24** [2] - 72:11, 72:12
**241** [1] - 113:16
**277** [1] - 132:24
**281** [1] - 132:24
**29** [1] - 57:14
**29th** [1] - 57:16
**2:45** [1] - 141:7
**2:46** [1] - 141:7
**2:52** [1] - 145:13
**2d** [1] - 132:24

**3**

**3** [8] - 22:19, 22:22, 34:10, 93:9, 93:12, 93:14, 94:4, 115:22
**301** [1] - 118:16
**31** [1] - 111:1
**36** [2] - 2:24, 111:9
**366** [1] - 114:15
**369** [1] - 129:1
**37** [1] - 3:3
**37-1** [5] - 56:13, 56:20, 115:4, 115:9, 115:10
**370** [3] - 114:15, 128:13, 135:18
**373** [3] - 113:23, 129:1, 131:20
**378** [1] - 131:15
**382-83** [1] - 128:14
**384** [1] - 131:14
**385** [1] - 132:1
**386** [1] - 135:18
**387** [1] - 131:17
**389** [2] - 131:15, 131:23
**39** [1] - 146:6
**3rd** [3] - 140:2, 142:18, 144:2

**4**

**4** [5] - 52:4, 52:11, 113:2, 140:8, 146:5
**40** [1] - 110:17
**400** [1] - 114:19
**408(a)(7)(B** [1] - 110:21
**41(c** [1] - 113:21
**412** [2] - 128:15, 133:12
**42** [2] - 110:21, 138:9
**420** [1] - 128:16
**421** [1] - 128:15
**428** [1] - 128:14
**429** [1] - 128:16
**43** [4] - 3:3, 112:19, 113:1, 146:8
**433** [1] - 131:15
**441** [3] - 128:14, 129:1, 131:20
**446** [1] - 129:24
**45** [2] - 100:22, 121:9
**462** [1] - 114:14
**468** [2] - 113:8, 128:16
**474** [1] - 129:24
**475** [1] - 128:15
**480** [1] - 114:17
**481** [1] - 114:17
**4th** [8] - 114:19, 129:24, 132:10, 133:11, 139:12, 140:10, 140:17, 140:21

**5**

**5** [2] - 1:11, 147:6
**50** [2] - 32:13, 129:9
**502** [1] - 113:23
**517** [1] - 114:1
**52** [1] - 110:23
**520** [1] - 113:23
**530** [1] - 128:14
**540** [1] - 114:14
**547** [1] - 113:21
**559** [1] - 129:9
**560** [5] - 128:13, 131:14, 131:17, 131:23, 135:18

**6**

**6** [5] - 5:25, 8:21, 118:8, 132:15, 134:21
**60** [2] - 54:14, 129:9
**625** [2] - 86:16, 119:22
**631** [1] - 129:14
**658** [1] - 129:15
**662** [1] - 132:24
**663** [1] - 114:18

**668** [1] - 129:15
**680** [1] - 129:24
**690** [2] - 113:16, 114:1
**696** [1] - 114:1
**6:15** [1] - 33:24
**6:25** [14] - 12:16, 12:24, 13:17, 33:24, 62:25, 76:7, 84:6, 97:10, 100:4, 102:4, 119:4, 134:22, 135:15, 136:24
**6:30** [1] - 132:15

**7**

**7** [1] - 111:12
**75** [1] - 32:13
**76** [1] - 146:8
**7687** [4] - 52:9, 68:21, 76:24, 77:10
**79** [1] - 135:25

**8**

**8** [12] - 2:20, 10:5, 51:17, 56:9, 56:10, 56:11, 111:13, 112:9, 117:17, 117:21, 118:8, 121:15
**80** [2] - 107:21, 108:4
**83** [1] - 135:25
**835** [1] - 133:11
**897** [1] - 113:8
**8th** [22] - 3:1, 5:19, 5:25, 25:7, 25:10, 25:16, 32:10, 34:21, 40:20, 44:9, 44:12, 54:18, 60:17, 61:10, 63:1, 73:23, 73:24, 77:14, 78:7, 87:10, 93:24, 95:15

**9**

**9** [1] - 102:4
**90** [3] - 54:14, 57:17, 113:22
**911** [2] - 59:20, 110:20
**96** [1] - 113:22
**974** [1] - 114:16
**982** [1] - 129:25
**9:00** [1] - 72:1
**9:15** [1] - 71:24
**9th** [1] - 25:18

**A**

**a.m** [7] - 2:1, 5:25, 13:17, 76:19, 100:4,

135:15
**abandon** [1] - 128:24
**abandoned** [1] - 128:24
**ABELSON** [1] - 138:22
**Abelson** [3] - 1:19, 2:11, 138:18
**abetting** [1] - 110:24
**able** [14] - 15:13, 33:16, 37:1, 47:23, 49:9, 49:12, 50:19, 66:25, 67:3, 120:22, 124:15, 141:6, 141:15, 144:1
**absolute** [2] - 79:7, 144:22
**absolutely** [7] - 35:8, 45:7, 58:13, 62:5, 69:14, 70:1, 78:8
**acceptable** [1] - 140:15
**accepted** [2] - 44:19, 48:20
**accepts** [1] - 97:16
**access** [1] - 115:12
**according** [8] - 112:6, 112:23, 120:7, 121:15, 122:12, 125:22, 130:19, 139:8
**account** [1] - 110:21
**accurate** [7] - 17:13, 78:6, 80:14, 81:1, 81:10, 97:18, 147:9
**accusations** [1] - 106:5
**accusatory** [1] - 19:17
**acknowledge** [1] - 23:23
**acknowledges** [1] - 124:12
**action** [1] - 48:22
**actions** [5] - 49:2, 49:15, 91:10, 131:10, 131:19
**activity** [2] - 47:13, 72:11
**acts** [1] - 132:3
**actual** [4] - 66:11, 75:8, 83:12, 103:9
**add** [7] - 79:15, 91:8, 110:12, 120:13, 127:11, 129:13, 137:7
**added** [4] - 59:8, 73:20, 81:16, 100:2
**addendum** [3] - 73:6, 73:13, 77:21
**addition** [2] - 2:23, 111:7
**additional** [19] - 19:22, 29:5, 29:23, 30:16, 41:9, 44:18, 60:12, 69:4, 70:8, 74:5, 90:11, 92:16, 92:21, 95:19, 96:11, 96:13, 98:24, 100:9,

129:13
**additionally** [9] - 24:11, 38:5, 38:9, 97:8, 98:1, 98:3, 98:16, 99:1, 107:17
**address** [5] - 25:8, 27:7, 53:10, 137:6, 137:7
**addressed** [2] - 82:24, 140:1
**addressing** [1] - 83:7
**adequately** [3] - 112:25, 128:8, 136:23
**adjusted** [1] - 118:25
**adjustment** [2] - 12:5, 28:24
**administering** [3] - 24:12, 33:3, 33:5
**administration** [4] - 21:7, 38:16, 71:10, 88:21
**Administration** [1] - 2:8
**admissible** [2] - 79:3, 88:25
**admit** [2] - 90:1, 105:7
**admitting** [1] - 90:5
**ado** [3] - 90:24, 92:24, 101:10
**adopted** [1] - 86:5
**adult** [4] - 9:15, 19:24, 20:2, 118:17
**advance** [2] - 92:25, 137:19
**advice** [1] - 13:20
**advise** [8] - 24:23, 30:17, 69:3, 78:24, 85:12, 94:17, 95:22, 140:9
**advised** [30] - 14:4, 28:15, 29:21, 30:15, 31:9, 49:5, 53:5, 57:13, 68:18, 84:8, 84:24, 89:2, 95:18, 97:25, 103:18, 103:19, 120:10, 120:23, 121:5, 121:11, 124:10, 124:18, 125:15, 125:16, 128:8, 131:11, 134:14, 135:15, 136:23, 136:24
**advisement** [35] - 13:8, 32:9, 36:7, 68:19, 68:25, 69:2, 84:9, 86:17, 88:11, 93:11, 93:12, 94:3, 96:23, 97:11, 98:8, 102:4, 102:18, 103:16, 104:14, 104:19, 104:20, 117:22, 117:25, 119:9, 119:23, 120:3, 121:5, 121:17, 124:23, 125:23, 125:25, 134:25, 135:3, 137:5
**advisements** [4] - 34:2, 52:17, 77:12
**advising** [2] - 13:20,

29:4
**advocacy** [1] - 141:10
**affiant** [2] - 54:18, 115:7
**affidavit** [23] - 54:6, 54:19, 54:23, 56:8, 56:9, 57:19, 92:5, 107:23, 108:6, 108:8, 108:20, 108:22, 109:2, 109:3, 109:6, 109:12, 112:21, 112:24, 113:3, 113:9, 114:6, 115:19, 117:8
**affirmatively** [4] - 15:2, 46:11, 84:1, 109:8
**affixed** [1] - 147:10
**afford** [3] - 13:24, 63:19, 132:5
**afterwards** [1] - 31:20
**age** [1] - 138:7
**agency** [7] - 9:2, 41:1, 85:6, 111:24, 123:5, 125:6, 125:14
**AGENT** [4] - 4:6, 42:17, 146:5, 146:7
**Agent** [119] - 2:6, 2:7, 4:1, 4:20, 7:21, 8:9, 12:14, 12:18, 12:22, 14:18, 15:25, 16:12, 16:13, 16:17, 17:9, 18:6, 18:24, 19:8, 19:11, 19:19, 20:21, 21:5, 22:1, 25:9, 26:8, 30:15, 31:11, 31:18, 31:19, 33:22, 36:2, 39:18, 39:24, 40:2, 41:11, 41:20, 41:21, 42:11, 43:2, 43:6, 49:17, 51:1, 54:7, 54:17, 59:23, 60:13, 60:17, 60:21, 61:12, 63:10, 69:24, 70:5, 70:16, 71:9, 71:15, 73:19, 74:2, 75:16, 76:5, 83:6, 85:10, 86:3, 86:5, 86:19, 87:1, 87:6, 87:9, 87:15, 88:22, 95:13, 95:15, 95:21, 97:17, 98:3, 98:13, 99:9, 100:8, 100:23, 101:12, 102:21, 103:4, 105:10, 105:11, 105:20, 106:12, 108:16, 111:22, 111:24, 115:7, 118:6, 118:19, 118:23, 119:1, 119:4, 119:13, 119:21, 120:1, 120:5, 120:7, 120:9, 120:18, 121:15, 122:4, 122:12, 122:15, 123:17, 124:9, 125:4, 125:14, 125:23, 126:22, 126:25, 127:8, 136:13, 136:18, 136:20, 137:2
**agent** [39] - 4:21, 5:8,

7:18, 7:22, 8:8, 14:17, 22:11, 25:25, 27:5, 30:11, 41:5, 41:7, 43:18, 48:2, 50:11, 69:6, 76:23, 77:7, 87:6, 87:16, 106:10, 106:22, 111:24, 118:10, 119:4, 120:14, 121:13, 122:6, 123:19, 123:20, 124:3, 124:7, 124:16, 125:16, 125:19, 125:22, 127:3, 127:6, 127:11
**agent's** [1] - 92:5
**agents** [50] - 5:8, 5:10, 6:1, 6:17, 30:17, 43:22, 44:13, 44:16, 48:5, 48:13, 49:18, 49:24, 50:4, 50:25, 51:2, 51:7, 51:22, 57:10, 57:20, 58:5, 58:10, 58:12, 74:22, 77:5, 88:6, 88:18, 88:20, 89:3, 92:4, 92:20, 99:5, 102:8, 102:10, 108:9, 111:25, 118:1, 118:7, 118:14, 119:21, 121:22, 122:9, 123:13, 126:23, 127:6, 129:20, 130:9, 131:4, 131:5, 133:16, 136:19
**agents'** [1] - 87:8
**ages** [1] - 132:18
**aggravated** [1] - 110:22
**aggressive** [3] - 19:16, 70:2, 133:17
**ago** [2] - 116:1, 116:2
**agree** [9] - 86:1, 94:15, 94:18, 94:19, 99:19, 101:6, 102:20, 103:10, 105:23
**agreed** [9] - 31:10, 51:22, 52:17, 58:6, 85:23, 86:19, 86:22, 87:7, 97:13
**ahead** [1] - 119:25
**aiding** [1] - 110:24
**air** [1] - 70:9
**airtight** [1] - 129:19
**aka** [1] - 147:5
**AKA** [3] - 1:7, 2:3, 138:2
**alert** [1] - 122:23
**alerted** [3] - 106:24, 123:4, 133:24
**allegations** [1] - 35:24
**allocation** [1] - 108:18
**allotted** [1] - 72:16
**allow** [1] - 122:19
**allowed** [1] - 58:6
**alluded** [1] - 126:1
**almost** [2] - 124:24, 144:5

**alone** [8] - 11:20, 11:21, 41:14, 41:15, 88:9, 118:22, 133:3, 134:19
**aloud** [1] - 14:1
**alternative** [3] - 2:17, 111:6, 142:25
**amended** [2] - 59:9, 74:1
**Amendment** [2] - 94:8, 113:12
**AMERICA** [1] - 1:4
**America** [1] - 2:3
**American** [2] - 45:25, 53:3
**amount** [4] - 47:12, 49:13, 134:19, 139:25
**ample** [1] - 109:15
**analysis** [3] - 104:8, 105:8, 107:23
**analyze** [1] - 85:1
**analyzing** [1] - 83:1
**angry** [1] - 122:25
**announce** [6] - 6:19, 6:21, 6:25, 8:14, 118:9, 118:15
**announced** [2] - 7:9, 9:21
**announcing** [1] - 8:15
**answer** [41] - 14:12, 14:22, 15:3, 16:21, 17:1, 17:9, 36:18, 51:20, 57:18, 65:14, 65:16, 66:22, 66:24, 67:4, 67:5, 67:22, 67:24, 67:25, 68:2, 68:15, 74:14, 80:11, 86:20, 87:4, 87:21, 97:13, 97:23, 120:8, 121:12, 121:25, 122:1, 122:3, 122:5, 126:14, 126:18, 127:23, 134:3, 134:5, 141:23, 144:2
**answered** [17] - 7:10, 7:12, 9:20, 9:23, 21:11, 27:8, 27:12, 36:22, 46:11, 46:19, 61:24, 63:23, 65:13, 67:19, 121:11, 131:8, 133:18
**answering** [14] - 17:1, 29:5, 29:22, 30:16, 31:10, 34:6, 34:15, 95:18, 96:11, 96:19, 96:20, 119:17, 126:12
**answers** [12] - 17:10, 17:14, 17:20, 25:15, 25:22, 34:25, 35:3, 35:9, 76:11, 76:13, 87:25, 103:2
**anticipate** [1] - 141:16
**anticipated** [1] - 127:17

**Antigua** [7] - 45:8, 46:6, 46:24, 48:24, 108:25, 109:9, 125:9
**anyway** [3] - 56:16, 89:4, 140:4
**apart** [4] - 121:3, 125:12, 133:20, 134:11
**apartment** [15] - 7:3, 7:4, 7:5, 7:7, 7:8, 9:5, 10:14, 10:18, 11:14, 50:18, 61:12, 61:17, 62:1, 118:7, 118:16
**Apartment** [2] - 111:14, 118:16
**apologies** [3] - 10:8, 80:20, 86:11
**apologize** [2] - 93:6, 143:20
**apologizing** [1] - 124:5
**appear** [6] - 16:15, 18:14, 69:15, 69:18, 122:8, 133:15
**appearance** [2] - 8:3, 64:11
**Appearances** [1] - 1:15
**appeared** [4] - 18:16, 118:9, 119:5, 122:8
**application** [12] - 44:19, 44:22, 44:24, 47:5, 49:20, 55:19, 55:20, 59:20, 65:1, 113:18, 114:21, 115:2
**applications** [1] - 108:23
**applied** [6] - 46:25, 47:20, 47:21, 53:2, 64:24, 84:13
**apply** [2] - 45:13, 107:19
**appointed** [2] - 13:25, 63:19
**appreciate** [1] - 117:4
**approach** [1] - 86:8
**appropriate** [2] - 75:18, 80:23
**appropriately** [1] - 84:8
**approval** [1] - 55:4
**approved** [2] - 74:2, 75:20
**area** [1] - 10:18
**argue** [7] - 55:18, 64:21, 81:21, 81:22, 86:24, 102:23, 103:1
**argues** [1] - 112:16
**arguing** [1] - 107:15
**argument** [15] - 55:1, 55:25, 56:2, 64:8, 78:16, 81:20, 82:6, 82:12, 84:11, 90:14, 107:15, 112:16, 124:1, 136:25

**arguments** [2] - 82:10, 117:13
**armed** [1] - 6:7
**armor** [1] - 6:7
**arraigned** [1] - 137:16
**arraignment** [4] - 92:18, 137:12, 137:21, 137:23
**arrange** [2] - 143:8, 145:5
**arrangements** [2] - 143:10, 143:14
**arrest** [41] - 2:25, 5:11, 5:18, 29:19, 29:21, 30:8, 35:6, 38:1, 44:11, 49:16, 57:6, 57:8, 57:10, 58:21, 64:19, 68:23, 70:23, 71:1, 71:25, 72:15, 72:17, 72:20, 73:13, 75:6, 75:7, 75:12, 77:21, 82:17, 84:18, 85:7, 90:17, 91:25, 95:18, 102:1, 104:22, 106:19, 108:24, 117:16, 121:1, 132:14, 133:21
**arrested** [9] - 45:21, 45:23, 46:6, 50:2, 58:16, 58:17, 74:12, 90:12, 102:1
**arresting** [3] - 89:18, 89:19, 134:11
**arrests** [5] - 24:25, 32:20, 61:19, 72:11, 75:13
**arrive** [2] - 127:23, 132:7
**arrived** [6] - 20:24, 21:1, 27:6, 70:15, 90:3, 118:7
**arriving** [1] - 72:7
**ASAC** [1] - 60:14
**ascertain** [1] - 116:2
**ascertaining** [1] - 23:10
**aside** [5] - 13:6, 70:6, 83:13, 90:10, 90:18
**assertions** [1] - 105:3
**asserts** [1] - 112:20
**assigned** [10] - 5:13, 5:14, 6:13, 6:15, 43:19, 43:20, 44:5, 44:6, 48:2, 49:18
**assignment** [1] - 5:16
**assignments** [2] - 48:14, 48:15
**Assistant** [2] - 2:4, 74:2
**assume** [1] - 100:16
**assumed** [1] - 41:6
**assurance** [1] - 95:8
**assurances** [1] - 97:6
**astute** [1] - 105:24
**attach** [1] - 121:21

**attached** [1] - 3:19
**attempt** [3] - 44:22, 80:24, 88:7
**attempting** [1] - 70:21
**attempts** [1] - 129:12
**attention** [5] - 29:18, 45:5, 56:8, 61:18, 62:18
**attest** [1] - 75:17
**attested** [1] - 116:17
**attorney** [9] - 14:9, 15:1, 18:4, 34:19, 36:18, 36:19, 37:12, 37:20, 120:6
**Attorney** [1] - 2:4
**Attorney's** [4] - 48:19, 49:5, 74:4, 116:10
**August** [1] - 110:16
**aunt** [9] - 16:9, 16:10, 49:9, 67:3, 67:14, 92:1, 101:8, 126:16, 126:17
**aunts** [1] - 67:2
**AUSA** [3] - 49:5, 59:25, 73:17
**author** [1] - 31:20
**authored** [2] - 73:22, 73:23
**authorized** [1] - 113:11
**available** [2] - 15:14, 116:6
**averments** [1] - 114:20
**avers** [1] - 115:11
**aware** [20] - 19:23, 53:1, 55:9, 64:7, 67:21, 68:1, 70:7, 70:10, 71:11, 92:9, 92:20, 106:16, 107:8, 109:9, 113:16, 116:5, 116:8, 125:17, 126:19, 145:1
**awareness** [1] - 128:23
**Ayn** [3] - 49:5, 59:23, 59:25

## B

**backdrop** [1] - 83:19
**background** [2] - 85:6, 112:2
**backup** [1] - 139:12
**backwards** [1] - 144:3
**bad** [1] - 49:2
**Baltimore** [4] - 1:11, 1:24, 20:7, 20:8
**bar** [1] - 84:22
**bare** [2] - 107:17, 108:7
**based** [17] - 3:17, 8:4, 45:13, 49:2, 50:12, 50:24, 51:9, 53:11, 57:19, 65:1, 66:22, 76:11, 93:21, 108:15,

108:18, 109:10, 132:13
**basic** [1] - 46:9
**basis** [1] - 114:24
**bat** [1] - 61:16
**bathroom** [1] - 42:4
**became** [2] - 58:11, 92:16
**become** [2] - 58:8, 88:14
**began** [8] - 21:1, 37:6, 49:14, 65:14, 71:8, 102:9, 111:3, 136:18
**begin** [4] - 48:2, 75:21, 110:15, 118:5
**beginning** [2] - 40:18, 137:23
**Behalf** [2] - 1:16, 1:18
**behalf** [2] - 2:5, 88:21
**behind** [4] - 20:10, 75:7, 132:22, 133:5
**behold** [1] - 47:20
**belief** [1] - 114:4
**believes** [1] - 103:17
**benefit** [1] - 74:11
**Berghuis** [6] - 128:12, 129:1, 131:13, 131:17, 131:23, 135:17
**Berkemer** [1] - 128:15
**beside** [1] - 99:23
**best** [3] - 60:15, 97:19, 109:24
**better** [3] - 103:13, 122:25, 140:11
**between** [16] - 2:12, 10:24, 40:20, 41:20, 51:16, 56:6, 87:9, 87:14, 91:11, 101:19, 105:6, 117:22, 134:16, 136:4, 136:9, 142:25
**biographical** [3] - 15:21, 40:4, 46:9
**biography** [1] - 57:4
**biological** [1] - 116:15
**birth** [5] - 66:5, 66:7, 66:10, 66:16, 66:21
**bit** [3] - 29:17, 105:2, 124:7
**black** [1] - 52:2
**blower** [1] - 70:10
**blown** [1] - 120:14
**blurt** [2] - 99:2, 99:13
**body** [1] - 6:7
**bones** [2] - 107:18, 108:7
**booking** [1] - 89:12
**Border** [1] - 22:11
**born** [5] - 46:10, 112:5, 116:25, 138:8, 138:9
**boss** [1] - 74:2
**bottom** [4] - 73:11,

73:12, 73:13, 120:11
**bottoms** [4] - 27:10, 94:1, 118:10, 118:13
**boundaries** [1] - 114:9
**box** [2] - 4:4, 42:15
**boxers** [2] - 9:19, 10:6
**break** [7] - 6:22, 76:17, 82:21, 99:3, 100:1, 105:25, 135:10
**breaking** [7] - 20:22, 21:5, 71:5, 88:20, 105:4, 122:17, 123:14
**brief** [6] - 38:1, 76:18, 109:22, 121:22, 134:17, 141:5
**briefed** [3] - 8:8, 35:21, 143:17
**briefing** [6] - 12:20, 17:12, 17:22, 36:2, 73:17, 140:4
**briefings** [3] - 7:16, 7:18, 8:4
**briefly** [6] - 39:18, 45:1, 101:18, 113:9, 118:4, 126:11
**bright** [1] - 114:8
**bring** [5] - 48:24, 54:9, 77:11, 77:13, 88:1
**bringing** [4] - 9:4, 58:24, 75:1, 137:19
**brother** [4] - 64:19, 64:20, 65:15, 65:21
**brothers** [1] - 66:20
**brothers'** [2] - 65:11, 65:13
**brought** [9] - 19:21, 20:4, 25:7, 28:5, 41:21, 59:10, 109:1, 134:16, 135:11
**brutality** [1] - 134:10
**building** [4] - 7:2, 7:3, 7:5, 11:14
**bullet** [4] - 13:19, 63:12, 119:15, 126:2
**bullet-pointed** [1] - 13:19
**bulleted** [1] - 63:3
**bulleted-point** [1] - 63:3
**bullets** [1] - 34:11
**bump** [1] - 141:12
**Burbine** [2] - 128:15, 128:25
**burden** [7] - 3:8, 82:6, 93:23, 94:9, 98:22, 107:14, 128:19
**Bureau** [1] - 43:13
**Bustamonte** [1] - 133:12
**Butler** [2] - 129:1,

131:20
  BY [40] - 4:13, 5:1, 6:24, 8:12, 9:18, 11:12, 12:13, 14:15, 15:6, 17:8, 17:19, 21:25, 25:4, 28:20, 29:16, 30:10, 32:8, 33:18, 37:22, 39:17, 41:19, 43:11, 50:9, 50:23, 51:19, 54:15, 55:6, 56:4, 56:19, 59:16, 65:3, 66:3, 68:17, 76:8, 76:22, 146:5, 146:6, 146:6, 146:8, 146:8

## C

  calculus [1] - 104:15
  calendar [2] - 139:15, 139:22
  calm [4] - 69:17, 69:21, 126:20, 133:14
  calmly [1] - 106:7
  cannot [8] - 63:19, 64:16, 64:17, 68:15, 80:15, 81:4, 113:24, 130:13
  capacity [2] - 22:4, 133:9
  car [49] - 10:25, 11:13, 11:18, 11:22, 12:22, 20:9, 28:5, 28:6, 28:8, 28:9, 41:16, 41:21, 41:23, 61:2, 70:14, 72:19, 74:7, 82:22, 83:7, 83:16, 83:19, 83:24, 84:6, 84:17, 88:6, 89:7, 91:7, 94:5, 97:24, 98:22, 100:4, 101:6, 102:11, 117:8, 120:20, 126:7, 126:23, 127:18, 128:2, 132:21, 133:4, 133:21, 134:12, 134:16, 134:20, 135:2
  card [6] - 25:1, 47:13, 72:25, 75:8, 75:12, 92:8
  cardwell [1] - 131:15
  carefully [1] - 113:4
  Carolina [2] - 128:25, 131:20
  carry [1] - 97:1
  carrying [1] - 6:10
  Case [1] - 147:5
  CASE [1] - 1:5
  case [84] - 25:25, 26:20, 26:21, 27:5, 31:15, 33:7, 35:25, 40:20, 41:2, 41:5, 41:7, 44:5, 44:6, 44:7, 44:20, 44:21, 47:4, 47:23, 48:5, 48:18,

48:20, 51:3, 58:19, 59:22, 59:24, 64:14, 64:15, 74:15, 75:8, 75:19, 77:3, 77:17, 78:7, 78:21, 80:21, 81:8, 87:6, 87:11, 87:17, 89:11, 89:13, 89:16, 89:20, 99:16, 101:7, 102:6, 108:1, 110:15, 112:2, 113:22, 113:23, 116:5, 117:5, 124:24, 125:1, 125:3, 128:6, 128:10, 128:12, 129:1, 129:4, 130:1, 130:22, 130:23, 131:8, 131:14, 132:9, 132:23, 135:11, 135:13, 135:24, 136:1, 136:4, 136:11, 136:13, 140:8, 140:12, 141:16, 141:25, 142:3, 144:23
  case-in-chief [1] - 128:6
  cases [15] - 43:25, 48:15, 113:14, 114:7, 114:12, 128:19, 129:2, 129:16, 130:2, 130:5, 132:6, 132:24, 133:10, 136:8, 136:10
  cash [2] - 19:23, 20:2
  castigating [2] - 123:12, 123:13
  categories [1] - 117:14
  category [2] - 117:17, 117:20
  ceased [2] - 17:6, 102:7
  cell [2] - 72:6, 104:23
  center [6] - 7:6, 21:1, 61:3, 61:6, 70:15, 74:14
  cert [1] - 129:25
  certain [2] - 140:17, 140:24
  certainly [1] - 105:25
  CERTIFICATE [1] - 147:1
  certificate [5] - 66:5, 66:7, 66:10, 66:16, 66:21
  certify [2] - 147:3, 147:7
  challenge [5] - 90:20, 94:24, 96:25, 117:4, 127:23
  challenging [1] - 120:19
  chambers [2] - 92:19, 137:20
  chance [2] - 80:2, 144:24
  change [4] - 103:14, 103:15, 104:15, 144:24
  changed [1] - 104:9
  changes [1] - 104:8

  characterize [1] - 99:4
  characterizes [1] - 105:20
  charge [7] - 13:25, 63:20, 64:22, 69:6, 74:2, 74:5, 111:2
  charged [5] - 30:19, 72:23, 110:18, 138:20, 138:23
  charges [21] - 29:5, 29:23, 30:16, 59:2, 59:11, 59:17, 59:18, 60:6, 69:4, 69:19, 90:12, 92:14, 92:17, 95:19, 96:11, 96:13, 99:24, 100:2, 100:9, 126:21, 138:15
  chastising [1] - 136:19
  check [10] - 32:24, 46:1, 63:14, 63:16, 63:18, 63:20, 76:4, 118:24, 139:15, 140:4
  checked [1] - 137:20
  checking [2] - 12:3, 126:2
  checkmarks [7] - 13:19, 63:3, 63:4, 63:5, 63:7, 119:24, 120:1
  checks [2] - 45:12, 46:14
  Cheyenne [56] - 2:3, 7:11, 15:20, 17:4, 18:22, 21:13, 21:14, 29:15, 36:8, 36:10, 36:16, 38:20, 44:3, 44:24, 45:4, 49:14, 52:15, 53:23, 62:11, 64:7, 64:17, 64:18, 64:25, 65:11, 66:11, 67:16, 70:25, 71:1, 71:17, 73:3, 76:2, 76:14, 86:20, 89:25, 90:4, 90:21, 91:1, 91:15, 92:11, 108:24, 109:8, 110:17, 112:4, 112:22, 116:15, 116:24, 117:1, 123:22, 125:2, 125:9, 125:21, 130:23, 138:6, 147:5
  CHEYENNE [2] - 1:7, 138:2
  chief [2] - 81:8, 128:6
  child [2] - 46:21, 109:8
  children [6] - 9:15, 53:21, 106:4, 118:17, 132:17, 132:18
  choice [4] - 128:21, 132:4, 132:7, 134:8
  choose [1] - 126:15
  chooses [1] - 79:23
  choosing [1] - 134:3

  chose [6] - 79:5, 81:5, 81:6, 97:15, 134:4, 145:1
  chosen [1] - 80:22
  chronological [2] - 118:5, 124:6
  chronologically [1] - 119:25
  Circuit [15] - 113:17, 113:23, 114:16, 114:17, 114:19, 129:12, 129:15, 129:24, 131:15, 132:9, 132:10, 132:25, 133:11, 135:25, 136:5
  Circuit's [1] - 129:23
  circumstances [12] - 12:7, 41:4, 84:16, 94:4, 98:21, 100:19, 102:6, 114:2, 114:10, 120:13, 131:21, 132:7
  citations [2] - 110:12, 137:7
  cite [10] - 107:25, 113:15, 113:17, 113:21, 128:25, 129:22, 131:13, 131:14, 132:23, 136:10
  cited [2] - 107:20, 108:2
  citing [1] - 131:20
  citizen [7] - 45:9, 45:17, 45:23, 53:3, 64:25, 112:5, 125:9
  Citizen [1] - 45:25
  citizenship [3] - 59:21, 65:2, 110:20
  civilians [1] - 62:4
  claim [11] - 54:2, 59:21, 64:23, 65:2, 89:22, 90:19, 92:1, 92:2, 110:19, 144:23
  claimed [5] - 16:4, 16:5, 16:6, 90:21, 116:24
  claims [1] - 105:4
  clarify [4] - 31:20, 44:25, 101:19, 107:13
  Clause [1] - 129:5
  clear [4] - 31:18, 76:9, 130:9, 132:6
  cleared [1] - 10:14
  clearing [1] - 62:6
  clearly [1] - 132:13
  Clenney [1] - 129:14
  CLERK [15] - 4:3, 4:8, 42:14, 42:19, 42:25, 137:25, 138:4, 138:7, 138:10, 138:12, 138:15, 138:18, 138:23, 139:2, 139:6
  Clerk [1] - 137:24
  client [5] - 78:25, 98:5, 98:17, 99:13, 101:12
  close [9] - 5:6, 16:9,

49:8, 53:10, 53:16, 84:20, 126:17, 141:16, 144:22
  closest [1] - 67:2
  clothing [2] - 19:22, 20:2
  co [1] - 39:9
  co-counsel [1] - 39:9
  code [1] - 50:22
  Code [3] - 52:11, 59:19, 59:20
  coercion [3] - 84:13, 128:21, 134:8
  coercive [1] - 133:23
  cogent [1] - 105:23
  coherent [6] - 18:14, 18:16, 69:15, 122:8, 126:21, 133:15
  coincidence [1] - 113:15
  colleague [4] - 19:5, 24:18, 28:12, 30:22
  colleagues [3] - 6:4, 8:24, 13:10
  collection [1] - 21:3
  Columbia [6] - 2:21, 5:22, 20:8, 50:18, 50:21, 111:15
  combative [1] - 58:11
  comfort [1] - 67:12
  comfortable [2] - 75:25, 142:9
  command [1] - 6:17
  commence [2] - 139:9, 140:10
  commensurate [1] - 46:3
  comment [2] - 89:14, 122:22
  comments [10] - 20:21, 21:4, 39:7, 101:8, 105:24, 122:15, 123:9, 123:18, 127:4
  committed [3] - 46:4, 108:11, 116:3
  common [2] - 108:20, 114:9
  communication [2] - 105:5, 105:17
  compartmentalize [1] - 117:14
  compiled [1] - 72:15
  compiling [1] - 25:24
  complaint [1] - 65:1
  complete [3] - 31:11, 74:7, 147:9
  completed [7] - 24:17, 77:4, 95:3, 95:6, 119:19, 129:18, 129:19
  completely [2] - 100:7,

135:4
  **complied** [1] - 60:17
  **component** [2] -
122:14, 123:10
  **components** [2] -
82:20, 128:18
  **comport** [2] - 17:21,
60:23
  **comported** [1] - 17:11
  **comports** [1] - 61:8
  **comprehend** [2] -
133:13, 134:23
  **comprehended** [1] -
134:6
  **comprehension** [1] -
132:8
  **compromise** [1] - 136:6
  **concede** [1] - 102:20
  **concedes** [2] - 119:12,
119:15
  **concept** [1] - 113:24
  **concern** [5] - 10:11,
47:12, 85:11, 94:16,
115:14
  **concerned** [3] - 113:16,
130:13, 134:24
  **conclude** [1] - 113:6
  **concluded** [2] - 21:20,
99:13
  **concluding** [1] - 114:24
  **conclusion** [4] -
113:10, 115:2, 132:12,
145:13
  **conditioner** [1] - 70:10
  **conditions** [1] - 132:21
  **conducive** [3] - 74:10,
74:25, 127:16
  **conduct** [5] - 49:19,
126:6, 133:19, 134:3,
135:21
  **conducted** [3] - 50:25,
53:8, 125:25
  **conducting** [1] - 74:10
  **confer** [2] - 39:8,
139:23
  **conference** [3] - 140:2,
142:18, 144:20
  **conferred** [1] - 137:19
  **confidence** [1] - 96:15
  **confined** [1] - 114:20
  **confirm** [2] - 61:22,
139:2
  **confirmed** [3] - 46:25,
53:20, 103:20
  **confirming** [2] - 41:3,
92:15
  **confrontational** [2] -
21:4, 105:4
  **confronted** [1] - 107:2
  **confused** [2] - 53:18,

69:18
  **confusion** [2] - 18:20,
18:21
  **connection** [2] -
111:19, 115:20
  **conscience** [1] - 84:21
  **consequences** [2] -
125:16, 128:24
  **consider** [2] - 60:5,
131:21
  **consideration** [3] -
74:4, 78:17, 109:15
  **consist** [1] - 23:3
  **consistent** [1] - 125:23
  **consistently** [1] - 136:7
  **consists** [2] - 23:4,
115:4
  **consolidated** [1] - 3:2
  **constant** [1] - 105:5
  **constitute** [1] - 147:7
  **constitutional** [1] -
124:10
  **constitutionally** [1] -
113:12
  **consulate** [5] - 45:10,
45:23, 46:13, 46:17,
125:8
  **Consulate** [1] - 45:16
  **consulates** [1] - 45:24
  **consult** [4] - 13:22,
18:4, 63:17, 68:7
  **contact** [4] - 21:19,
41:1, 50:14, 105:5
  **contacted** [1] - 40:21
  **contain** [1] - 119:21
  **contained** [4] - 111:1,
114:21, 117:8, 120:4
  **contemporaneous** [2] -
87:15, 87:18
  **contended** [1] - 136:1
  **contends** [1] - 112:11
  **content** [2] - 129:7,
132:14
  **contention** [1] - 112:3
  **contested** [1] - 143:17
  **context** [15] - 61:25,
63:6, 83:25, 89:10,
89:20, 90:2, 91:20,
91:25, 104:4, 104:11,
105:2, 106:17, 125:3,
129:4, 131:24
  **continually** [1] - 36:8
  **continue** [5] - 15:1,
70:16, 70:19, 86:25, 99:4
  **continued** [3] - 21:4,
36:15, 83:11
  **continues** [1] - 89:25
  **continuing** [7] - 97:23,
102:24, 104:23, 105:3,
105:11, 105:12, 105:13

  **continuous** [1] - 105:16
  **continuously** [2] -
40:15, 88:17
  **contraband** [3] -
113:19, 114:4, 114:11
  **control** [1] - 6:17
  **controlled** [1] - 11:10
  **convenience** [2] - 82:9,
82:19
  **Convention** [1] - 45:13
  **convention** [1] - 45:20
  **conventions** [2] -
45:13, 45:22
  **conversation** [40] -
15:24, 16:11, 17:24,
18:1, 18:15, 18:23, 19:1,
19:3, 19:6, 19:12, 19:13,
19:15, 49:4, 52:20,
52:23, 60:7, 64:9, 69:7,
69:10, 70:11, 70:12,
70:21, 71:20, 73:21,
75:21, 83:16, 84:2, 84:6,
88:8, 89:6, 89:7, 91:7,
91:8, 101:20, 102:8,
102:13, 102:22, 105:9,
105:10
  **conversations** [5] -
39:5, 50:24, 57:21,
71:13, 88:19
  **convey** [1] - 123:16
  **cooperative** [3] - 69:20,
126:21, 133:14
  **copies** [1] - 93:9
  **cops** [1] - 75:19
  **copy** [5] - 3:18, 66:16,
86:7, 93:7, 138:12
  **Copy** [1] - 76:7
  **corners** [2] - 82:2,
114:21
  **cornerstone** [1] -
113:11
  **correct** [80] - 6:23, 8:2,
8:6, 9:9, 17:14, 18:19,
22:5, 23:2, 23:20, 23:23,
23:24, 24:2, 24:3, 24:6,
24:7, 24:9, 24:12, 24:13,
24:16, 24:19, 25:5, 25:6,
26:14, 26:19, 27:8, 27:9,
27:20, 29:23, 31:1, 31:2,
31:16, 33:20, 33:24,
33:25, 34:13, 35:2,
35:19, 35:20, 35:22,
35:23, 35:25, 36:1, 36:4,
38:3, 38:6, 39:3, 39:5,
39:23, 40:9, 40:12,
41:23, 41:24, 49:22,
52:1, 52:16, 55:1, 55:5,
56:25, 57:12, 57:14,
57:17, 57:22, 58:1, 59:1,
65:25, 68:21, 76:25,

77:1, 77:10, 79:16,
80:14, 87:5, 87:23,
103:23, 106:15, 106:21,
107:7, 137:18, 139:4,
142:17
  **corrections** [2] -
110:12, 137:8
  **correctly** [3] - 66:22,
67:24, 89:20
  **corresponded** [1] -
120:3
  **corroborated** [1] -
126:22
  **Coulson** [4] - 3:19,
108:7, 109:16, 111:12
  **counsel** [32] - 2:9, 2:13,
3:4, 14:25, 22:21, 29:24,
39:9, 56:14, 59:4, 76:16,
79:15, 81:1, 81:10, 82:7,
88:9, 90:10, 93:4, 94:15,
97:15, 97:22, 103:19,
108:1, 109:20, 110:14,
117:12, 119:7, 138:19,
141:3, 141:8, 141:20
  **count** [3] - 59:19, 59:20,
110:15
  **counted** [2] - 19:23,
20:2
  **countries** [1] - 48:7
  **country** [4] - 40:13,
45:8, 45:21, 45:22
  **Counts** [2] - 138:23,
139:3
  **counts** [1] - 111:1
  **County** [2] - 61:20,
92:15
  **couple** [3] - 115:1,
115:5, 137:13
  **course** [26] - 18:6,
19:12, 21:13, 36:21,
50:1, 68:3, 69:2, 71:17,
71:19, 75:22, 82:15,
84:18, 94:21, 97:5,
98:14, 99:10, 100:15,
101:25, 104:6, 104:21,
107:23, 123:6, 124:25,
127:23, 129:4, 135:21
  **court** [9] - 13:22, 63:16,
76:16, 104:25, 117:6,
131:18, 131:19, 132:6,
143:6
  **COURT** [195] - 1:1, 2:9,
2:13, 3:11, 3:14, 3:20,
3:24, 4:22, 4:25, 6:21,
8:7, 8:10, 9:16, 10:7,
11:7, 12:11, 12:17,
14:11, 14:22, 15:2, 16:5,
16:19, 16:22, 16:25,
17:17, 21:23, 22:21,
22:23, 24:21, 26:25,

28:18, 29:3, 29:10,
29:24, 30:2, 30:5, 30:9,
31:7, 31:15, 31:21,
31:24, 32:2, 33:10,
33:15, 35:17, 37:14,
37:18, 39:15, 40:25,
41:8, 41:11, 41:14, 42:7,
42:9, 42:13, 43:8, 45:2,
45:16, 48:12, 50:7,
50:17, 51:14, 51:18,
54:5, 54:10, 55:3, 55:15,
55:23, 56:2, 56:13,
56:18, 57:15, 59:4,
59:15, 64:14, 65:20,
65:23, 66:2, 68:14, 75:4,
76:16, 76:20, 78:1,
78:11, 78:13, 78:19,
78:24, 79:15, 79:25,
80:3, 80:7, 80:11, 80:19,
80:21, 81:4, 81:13,
81:15, 81:18, 82:3, 82:5,
82:9, 82:18, 83:2, 83:5,
83:18, 84:4, 85:14,
85:18, 86:1, 86:7, 86:9,
86:12, 86:14, 87:1, 87:3,
87:20, 87:24, 89:9, 90:9,
90:14, 90:24, 91:4,
91:13, 93:2, 93:4, 93:7,
93:10, 93:14, 93:17,
93:20, 94:15, 94:23,
95:2, 95:7, 95:10, 96:17,
99:6, 99:17, 100:16,
100:20, 101:1, 101:14,
101:17, 101:21, 101:24,
102:3, 102:10, 102:14,
103:21, 103:23, 104:11,
105:19, 106:18, 106:24,
107:1, 107:4, 107:9,
107:12, 107:24, 108:5,
109:18, 109:20, 110:2,
110:6, 110:8, 110:11,
119:9, 137:15, 137:22,
139:7, 139:15, 139:17,
139:21, 140:6, 140:11,
140:18, 140:23, 141:2,
141:5, 141:8, 141:20,
141:23, 142:4, 142:11,
142:15, 142:19, 142:23,
143:4, 143:24, 144:9,
144:14, 144:21, 145:6,
145:8, 145:11
  **Court** [50] - 3:10, 3:22,
44:25, 59:12, 60:19,
63:6, 78:15, 80:10, 85:6,
87:9, 87:20, 88:10,
88:24, 92:18, 93:6,
94:11, 94:16, 96:15,
97:6, 97:21, 102:20,
102:24, 103:13, 104:19,
108:12, 108:13, 108:17,
110:4, 110:8, 111:3,

111:20, 113:22, 114:2, 128:13, 129:9, 131:17, 131:20, 131:23, 132:1, 132:11, 135:18, 135:23, 139:10, 139:13, 139:23, 140:5, 140:16, 147:16
Court's [4] - 29:2, 35:16, 57:18, 85:11
court's [1] - 114:23
Courthouse [1] - 1:23
courtroom [4] - 9:21, 9:24, 76:17, 111:22
courts [1] - 136:7
cover [1] - 99:8
covers [1] - 127:22
creates [1] - 89:21
credible [1] - 118:1
credibly [1] - 111:25
credit [3] - 47:13, 49:1, 49:2
credited [1] - 87:20
crime [8] - 77:9, 95:24, 96:2, 113:20, 114:5, 114:11, 115:16, 116:3
crimes [2] - 43:22, 46:3
CRIMINAL [1] - 1:5
Criminal [1] - 2:4
criminal [7] - 5:15, 5:16, 7:22, 30:18, 43:21, 44:1, 48:10
Cristobal [1] - 132:9
critically [1] - 133:10
criticism [1] - 106:11
criticisms [2] - 106:8
cross [4] - 21:23, 56:5, 76:20, 124:5
CROSS [4] - 21:24, 76:21, 146:6, 146:8
cuffed [2] - 12:11, 12:12
cuffs [2] - 20:14, 28:24
culminate [1] - 55:4
cumulative [1] - 83:11
cured [1] - 90:7
curious [1] - 40:25
current [2] - 44:17, 58:5
custodial [11] - 3:9, 13:11, 82:16, 83:14, 84:17, 85:4, 116:23, 119:10, 121:4, 125:13, 128:5
custody [20] - 3:12, 13:14, 23:5, 33:24, 39:3, 50:2, 50:3, 75:19, 82:15, 85:1, 88:17, 89:3, 93:25, 98:1, 98:10, 104:6, 108:25, 119:11, 128:1, 129:6
cut [2] - 26:10, 73:25
cuts [1] - 90:14

**D**

damning [1] - 100:8
dark [1] - 104:22
databases [1] - 47:19
date [20] - 2:25, 25:1, 25:15, 25:23, 25:25, 26:9, 26:13, 50:8, 54:5, 54:10, 57:14, 57:15, 92:8, 139:12, 140:3, 140:17, 140:24, 142:20, 143:2
dates [3] - 142:16, 142:24, 142:25
Dave [1] - 74:3
David [3] - 1:19, 2:10, 60:14
Davis [99] - 2:3, 2:11, 7:11, 15:20, 17:4, 18:22, 21:13, 21:14, 24:18, 25:12, 25:16, 25:21, 26:17, 28:21, 29:4, 29:15, 30:14, 30:15, 34:5, 34:21, 34:25, 35:18, 36:6, 36:8, 36:9, 36:10, 36:16, 38:21, 39:10, 44:3, 44:24, 45:4, 49:14, 52:4, 52:6, 52:8, 52:10, 52:12, 52:14, 52:15, 53:24, 62:11, 64:7, 64:17, 64:18, 64:25, 65:11, 66:4, 66:11, 67:16, 70:25, 71:1, 71:17, 73:3, 76:2, 76:14, 79:2, 80:6, 86:20, 89:25, 90:4, 90:21, 91:1, 91:15, 92:12, 93:23, 94:6, 94:12, 94:21, 95:8, 95:22, 96:1, 96:15, 97:22, 98:12, 98:18, 98:22, 101:13, 108:25, 109:4, 109:7, 109:8, 110:17, 112:5, 112:22, 113:15, 116:15, 116:25, 117:2, 123:23, 125:2, 125:10, 125:21, 130:24, 138:6, 138:23, 147:5
DAVIS [2] - 1:7, 138:2
Davis's [1] - 112:7
days [5] - 54:14, 57:17, 104:23, 141:9, 141:25
dead [2] - 91:17, 91:19
dealing [1] - 84:23
deceased [2] - 67:21, 91:16
December [18] - 57:13, 57:16, 57:18, 90:15, 91:13, 91:14, 107:3, 107:4, 116:21, 121:6,

121:10, 125:13, 139:12, 139:14, 140:8, 140:10, 140:17, 140:21
deception [2] - 128:22, 134:9
decide [1] - 103:13
decided [1] - 55:9
decision [13] - 79:3, 113:17, 114:16, 114:17, 114:19, 128:13, 128:24, 129:15, 129:23, 131:15, 132:9, 134:4, 136:1
declined [3] - 87:21, 108:18, 116:9
deemed [1] - 80:12
defeats [1] - 108:15
Defendant [3] - 1:8, 1:18, 119:7
DEFENDANT [13] - 79:10, 79:13, 81:14, 81:17, 138:2, 138:3, 138:6, 138:9, 138:11, 138:14, 138:17, 139:1, 139:5
defendant [218] - 2:14, 2:17, 2:23, 3:3, 9:4, 9:19, 10:17, 10:23, 11:5, 12:15, 12:23, 13:15, 14:4, 14:20, 15:8, 15:17, 15:21, 16:12, 18:1, 18:7, 18:14, 19:4, 19:13, 20:3, 20:9, 20:18, 21:20, 27:8, 33:11, 37:5, 39:19, 41:2, 41:20, 41:23, 47:6, 47:20, 48:23, 49:3, 50:2, 50:11, 52:15, 57:9, 57:10, 58:3, 58:8, 58:24, 60:4, 60:12, 60:22, 61:3, 61:12, 61:15, 61:16, 62:8, 62:15, 63:8, 63:11, 63:16, 66:13, 66:19, 67:15, 67:19, 68:4, 68:11, 68:15, 69:3, 69:11, 69:25, 70:5, 70:8, 70:13, 70:19, 71:4, 71:6, 71:16, 71:21, 71:22, 74:6, 76:1, 76:17, 82:15, 83:14, 84:11, 84:13, 84:24, 85:4, 85:21, 85:22, 86:17, 86:21, 87:3, 87:21, 87:24, 87:25, 88:8, 88:18, 88:20, 89:1, 89:10, 89:21, 89:23, 90:25, 93:12, 96:5, 96:22, 102:7, 102:23, 103:7, 105:5, 109:10, 109:11, 110:17, 111:5, 111:8, 112:3, 112:6, 112:22, 112:25, 115:20, 116:3,

116:20, 116:22, 117:15, 117:19, 118:9, 118:13, 118:21, 118:22, 118:25, 119:2, 119:11, 119:20, 120:5, 120:7, 120:12, 120:16, 120:20, 120:21, 121:2, 121:16, 121:17, 121:23, 122:4, 122:7, 122:11, 122:15, 122:16, 122:23, 123:3, 123:12, 123:18, 123:19, 123:20, 123:21, 124:2, 124:9, 124:14, 124:15, 124:16, 124:18, 124:23, 125:2, 125:7, 125:12, 125:14, 125:20, 126:3, 126:4, 126:7, 126:9, 126:12, 126:14, 126:16, 126:20, 126:24, 127:4, 127:5, 127:8, 127:13, 127:18, 127:20, 128:1, 128:5, 128:8, 128:17, 130:12, 130:15, 130:20, 130:23, 131:4, 131:5, 131:7, 131:11, 132:12, 133:4, 133:21, 133:24, 134:16, 135:2, 135:9, 135:15, 136:1, 136:14, 136:16, 136:19, 136:23, 137:1, 137:5, 137:15, 137:25, 138:19, 143:8
Defendant's [17] - 22:19, 26:5, 26:7, 26:23, 27:1, 27:4, 29:25, 30:3, 34:10, 77:16, 93:5, 93:11, 93:14, 93:16, 94:3, 95:13, 97:9
defendant's [26] - 2:21, 7:4, 22:22, 27:1, 30:2, 48:8, 49:13, 50:17, 59:9, 74:11, 78:17, 90:19, 91:16, 93:19, 93:20, 103:1, 111:14, 111:16, 116:1, 118:7, 118:18, 118:25, 123:15, 131:10, 132:23, 133:9
defendants [1] - 13:12
defense [23] - 2:16, 3:16, 10:4, 59:13, 73:10, 78:20, 82:3, 86:5, 86:12, 90:10, 103:10, 107:14, 111:7, 112:10, 112:16, 112:20, 112:23, 119:15, 119:19, 140:15, 140:18, 141:25, 142:3
Defense [2] - 73:12, 86:14
defer [2] - 3:10, 80:10
defined [2] - 113:24, 114:8

Delaware [1] - 2:18
delay [2] - 136:4, 136:12
deliberate [3] - 128:21, 132:4, 134:8
demeanor [1] - 126:20
demonstrate [1] - 128:7
denied [3] - 117:9, 122:12, 129:25
deny [2] - 117:6, 137:3
departed [1] - 20:6
Department [15] - 4:17, 5:5, 22:2, 22:3, 22:7, 22:10, 22:13, 22:16, 43:13, 48:9, 61:20, 75:14, 77:7, 94:10, 111:23
department [4] - 22:20, 45:24, 53:9, 75:20
deputy [1] - 76:17
DeQuasie [1] - 113:22
describe [3] - 10:1, 44:15, 113:13
described [2] - 122:16, 126:20
description [2] - 105:21, 133:15
detached [1] - 108:22
detail [1] - 116:14
determination [3] - 55:8, 114:9, 133:10
determine [6] - 64:12, 64:17, 74:16, 85:3, 131:21, 133:8
determined [1] - 79:19
determining [1] - 85:6
develop [1] - 49:12
Dickerson [1] - 128:14
dictates [1] - 130:10
died [2] - 16:8, 126:19
difference [1] - 91:2
differences [1] - 125:5
different [7] - 56:6, 61:1, 77:2, 95:24, 104:11, 104:22, 106:22
differently [2] - 61:1, 98:14
dignitaries [1] - 5:7
Diplomat [1] - 4:1
Diplomatic [15] - 2:6, 4:17, 4:22, 5:3, 5:4, 5:9, 13:8, 13:11, 16:1, 43:13, 75:9, 86:17, 96:8, 97:10, 111:23
dire [1] - 129:24
DIRE [1] - 129:24
Dire [1] - 130:2
direct [5] - 28:22, 29:18, 56:7, 124:8
DIRECT [4] - 4:12,

43:10, 146:5, 146:8
**directed** [1] - 106:10
**direction** [1] - 60:11
**directly** [4] - 4:9, 34:8, 42:20, 63:10
**discerning** [1] - 23:14
**disclose** [1] - 55:18
**disclosed** [2] - 59:13, 60:10
**discovery** [2] - 51:25, 73:11
**discrepancy** [1] - 87:14
**discussed** [1] - 60:8
**discussion** [3] - 120:25, 123:23, 124:1
**discussions** [1] - 68:3
**dispute** [3] - 3:11, 119:11, 127:25
**disrespectful** [5] - 19:4, 19:8, 19:9, 69:24, 122:10
**disseminated** [1] - 7:17
**distinct** [1] - 128:18
**district** [1] - 47:10
**District** [1] - 116:10
**DISTRICT** [2] - 1:1, 1:1
**diverge** [1] - 87:8
**diverges** [1] - 118:2
**DIVISION** [1] - 1:2
**DNA** [5] - 21:3, 21:15, 72:6, 104:5, 104:13
**document** [5] - 13:1, 63:12, 103:13, 103:15, 138:13
**documentation** [3] - 25:24, 41:9, 47:1
**documenting** [1] - 41:7
**documents** [2] - 54:2, 115:10
**DOE** [2] - 1:6, 138:2
**Doe** [8] - 2:3, 44:2, 44:10, 44:16, 70:23, 108:23, 110:17, 147:4
**Doe's** [1] - 51:10
**done** [12] - 25:2, 33:7, 36:2, 45:12, 49:21, 53:6, 59:14, 75:13, 103:7, 103:14, 105:2, 137:22
**door** [22] - 6:22, 7:10, 7:13, 8:14, 8:15, 8:16, 8:25, 9:20, 9:23, 10:24, 27:8, 27:12, 28:10, 28:11, 28:12, 28:18, 28:19, 33:22, 63:9, 90:3, 120:20
**doors** [1] - 7:7
**doublecheck** [1] - 141:2
**doubt** [1] - 142:4
**down** [19] - 6:22, 10:21, 10:25, 11:13, 28:18,

30:1, 40:21, 42:10, 50:14, 73:25, 74:18, 74:21, 75:23, 78:13, 80:8, 103:6, 138:5, 141:9, 143:21
**drafted** [1] - 72:17
**drawn** [5] - 8:24, 118:14, 132:25, 133:1, 133:3
**Drive** [1] - 39:2
**driver** [2] - 20:19, 41:16
**driver's** [1] - 20:10
**driving** [3] - 61:2, 70:7, 127:1
**DS** [1] - 16:1
**DSEP** [1] - 73:1
**DSS** [13] - 4:19, 5:13, 6:10, 20:3, 43:15, 43:17, 44:16, 45:6, 52:2, 52:8, 53:2, 57:10, 57:23
**Ducao** [3] - 49:5, 59:23, 59:25
**due** [3] - 135:1, 143:21, 144:14
**Due** [1] - 129:5
**duress** [1] - 104:12
**during** [69] - 6:4, 6:6, 9:12, 11:1, 11:4, 12:2, 13:11, 13:23, 18:6, 18:23, 19:3, 19:6, 19:12, 19:15, 20:8, 20:18, 20:20, 21:15, 22:12, 28:21, 33:20, 37:25, 38:5, 38:23, 41:6, 41:11, 43:6, 44:8, 44:23, 49:19, 50:1, 50:16, 51:10, 52:23, 53:22, 58:5, 58:7, 59:7, 60:9, 60:16, 60:23, 61:7, 63:18, 65:4, 66:17, 68:3, 68:22, 69:2, 69:7, 69:10, 70:5, 70:14, 70:19, 84:6, 84:18, 87:9, 105:6, 105:10, 105:12, 119:10, 120:8, 120:24, 123:10, 128:5
**duty** [2] - 41:24, 144:18
**dwelling** [3] - 6:18, 9:11, 9:12

## E

**e-mail** [9] - 26:8, 26:9, 26:15, 40:10, 60:18, 73:19, 73:25, 93:15, 93:17
**early** [1] - 117:16
**easier** [1] - 111:18
**easiest** [1] - 82:10
**easy** [1] - 117:13

**ECF** [15] - 2:17, 2:24, 3:3, 56:13, 56:20, 110:16, 111:5, 111:9, 112:19, 113:1, 115:3, 115:9, 115:10
**Eclipse** [2] - 2:22, 111:16
**edge** [1] - 63:9
**educated** [1] - 142:7
**effect** [3] - 71:11, 120:2, 129:16
**effectively** [2] - 99:2, 100:14
**efficient** [1] - 72:5
**effort** [2] - 108:9, 117:4
**efforts** [1] - 116:2
**eight** [1] - 108:8
**either** [16] - 15:4, 25:11, 32:24, 34:9, 36:15, 38:23, 48:22, 78:16, 80:5, 85:17, 88:3, 89:6, 98:15, 103:11, 103:16, 130:16
**elapsed** [2] - 136:9, 137:1
**election** [18] - 21:8, 21:10, 38:12, 38:17, 38:18, 60:4, 60:11, 71:15, 88:23, 90:11, 92:10, 92:11, 92:13, 99:10, 99:21, 104:3, 123:19, 127:9
**element** [1] - 99:11
**ELH-17-054** [3] - 1:6, 2:4, 147:5
**elicited** [3] - 83:23, 98:16, 103:24
**Ellen** [1] - 1:13
**employed** [6] - 4:14, 22:3, 22:6, 22:9, 22:12, 43:15
**employs** [1] - 41:1
**en** [1] - 128:2
**encountering** [1] - 10:15
**end** [6] - 16:12, 40:17, 88:8, 96:21, 102:13, 107:22
**ended** [1] - 102:15
**enforcement** [17] - 5:5, 5:10, 6:1, 7:10, 8:5, 22:4, 22:6, 47:19, 48:22, 49:15, 68:20, 71:7, 85:2, 108:23, 112:18, 117:18, 118:21
**engage** [2] - 71:12, 120:14
**engaged** [3] - 88:18, 89:3, 135:20
**ensure** [4] - 24:5, 89:18,

98:18, 114:23
**ensuring** [1] - 98:12
**entail** [1] - 6:16
**enter** [2] - 70:23, 72:13
**entered** [2] - 71:3, 73:1
**entering** [1] - 61:17
**entire** [3] - 17:4, 41:18, 69:21
**entirely** [1] - 92:22
**entitled** [3] - 52:2, 52:9, 89:17
**entry** [8] - 6:15, 6:18, 9:7, 9:10, 10:14, 11:5, 11:10
**environment** [1] - 75:24
**envision** [1] - 120:19
**Eric** [1] - 51:1
**especially** [2] - 30:18, 132:17
**Esquire** [3] - 1:17, 1:19, 1:19
**essentially** [2] - 41:17, 105:8
**establish** [2] - 112:25, 133:3
**established** [2] - 84:3, 124:22
**establishes** [1] - 113:4
**estimate** [3] - 54:13, 71:25, 141:21
**etc** [1] - 127:9
**event** [6] - 97:20, 98:24, 110:13, 121:14, 123:9, 137:8
**events** [2] - 60:20, 90:16
**evidence** [24] - 2:16, 57:24, 61:18, 73:1, 81:20, 81:22, 81:23, 85:22, 88:7, 93:1, 109:17, 111:5, 111:10, 113:19, 114:4, 114:11, 115:3, 124:15, 126:2, 128:8, 132:11, 132:19, 132:22, 133:13
**evidentiary** [1] - 111:20
**evolved** [1] - 75:10
**evolvement** [1] - 75:11
**exact** [4] - 25:25, 32:11, 123:15, 127:1
**exactly** [10] - 36:6, 61:8, 72:22, 74:3, 74:20, 82:25, 83:21, 88:2, 120:19, 130:17
**EXAMINATION** [10] - 4:12, 21:24, 39:16, 43:10, 76:21, 146:5, 146:6, 146:6, 146:8, 146:8
**examination** [1] - 124:5

**examine** [2] - 21:23, 76:20
**examining** [1] - 115:10
**example** [6] - 23:15, 80:13, 81:5, 81:7, 83:8, 126:16
**exampled** [1] - 60:18
**except** [4] - 46:11, 46:20, 101:7, 133:1
**exception** [4] - 107:18, 112:13, 113:7, 137:4
**exclusion** [1] - 115:22
**excuse** [5] - 31:17, 46:14, 65:22, 67:8, 105:12
**excused** [1] - 43:6
**execute** [1] - 5:10
**executed** [5] - 2:19, 5:21, 5:24, 62:4, 111:13
**executing** [3] - 62:13, 89:19, 92:21
**execution** [16] - 5:16, 5:18, 6:2, 6:5, 6:6, 6:13, 7:25, 44:9, 54:17, 58:18, 60:9, 66:17, 84:7, 87:10, 92:4, 92:7
**exercise** [1] - 132:4
**Exhibit** [12] - 13:1, 26:5, 26:7, 30:4, 56:20, 62:19, 73:12, 86:14, 93:6, 94:4, 119:6, 119:7
**exhibit** [3] - 60:18, 73:10, 86:12
**exhibits** [3] - 86:10, 111:25, 117:10
**exist(s** [1] - 114:2
**existed** [1] - 114:25
**exists** [1] - 112:22
**expect** [2] - 139:25, 141:17
**expediency** [1] - 81:19
**experience** [2] - 104:13, 115:9
**explain** [2] - 23:5, 63:6
**explained** [4] - 69:19, 126:5, 126:6, 131:3
**explaining** [1] - 127:12
**explicit** [1] - 88:3
**explicitly** [4] - 64:1, 87:7, 91:23, 97:22
**Explorer** [1] - 10:22
**express** [2] - 18:20, 131:22
**expressly** [2] - 86:1, 126:4
**extensive** [1] - 142:3
**extensively** [1] - 51:4
**extent** [4] - 86:23, 120:25, 121:20, 136:16
**external** [1] - 6:7

**extraordinary** [1] - 134:19
**eye** [1] - 11:25

## F

**F.2d** [2] - 114:16, 133:11
**F.3d** [11] - 107:21, 108:4, 113:16, 113:23, 114:18, 114:19, 129:15, 129:24, 131:15, 132:10, 135:25
**face** [4] - 4:4, 42:15, 105:22, 133:5
**faced** [1] - 7:7
**facility** [2] - 20:24, 128:3
**facing** [1] - 33:22
**fact** [27] - 55:9, 55:19, 66:23, 84:2, 85:4, 85:23, 90:7, 91:18, 94:12, 96:6, 99:12, 103:14, 103:15, 108:13, 115:25, 118:3, 122:2, 123:13, 125:2, 127:16, 130:1, 133:4, 133:20, 134:1, 134:4, 135:18, 135:20
**facts** [11] - 17:12, 31:9, 35:5, 44:20, 44:21, 97:18, 97:21, 108:16, 109:14, 114:2, 135:14
**faculties** [1] - 18:17
**fail** [1] - 137:6
**failing** [1] - 65:16
**failure** [3] - 91:21, 94:17, 121:12
**fair** [3] - 32:12, 101:1, 114:11
**fairly** [2] - 45:12, 89:2
**faith** [6] - 107:18, 108:14, 112:13, 113:5, 113:7
**false** [17] - 18:12, 30:19, 30:20, 52:12, 59:19, 59:21, 64:23, 68:19, 69:4, 69:5, 75:24, 77:8, 95:23, 110:19, 112:23, 116:23, 121:13
**False** [1] - 52:9
**falsely** [2] - 79:19, 84:15
**familiar** [7] - 13:5, 22:16, 26:20, 64:21, 68:25, 77:19, 108:12
**families** [11] - 20:23, 21:5, 38:15, 71:5, 88:21, 99:3, 100:1, 105:4, 105:25, 122:17, 123:14

**family** [3] - 15:22, 57:5, 65:8
**far** [9] - 11:16, 17:14, 90:22, 108:7, 113:15, 113:16, 130:13, 134:24, 140:12
**father** [19] - 16:3, 16:7, 49:9, 65:19, 65:20, 65:24, 66:4, 66:11, 66:21, 67:15, 67:19, 67:21, 67:22, 91:15, 91:19, 109:13, 117:1, 126:19
**FCRR** [1] - 1:23
**February** [37] - 2:20, 3:1, 5:19, 5:25, 10:5, 25:7, 25:10, 25:16, 25:18, 26:16, 27:6, 32:10, 34:21, 40:15, 40:20, 44:9, 44:12, 51:17, 54:18, 60:17, 61:9, 63:1, 73:23, 73:24, 77:14, 78:7, 87:10, 93:24, 95:15, 111:12, 111:13, 112:9, 117:17, 117:21, 118:8, 118:11, 121:15
**federal** [11] - 5:9, 30:17, 68:20, 69:6, 77:9, 77:11, 95:23, 96:13, 116:3, 121:13, 125:16
**fellow** [1] - 5:8
**felt** [2] - 16:19, 72:23
**female** [4] - 9:15, 19:24, 20:3, 118:17
**few** [4] - 75:1, 96:7, 114:13, 128:16
**fewer** [1] - 141:18
**field** [4] - 5:14, 10:21, 43:20, 47:4
**fifteen** [1] - 35:16
**Fifth** [1] - 94:7
**fifth** [2] - 119:14, 129:11
**file** [3] - 75:8, 143:6, 143:15
**filed** [8] - 2:15, 2:23, 3:2, 110:16, 110:25, 111:8, 139:24, 143:5
**files** [1] - 75:9
**fill** [3] - 37:23, 75:13, 103:5
**fill-out** [1] - 75:13
**filled** [4] - 33:4, 74:20, 77:25, 78:4
**final** [1] - 117:12
**financial** [1] - 47:13
**fine** [3] - 110:5, 137:22, 144:15
**fingerprints** [1] - 71:3
**finish** [2] - 82:12,

141:11
**firearm** [4] - 61:18, 61:21, 62:12
**firearms** [5] - 6:10, 18:24, 39:9, 84:14, 122:10
**firm** [1] - 64:8
**first** [57] - 3:20, 4:9, 4:10, 8:25, 25:20, 26:15, 26:18, 29:7, 39:25, 40:6, 41:21, 42:21, 42:22, 43:3, 44:5, 44:6, 44:15, 44:19, 44:23, 45:1, 45:5, 50:10, 50:12, 50:14, 52:2, 55:3, 55:16, 55:19, 60:6, 65:12, 70:12, 72:2, 73:20, 73:22, 78:19, 82:7, 87:11, 91:11, 92:21, 94:23, 97:9, 99:13, 100:14, 101:18, 111:17, 121:5, 123:3, 129:7, 140:25, 141:15, 141:17, 142:6
**Five** [2] - 138:24, 139:3
**five** [15] - 17:25, 19:1, 19:12, 21:18, 47:7, 69:8, 69:9, 72:5, 83:15, 84:5, 86:23, 89:7, 91:7, 105:9, 121:22
**five-minute** [7] - 19:1, 19:12, 83:15, 84:5, 86:23, 89:7, 91:7
**floor** [2] - 7:7, 7:8
**Floor** [1] - 1:23
**Florida** [3] - 16:4, 67:20, 129:8
**flown** [1] - 49:11
**focus** [2] - 111:17, 130:6
**focusing** [3] - 61:2, 121:14, 122:6
**follow** [8] - 23:7, 24:14, 24:25, 33:10, 53:6, 121:2, 131:25, 136:3
**follow-up** [2] - 33:10, 53:6
**followed** [3] - 21:11, 38:19, 136:17
**following** [13] - 15:16, 21:7, 23:10, 38:17, 49:20, 52:17, 65:4, 82:17, 84:9, 85:24, 92:14, 141:19
**FOR** [1] - 1:1
**force** [3] - 84:13, 105:1, 134:11
**Ford** [1] - 10:22
**foregoing** [1] - 147:7
**foreign** [6] - 5:7, 45:8, 45:20, 48:7, 48:13, 48:23

**forget** [1] - 92:18
**form** [110] - 13:5, 13:7, 13:9, 13:10, 13:13, 14:14, 14:16, 14:19, 15:13, 17:16, 22:16, 22:20, 22:25, 23:1, 23:6, 23:7, 23:10, 23:14, 23:18, 23:25, 24:5, 24:8, 24:12, 24:15, 24:23, 24:24, 25:5, 25:7, 27:4, 32:10, 32:15, 32:17, 32:19, 32:22, 32:24, 33:1, 33:4, 33:5, 33:11, 34:3, 34:8, 34:12, 34:20, 36:6, 36:7, 36:21, 37:5, 37:23, 52:2, 52:7, 52:9, 52:13, 62:19, 62:21, 62:23, 63:24, 68:1, 68:19, 68:21, 68:22, 74:8, 75:14, 75:23, 75:24, 77:1, 77:2, 77:6, 77:11, 77:20, 77:23, 78:1, 85:11, 85:20, 94:10, 94:25, 95:3, 95:5, 95:14, 95:21, 96:4, 96:8, 97:5, 97:25, 116:23, 119:10, 119:14, 119:15, 119:18, 119:19, 119:22, 119:24, 120:1, 120:4, 120:16, 120:17, 120:20, 120:22, 121:16, 124:14, 126:1, 129:18, 131:5, 132:14
**Form** [2] - 76:24, 77:10
**form's** [1] - 97:5
**formal** [1] - 64:5
**formalistic** [1] - 131:25
**formality** [2] - 24:24, 76:3
**formalized** [2] - 75:15, 75:17
**forms** [2] - 94:3, 103:5
**formulation** [2] - 129:14, 130:3
**forth** [7] - 3:8, 71:8, 85:10, 108:8, 108:22, 109:6, 109:12
**forward** [5] - 4:3, 37:1, 42:14, 124:4, 139:14
**four** [13] - 13:19, 34:11, 36:5, 37:4, 37:10, 63:3, 63:12, 82:2, 94:2, 114:21, 129:8, 129:10, 141:18
**Four** [2] - 138:24, 139:3
**Fourth** [14] - 1:23, 113:12, 113:17, 113:23, 114:16, 114:17, 129:12, 129:15, 129:23, 131:15, 132:9, 132:25, 135:25,

136:5
**frame** [1] - 72:16
**frankly** [1] - 99:18
**Franks** [5] - 2:18, 55:15, 56:2, 107:15, 111:6
**frankson** [1] - 135:25
**FRANKSON** [1] - 135:25
**Frankson** [1] - 136:11
**fraud** [11] - 5:6, 43:24, 60:6, 72:24, 110:19, 110:21, 110:23, 111:2, 115:10, 115:12
**fraudulent** [1] - 47:12
**fraudulently** [1] - 45:5
**free** [4] - 13:25, 63:20, 128:20, 134:8
**freely** [1] - 71:16
**Friday** [4] - 141:10, 141:11, 141:19, 142:18
**front** [23] - 11:22, 12:11, 15:11, 19:23, 20:14, 20:17, 33:13, 33:15, 36:22, 36:24, 37:2, 49:25, 54:4, 54:6, 70:22, 74:12, 120:20, 121:16, 124:14, 142:22, 143:6, 143:20
**fruits** [2] - 78:18, 113:19
**frustrated** [5] - 16:15, 16:19, 34:25, 35:11, 122:25
**frustrating** [1] - 35:7
**fugitive** [1] - 113:20
**full** [11] - 64:9, 74:18, 96:3, 98:6, 98:18, 103:6, 120:14, 126:6, 128:23, 132:2, 138:5
**full-blown** [1] - 120:14
**fully** [2] - 53:5, 107:8
**fulsome** [1] - 91:25
**future** [1] - 88:25

## G

**gates** [1] - 114:13
**geared** [1] - 142:16
**general** [1] - 13:7
**Geneva** [1] - 45:13
**genuine** [1] - 127:17
**gist** [1] - 127:1
**given** [30] - 7:18, 20:2, 29:6, 30:14, 30:25, 32:17, 33:11, 36:21, 37:23, 46:7, 66:24, 85:5, 92:14, 94:4, 96:5, 96:6, 96:9, 96:14, 98:6, 98:19, 98:20, 98:24, 100:25,

103:8, 104:20, 106:23, 120:17, 127:15, 129:8, 130:22
**glaring** [1] - 55:16
**goal** [2] - 74:13, 127:12
**goals** [1] - 127:12
**GOVERNMENT** [1] - 146:4
**government** [39] - 2:5, 3:2, 3:7, 3:17, 12:25, 21:22, 27:23, 43:2, 62:18, 80:15, 80:17, 80:23, 81:4, 81:7, 82:1, 82:16, 83:5, 86:24, 87:19, 89:25, 93:3, 93:22, 94:8, 97:24, 98:21, 99:1, 102:23, 102:25, 103:17, 105:7, 107:5, 107:25, 112:6, 119:12, 128:7, 128:19, 140:16, 143:11, 145:9
**Government** [3] - 1:16, 30:2, 119:6
**GOVERNMENT'S** [2] - 4:6, 42:17
**Government's** [3] - 13:1, 30:1, 56:20
**government's** [12] - 3:19, 35:24, 92:6, 93:1, 101:7, 105:17, 107:6, 112:3, 125:17, 128:6, 134:1, 141:16
**grand** [5] - 49:11, 58:25, 109:2, 109:4, 116:16
**great** [1] - 93:10
**Grossman** [1] - 114:18
**grounds** [1] - 135:7
**group** [2] - 5:13, 43:19
**groups** [2] - 72:2, 82:23
**Grubbs** [1] - 113:21
**guess** [16] - 39:22, 44:24, 53:17, 56:21, 77:6, 82:5, 96:25, 99:4, 101:2, 101:3, 104:11, 104:14, 106:9, 139:22, 140:23, 142:7
**guesstimate** [1] - 54:13
**guilty** [2] - 139:1, 139:3
**gun** [3] - 61:23, 61:24
**GX** [1] - 22:23

**H**

**half** [10] - 88:16, 100:4, 100:12, 101:19, 105:16, 117:24, 134:21, 135:16, 136:4, 136:12
**hand** [6] - 4:5, 42:16,

63:11, 106:12, 138:1, 138:4
**handcuffed** [19] - 9:6, 9:10, 15:8, 15:10, 15:12, 20:12, 27:20, 28:22, 28:25, 36:22, 36:24, 36:25, 61:13, 64:4, 74:9, 97:24, 118:13, 119:1, 120:9
**handcuffs** [9] - 12:4, 20:17, 74:25, 118:25, 132:21, 132:22, 133:3, 133:5, 134:12
**handed** [1] - 39:11
**handful** [1] - 91:6
**handled** [1] - 98:13
**hands** [2] - 37:2, 133:5
**handwriting** [5] - 14:16, 62:21, 62:22, 73:10, 119:22
**hang** [1] - 141:2
**hardly** [2] - 123:6, 130:22
**harm** [2] - 90:5, 90:8
**harsh** [1] - 132:20
**head** [1] - 41:7
**health** [4] - 12:4, 42:5, 45:11, 118:24
**hear** [5] - 61:4, 70:9, 96:12, 96:23, 126:23
**heard** [10] - 54:16, 60:20, 61:4, 85:9, 87:9, 88:17, 93:22, 96:22, 111:20, 134:2
**Hearing** [1] - 1:10
**hearing** [18] - 2:8, 2:18, 3:7, 55:15, 79:7, 79:12, 79:17, 79:23, 80:25, 83:25, 87:12, 94:6, 111:6, 111:20, 117:11, 143:8, 143:18, 144:16
**heart** [3] - 64:14, 64:15, 112:2
**heels** [1] - 11:10
**held** [5] - 33:13, 33:15, 111:20, 124:14, 134:18
**help** [3] - 71:2, 101:21, 102:10
**helpful** [1] - 142:1
**helps** [2] - 85:3, 101:7
**hereby** [1] - 147:3
**hereunto** [1] - 147:10
**high** [1] - 84:22
**highlight** [1] - 115:1
**himself** [18] - 15:19, 15:20, 33:12, 37:24, 62:8, 62:9, 62:10, 89:21, 91:1, 94:12, 94:13, 101:13, 104:23, 113:1, 120:18, 123:22, 125:21

**hindsight** [1] - 96:17
**hip** [2] - 39:12, 39:13
**history** [2] - 121:16, 125:6
**hitting** [1] - 126:2
**hold** [1] - 120:17
**holding** [3] - 32:14, 104:23, 139:19
**holiday** [1] - 141:13
**Hollander** [1] - 1:13
**holster** [1] - 39:11
**holstered** [5] - 18:25, 69:22, 122:10, 126:23, 133:20
**home** [7] - 52:21, 56:24, 62:4, 66:16, 84:18, 94:1, 109:16
**honest** [2] - 29:8, 142:4
**Honor** [148] - 2:10, 3:6, 3:13, 14:13, 14:24, 15:5, 17:20, 21:22, 22:1, 22:22, 22:24, 24:22, 25:3, 29:25, 30:3, 31:13, 31:17, 32:1, 32:6, 33:17, 39:8, 39:13, 39:18, 40:24, 41:4, 41:13, 42:6, 42:8, 42:11, 43:1, 50:10, 51:13, 54:9, 55:5, 55:13, 55:21, 56:6, 59:5, 65:22, 68:16, 76:23, 78:2, 78:9, 78:12, 78:22, 79:1, 79:21, 79:22, 80:1, 80:9, 80:10, 80:18, 81:2, 81:3, 81:11, 81:12, 81:14, 81:25, 82:1, 82:4, 82:8, 82:14, 82:25, 83:4, 83:10, 86:3, 86:8, 86:11, 86:13, 86:15, 87:2, 87:5, 87:23, 88:2, 89:15, 90:13, 90:23, 91:3, 93:3, 93:5, 93:13, 93:19, 93:21, 93:22, 94:19, 95:1, 95:4, 95:12, 95:24, 96:9, 97:2, 97:13, 97:16, 98:3, 99:1, 99:11, 99:13, 101:16, 101:18, 102:5, 103:22, 104:4, 104:17, 106:15, 106:21, 107:7, 107:11, 107:13, 107:22, 108:3, 108:6, 109:19, 110:1, 110:5, 110:7, 119:8, 137:10, 137:11, 137:18, 139:8, 140:9, 140:16, 140:19, 141:1, 141:4, 141:14, 141:22, 142:2, 142:10, 142:13, 142:14, 142:17, 142:21, 143:3, 143:19, 143:22, 144:7, 144:8, 144:12, 144:13, 144:17, 145:3,

145:4, 145:5, 145:7, 145:9, 145:10
**Honor's** [2] - 79:2, 107:23
**Honorable** [1] - 1:13
**hour** [8] - 88:16, 100:4, 100:12, 110:2, 110:3, 132:16, 134:21, 136:12
**hours** [14] - 62:23, 72:11, 72:12, 86:16, 100:22, 101:19, 105:16, 117:17, 117:24, 119:22, 135:17, 135:19, 136:4, 136:8
**house** [2] - 61:23, 98:2
**housekeeping** [1] - 137:13
**Howard** [1] - 92:15
**huge** [1] - 139:25
**hundred** [1] - 32:12
**hypothetical** [1] - 40:1

**I**

**IAFIS** [1] - 71:2
**Id** [2] - 132:1, 132:5
**ID** [2] - 49:7, 72:25
**ID's** [1] - 67:21
**identifiable** [1] - 116:4
**identification** [6] - 6:9, 8:3, 46:10, 72:25, 90:6, 92:8
**identified** [4] - 7:11, 15:20, 91:1, 125:21
**identify** [9] - 15:19, 62:8, 62:9, 62:10, 66:25, 91:21, 101:13, 109:8, 125:21
**identifying** [1] - 90:7
**identities** [1] - 116:17
**identity** [44] - 18:21, 21:12, 21:14, 35:19, 38:20, 43:24, 44:3, 45:4, 45:15, 47:14, 48:8, 48:24, 48:25, 49:10, 52:15, 53:3, 53:23, 57:5, 57:24, 62:13, 64:6, 64:12, 64:17, 64:24, 65:15, 66:5, 71:2, 73:4, 74:16, 75:22, 76:13, 89:22, 90:19, 98:5, 103:9, 109:13, 110:22, 112:4, 112:7, 112:23, 116:1, 124:17, 131:8
**ill** [1] - 120:10
**illegally** [1] - 64:23
**Illinois** [1] - 114:13
**image** [1] - 47:2
**imagine** [2] - 74:12,

122:19
**immediate** [2] - 10:18, 88:5
**immediately** [3] - 27:20, 74:18, 136:3
**immigration** [1] - 48:22
**impaired** [1] - 133:10
**impasse** [1] - 16:14
**impeach** [2] - 79:20, 80:24
**implicated** [1] - 123:22
**implications** [1] - 106:5
**implicitly** [1] - 97:21
**implied** [5] - 86:2, 88:1, 88:4, 131:9, 131:22
**important** [10] - 80:7, 85:1, 85:6, 87:14, 108:10, 108:13, 121:1, 130:4, 133:6, 134:2
**impose** [1] - 131:24
**impossible** [1] - 128:11
**impostor** [2] - 112:3, 125:3
**impressed** [1] - 115:24
**IMS** [3] - 26:20, 73:6, 77:17
**IN** [1] - 1:1
**inability** [1] - 134:23
**inaccurate** [1] - 79:16
**inadmissible** [1] - 128:6
**inappropriate** [1] - 133:19
**incarcerated** [6] - 45:8, 45:10, 45:17, 46:5, 46:24, 125:9
**incarceration** [1] - 45:20
**include** [5] - 5:5, 60:12, 72:18, 110:18, 111:2
**included** [1] - 119:16
**includes** [3] - 41:2, 92:8, 116:14
**including** [4] - 3:18, 46:6, 55:3, 101:5
**incommunicado** [1] - 134:19
**inconsistent** [3] - 80:25, 118:3, 132:3
**incriminate** [1] - 64:22
**independently** [1] - 61:5
**INDEX** [1] - 146:1
**indicate** [20] - 14:4, 14:7, 14:8, 15:4, 18:2, 32:18, 36:15, 36:17, 36:19, 36:20, 62:24, 65:5, 66:10, 68:4, 68:7, 68:11, 76:1, 85:23, 94:13, 126:9
**indicated** [18] - 14:6,

27:16, 34:24, 35:13, 36:2, 38:4, 39:9, 53:19, 58:4, 76:5, 86:18, 97:11, 98:5, 120:5, 120:9, 127:20, 127:25, 139:10

**indicates** [4] - 32:19, 32:24, 33:1, 62:23

**indicating** [2] - 15:16, 135:21

**indication** [4] - 52:23, 75:6, 88:9, 105:1

**indications** [1] - 61:17

**indicia** [1] - 112:16

**indictment** [19] - 58:21, 58:23, 58:25, 59:2, 59:10, 59:11, 59:17, 59:18, 60:3, 92:17, 109:3, 110:16, 110:25, 111:12, 137:13, 137:16, 138:13, 138:25, 139:4

**individual** [11] - 16:6, 16:7, 45:7, 46:5, 46:8, 48:8, 49:13, 91:17, 112:4, 116:15, 132:2

**individuals** [2] - 9:13, 10:15

**indoors** [1] - 19:22

**indulgence** [2] - 29:2, 35:16

**infer** [1] - 131:18

**inference** [1] - 61:5

**inflammatory** [11] - 20:21, 21:4, 38:14, 39:7, 83:6, 99:6, 99:7, 105:21, 106:9, 106:11, 122:16

**influence** [4] - 18:18, 69:16, 122:9, 133:16

**information** [22] - 15:21, 17:3, 17:11, 17:21, 35:7, 35:8, 40:4, 48:17, 51:9, 54:21, 54:22, 60:8, 69:5, 90:25, 103:7, 108:10, 112:20, 112:24, 116:4, 116:6, 116:18, 143:8

**informed** [1] - 45:21

**initial** [32] - 6:18, 12:19, 29:19, 29:21, 30:8, 39:3, 39:25, 48:17, 51:11, 53:6, 54:14, 58:23, 59:2, 59:8, 59:17, 59:18, 61:7, 62:7, 64:11, 65:4, 72:17, 72:20, 73:6, 73:20, 74:22, 75:5, 90:1, 95:17, 101:19, 103:15, 104:8, 105:9

**initiate** [2] - 45:1, 70:21

**initiated** [4] - 47:9, 71:20, 71:22, 88:18

**initiation** [2] - 47:8,

70:22

**initiative** [1] - 71:10

**innocent** [1] - 130:22

**inquire** [1] - 38:13

**inquired** [1] - 38:11

**inquiries** [1] - 129:6

**inquiry** [4] - 128:17, 129:5, 136:13, 136:17

**inside** [3] - 9:13, 11:18, 28:13

**insinuated** [1] - 38:16

**instances** [1] - 98:19

**instant** [1] - 104:22

**instead** [1] - 137:19

**instructions** [1] - 143:21

**instrumentalities** [1] - 113:19

**insufficient** [1] - 102:25

**intake** [17] - 20:7, 20:20, 20:24, 21:1, 21:2, 38:1, 41:12, 41:17, 82:23, 100:5, 102:4, 104:12, 117:21, 117:25, 123:10, 127:3, 128:3

**integrity** [1] - 136:7

**intelligent** [1] - 123:2

**intend** [4] - 83:13, 84:1, 90:1, 93:1

**intending** [4] - 83:5, 83:18, 100:24, 126:6

**intends** [1] - 43:2

**intent** [1] - 120:14

**intention** [2] - 43:4, 64:5

**interacted** [1] - 44:16

**interacting** [1] - 42:1

**interaction** [8] - 16:11, 21:15, 37:25, 39:6, 51:16, 62:7, 68:22, 72:3

**interactions** [3] - 12:2, 12:3, 85:2

**interesting** [1] - 106:7

**intermittent** [1] - 12:3

**interrogated** [1] - 131:19

**interrogation** [4] - 100:24, 128:6, 136:3, 136:10

**interview** [47] - 18:6, 46:8, 49:21, 50:10, 50:12, 50:15, 50:16, 50:25, 51:11, 53:6, 53:7, 53:8, 53:22, 54:11, 54:13, 54:14, 56:23, 57:14, 57:23, 58:3, 58:5, 64:5, 65:4, 67:15, 74:10, 74:19, 74:21, 74:22, 77:4, 84:17, 84:19, 88:6, 91:11, 91:14, 94:17,

103:6, 109:6, 109:12, 120:15, 121:20, 126:6, 127:16, 127:17, 127:19, 134:21

**interviewed** [8] - 33:2, 46:23, 57:10, 90:12, 90:15, 108:25, 121:3, 125:14

**interviewing** [2] - 24:9, 46:13

**interviews** [16] - 47:25, 48:6, 49:24, 50:1, 72:12, 90:20, 90:21, 91:9, 91:23, 91:24, 92:13, 101:12, 116:19, 116:24, 123:5, 125:11

**intimately** [1] - 87:16

**intimidation** [2] - 128:21, 134:8

**introduce** [7] - 80:16, 81:8, 83:13, 83:24, 84:1, 93:1, 105:18

**introduced** [8] - 62:18, 73:10, 75:15, 86:4, 89:8, 112:1, 115:3, 117:11

**intrusive** [1] - 57:7

**invariable** [1] - 129:10

**investigate** [2] - 43:23, 116:2

**investigated** [1] - 123:5

**investigating** [1] - 125:7

**investigation** [30] - 7:23, 44:2, 44:17, 44:18, 44:23, 45:1, 47:8, 47:9, 48:3, 48:4, 49:15, 49:19, 49:20, 51:2, 53:2, 53:11, 53:19, 54:22, 55:4, 57:20, 76:11, 78:7, 91:9, 92:15, 92:23, 108:8, 115:20, 116:9, 121:2, 125:11

**investigations** [3] - 5:6, 5:15, 115:8

**Investigative** [1] - 72:13

**investigator** [6] - 12:18, 12:19, 44:2, 44:8, 48:10, 49:18

**investigators** [2] - 43:21, 52:18

**invoke** [3] - 121:24, 126:10, 134:14

**invoked** [3] - 71:14, 102:12, 102:19

**involuntariness** [1] - 133:4

**involuntary** [3] - 84:23, 104:9, 133:6

**involved** [7] - 5:18, 58:24, 61:21, 75:22,

75:23, 87:16, 125:19

**involvement** [3] - 44:8, 73:3, 87:11

**irreconcilably** [1] - 118:3

**irrelevant** [3] - 83:8, 100:7, 135:4

**island** [1] - 45:8

**Islands** [2] - 66:8, 112:5

**issuance** [1] - 112:18

**issue** [9] - 92:21, 94:24, 99:8, 99:14, 109:16, 113:5, 115:25, 116:12, 128:4

**issued** [6] - 3:18, 46:15, 66:8, 108:21, 111:11

**issues** [5] - 79:6, 80:5, 84:8, 89:13, 101:11

**issuing** [2] - 114:20, 117:6

**items** [2] - 113:14, 115:11

**itself** [5] - 7:23, 81:9, 85:20, 94:10, 133:23

**J**

**J-E-F-F-R-E-Y** [1] - 42:23

**jail** [3] - 46:23, 48:25, 109:9

**January** [2] - 111:1, 116:16

**Jason** [1] - 51:1

**Jeff** [7] - 2:6, 7:21, 8:9, 14:18, 27:5, 29:7, 38:14

**JEFFREY** [2] - 42:17, 146:7

**Jeffrey** [4] - 42:22, 111:24, 119:5, 125:4

**jeopardy** [1] - 89:21

**job** [6] - 48:6, 48:16, 71:8, 99:4, 106:10, 127:7

**John** [9] - 2:3, 44:2, 44:10, 44:16, 51:10, 70:23, 108:23, 110:17, 147:4

**JOHN** [2] - 1:6, 138:2

**join** [1] - 12:14

**judge** [7] - 55:7, 107:17, 114:20, 116:5, 116:8, 117:6, 143:10

**Judge** [5] - 1:13, 3:18, 108:7, 109:15, 111:11

**judges** [1] - 144:18

**judicially** [1] - 113:11

**July** [14] - 26:1, 26:2, 26:9, 26:13, 39:5, 39:7, 40:7, 40:10, 40:16,

40:18, 40:21, 59:9, 93:17

**June** [14] - 40:17, 44:18, 50:15, 54:12, 56:23, 74:23, 77:5, 107:2, 107:4, 109:11, 116:20, 121:6, 121:10, 125:13

**jurisdiction** [1] - 66:7

**jury** [7] - 49:11, 58:25, 109:2, 109:4, 116:16, 142:5, 143:21

**justice** [2] - 48:24, 84:21

**justification** [1] - 115:16

**K**

**keep** [1] - 11:25

**keeping** [1] - 104:22

**kept** [5] - 9:7, 17:3, 36:8, 36:15, 38:14

**key** [4] - 31:15, 31:16, 32:7, 124:12

**keyed** [1] - 108:13

**kind** [3] - 46:10, 74:10, 100:24

**kinds** [1] - 105:19

**knock** [9] - 6:19, 6:21, 6:25, 8:14, 118:9, 118:15, 133:2, 134:17, 134:21

**knocked** [2] - 7:9, 9:20

**knocking** [2] - 8:15, 118:9

**knowing** [2] - 85:3, 88:12

**knowingly** [12] - 84:25, 85:8, 86:22, 93:23, 94:21, 96:15, 98:12, 104:18, 104:19, 128:9, 128:22, 130:12

**knowledge** [6] - 44:13, 49:23, 57:20, 66:23, 91:16, 137:16

**known** [6] - 16:1, 91:20, 110:17, 114:2, 121:2, 128:12

**knows** [3] - 97:13, 99:11, 139:13

**L**

**label** [1] - 121:21

**lack** [4] - 84:12, 91:16, 112:16, 122:25

**Lafler** [2] - 143:8, 144:16

**laid** [1] - 116:14

**landing** [9] - 8:17, 9:5, 9:8, 10:6, 11:6, 39:25, 40:3, 61:11, 130:17
**language** [4] - 95:25, 97:4, 97:16, 99:3
**largely** [1] - 125:5
**last** [23] - 4:10, 8:10, 21:8, 21:10, 38:11, 38:17, 38:18, 42:21, 42:23, 48:14, 86:15, 90:15, 96:21, 96:22, 97:9, 104:2, 123:19, 127:8, 143:5, 144:5, 144:22
**lasted** [1] - 69:7
**late** [1] - 109:6
**Laura** [2] - 1:19, 2:11
**law** [23] - 5:4, 5:9, 5:10, 6:1, 7:9, 8:4, 13:22, 22:4, 22:6, 47:18, 63:16, 68:20, 71:7, 85:2, 89:16, 108:23, 112:17, 117:5, 117:18, 118:21, 131:8, 132:1, 136:25
**lawyer** [14] - 13:23, 13:24, 24:2, 31:4, 63:17, 63:18, 63:19, 63:25, 68:8, 81:15, 102:17, 124:20, 126:10
**lead** [10] - 12:19, 44:1, 44:8, 49:17, 87:6, 111:24, 115:1, 119:4, 121:12
**leader** [2] - 6:15, 118:6
**leading** [1] - 17:18
**leads** [1] - 48:6
**learn** [2] - 70:12, 115:25
**learned** [2] - 17:11, 123:3
**least** [8] - 33:1, 75:21, 90:14, 90:21, 101:10, 103:8, 117:13, 125:17
**leave** [1] - 117:23
**leaving** [2] - 90:10, 90:18
**led** [5] - 100:8, 100:9, 115:8, 125:11, 136:20
**left** [6] - 19:24, 52:20, 52:21, 63:10, 71:24, 135:12
**legal** [6] - 14:25, 89:20, 94:24, 95:3, 100:3, 100:18
**legally** [9] - 85:20, 94:18, 94:20, 99:23, 117:22, 119:18, 129:12, 136:23
**length** [3] - 78:3, 100:22, 121:22
**lengthy** [1] - 46:7

**Leon** [3] - 107:15, 107:18, 113:7
**less** [4] - 69:9, 72:5, 94:7, 116:6
**letter** [1] - 143:7
**letting** [1] - 12:8
**level** [2] - 84:20, 132:8
**license** [1] - 47:1
**light** [2] - 98:10, 103:11
**likely** [1] - 100:7
**limine** [10] - 88:25, 122:19, 135:6, 139:24, 139:25, 140:4, 142:20, 143:15, 143:23, 143:25
**limited** [3] - 7:25, 48:15, 80:5
**line** [9] - 23:19, 30:20, 33:1, 73:13, 73:23, 73:24, 86:15, 120:12
**lines** [7] - 52:4, 52:10, 72:12, 83:12, 104:10, 114:8, 127:5
**lingo** [1] - 34:7
**link** [1] - 117:8
**listed** [4] - 36:6, 37:4, 108:11, 109:17
**LITTLE** [78] - 2:10, 17:16, 21:25, 25:4, 28:20, 29:16, 29:25, 30:3, 30:7, 30:10, 32:8, 33:18, 37:22, 40:1, 42:8, 43:1, 50:6, 51:13, 51:15, 55:11, 55:13, 55:21, 55:25, 59:3, 76:22, 78:22, 79:1, 79:11, 79:14, 79:21, 80:4, 80:9, 81:2, 81:11, 81:25, 82:4, 93:5, 93:8, 93:12, 93:15, 93:19, 93:21, 94:19, 95:1, 95:4, 95:8, 95:12, 97:2, 99:7, 100:13, 100:17, 100:21, 101:2, 101:16, 107:11, 107:13, 108:3, 109:19, 110:4, 119:8, 137:10, 138:21, 140:19, 141:1, 141:4, 141:21, 142:2, 142:10, 142:12, 143:2, 143:19, 144:7, 144:12, 145:3, 145:5, 145:10, 146:6, 146:8
**live** [1] - 123:14
**lived** [3] - 16:4, 46:19, 112:7
**lo** [1] - 47:20
**local** [2] - 46:1, 48:1
**located** [2] - 7:4, 62:12
**location** [3] - 35:22, 98:9, 113:20
**locations** [1] - 115:13

**lock** [1] - 140:17
**logo** [1] - 52:2
**Lombard** [1] - 1:24
**look** [7] - 72:22, 80:2, 100:2, 106:7, 117:5, 132:6, 144:3
**looked** [5] - 55:17, 71:4, 71:5, 100:10, 115:13
**looking** [9] - 50:13, 63:10, 63:13, 64:20, 71:25, 97:8, 112:15, 116:22, 140:8
**lookout** [1] - 47:22
**looks** [1] - 64:18
**loosened** [1] - 28:24
**losses** [1] - 47:13
**lunch** [3] - 109:22, 135:10, 135:24
**luncheon** [1] - 110:10
**lying** [1] - 125:16

**M**

**Mack** [1] - 65:14
**Mackey** [5] - 65:15, 65:20, 65:23, 66:4, 109:7
**Madam** [1] - 137:23
**magistrate** [8] - 107:16, 108:22, 114:23, 116:5, 116:8, 137:20, 143:10, 144:18
**Magistrate** [1] - 111:11
**magistrates** [1] - 144:18
**mail** [9] - 26:8, 26:9, 26:15, 40:10, 60:18, 73:19, 73:25, 93:15, 93:17
**maintain** [1] - 89:25
**maintained** [2] - 86:20, 115:11
**maintaining** [1] - 18:21
**maintains** [1] - 89:24
**majority** [1] - 19:10
**man** [1] - 114:3
**Management** [1] - 72:14
**mandatory** [2] - 21:3, 45:21
**manner** [2] - 132:3, 147:9
**mark** [1] - 111:11
**marked** [6] - 12:25, 22:19, 26:4, 26:23, 27:1, 119:6
**maroon** [1] - 10:3
**married** [1] - 106:4
**Marshal** [3] - 60:16, 64:11, 70:23

**marshal's** [5] - 20:7, 20:20, 38:1, 104:6, 104:7
**Marshal's** [11] - 60:23, 67:13, 72:21, 102:2, 104:12, 117:19, 117:21, 122:14, 126:24, 127:3, 128:3
**Marshals** [1] - 100:5
**marshals** [5] - 20:25, 21:1, 27:13, 38:23, 72:5
**Marshals'** [1] - 77:22
**Mary** [3] - 1:23, 147:3, 147:15
**MARYLAND** [1] - 1:1
**Maryland** [14] - 1:11, 1:24, 2:21, 5:22, 46:16, 46:18, 46:19, 47:2, 50:21, 109:2, 112:7, 114:14, 116:10
**matches** [1] - 66:21
**math** [1] - 102:3
**matter** [14] - 2:2, 21:17, 59:10, 66:23, 79:4, 79:18, 98:21, 106:19, 108:18, 125:18, 126:15, 147:4, 147:9
**matters** [3] - 30:18, 137:14, 139:11
**McCarty** [1] - 128:16
**mean** [32] - 14:13, 16:25, 17:10, 25:13, 33:16, 41:3, 55:25, 56:5, 67:6, 73:9, 80:13, 83:7, 89:11, 90:14, 90:17, 90:25, 91:1, 97:8, 99:21, 100:11, 100:13, 101:4, 101:6, 101:8, 105:23, 106:11, 132:15, 135:5, 140:11, 141:23, 144:9, 144:21
**meaning** [1] - 128:22
**means** [3] - 19:18, 137:3, 144:14
**meant** [1] - 81:9
**meet** [3] - 47:10, 55:10, 94:8
**meeting** [1] - 60:2
**memo** [1] - 55:17
**memorializing** [2] - 59:12, 72:10
**memories** [1] - 61:5
**memory** [3] - 32:2, 60:20, 103:24
**mental** [1] - 134:22
**mention** [1] - 72:20
**mentioned** [16] - 42:3, 49:18, 67:2, 68:18, 72:22, 76:24, 112:9, 117:12, 118:1, 126:16, 127:11, 127:24, 130:4,

130:25, 131:1, 131:13
**mere** [1] - 136:6
**merely** [1] - 99:12
**message** [1] - 123:16
**met** [3] - 93:23, 98:21, 109:24
**microphone** [2] - 4:9, 42:20
**middle** [2] - 74:25, 132:16
**might** [12] - 80:24, 82:21, 86:8, 89:11, 103:14, 106:6, 106:11, 120:18, 129:11, 135:11, 141:5, 144:23
**mind** [2] - 73:2, 144:24
**mindful** [1] - 129:4
**mine** [1] - 73:22
**minimal** [1] - 75:21
**minor** [4] - 9:15, 110:12, 118:17, 137:8
**minute** [15] - 19:1, 19:12, 83:15, 83:16, 84:5, 86:23, 89:6, 89:7, 91:7, 135:17, 141:3, 143:5, 144:5, 144:22
**minutes** [14] - 17:25, 21:17, 21:18, 33:23, 69:8, 69:9, 72:5, 72:7, 75:2, 96:7, 100:22, 105:9, 121:9, 121:22
**miracles** [1] - 142:7
**Miranda** [63] - 22:13, 24:25, 25:11, 28:16, 29:2, 29:6, 30:14, 34:2, 35:18, 38:24, 39:19, 61:7, 61:9, 62:16, 65:5, 74:19, 75:7, 75:9, 75:18, 85:14, 85:16, 85:22, 88:12, 90:4, 90:5, 90:6, 93:24, 96:6, 98:7, 98:10, 98:15, 101:4, 102:6, 102:25, 103:11, 124:17, 124:18, 124:23, 128:9, 128:10, 128:18, 129:6, 129:10, 129:13, 130:4, 130:10, 130:12, 130:13, 130:14, 130:15, 130:18, 130:21, 131:18, 131:24, 134:25, 135:20, 136:2, 136:3, 136:7, 136:8, 136:24, 137:5
**Mirandize** [3] - 13:13, 24:22, 99:18
**Mirandized** [18] - 13:15, 25:2, 29:13, 31:2, 31:5, 31:12, 32:5, 38:25, 88:16, 89:10, 89:24, 98:24, 100:6, 100:12, 100:15, 103:3, 124:2,

124:11
 **miss** [1] - 109:23
 **missing** [1] - 95:11
 **misunderstood** [1] - 37:15
 **Mitsubishi** [2] - 2:22, 111:16
 **Molitors** [3] - 51:1, 52:3, 52:10
 **moment** [9] - 27:12, 39:8, 50:19, 56:10, 73:6, 90:18, 117:23, 124:25, 125:1
 **monitor** [1] - 13:3
 **Montgomery** [1] - 61:20
 **months** [3] - 57:16, 121:3, 125:12
 **Moody** [29] - 2:3, 44:3, 44:24, 45:4, 49:14, 52:15, 53:24, 66:4, 66:11, 73:3, 86:20, 90:21, 91:1, 92:11, 109:7, 109:8, 110:17, 112:5, 112:22, 116:15, 116:24, 117:2, 123:23, 125:2, 125:9, 125:21, 130:24, 138:6, 147:5
 **MOODY** [2] - 1:7, 138:2
 **Moran** [2] - 128:15, 128:25
 **morning** [15] - 2:10, 8:21, 22:1, 33:24, 62:25, 111:3, 117:16, 118:7, 118:8, 119:4, 132:15, 135:15, 136:25, 143:9, 144:19
 **morning's** [1] - 2:8
 **most** [7] - 21:18, 27:17, 81:21, 100:7, 125:7, 132:24, 134:20
 **mother** [7] - 49:8, 49:10, 53:20, 66:11, 109:5, 109:7, 116:16
 **motion** [23] - 2:16, 2:17, 2:18, 2:24, 3:15, 56:16, 78:16, 78:17, 78:20, 78:23, 80:5, 88:25, 101:9, 108:2, 111:4, 111:5, 111:8, 111:10, 117:7, 117:9, 122:19, 135:6, 137:3
 **Motions** [1] - 1:10
 **motions** [16] - 2:8, 2:15, 56:6, 81:22, 92:6, 111:4, 111:18, 111:19, 139:24, 139:25, 140:3, 142:20, 142:25, 143:15, 143:23, 143:25
 **mouth** [1] - 21:3
 **move** [6] - 23:18, 29:17,

37:1, 37:2, 77:19, 140:21
 **moved** [2] - 20:16, 83:14
 **moving** [1] - 55:22
 **MR** [192] - 2:2, 2:10, 3:6, 3:13, 3:15, 3:22, 3:25, 4:13, 5:1, 6:24, 8:12, 9:18, 11:12, 12:13, 14:15, 15:6, 16:24, 17:8, 17:16, 17:19, 21:25, 25:4, 28:20, 29:16, 29:25, 30:3, 30:7, 30:10, 31:17, 31:23, 32:1, 33:18, 37:22, 39:17, 40:1, 41:19, 42:6, 42:8, 42:11, 43:1, 43:5, 43:11, 50:6, 50:9, 50:23, 51:13, 51:15, 51:19, 54:15, 55:6, 55:11, 55:13, 55:21, 55:25, 56:4, 56:15, 56:19, 59:3, 59:5, 59:16, 65:3, 66:3, 68:17, 76:8, 76:22, 78:12, 78:15, 78:22, 79:1, 79:11, 79:14, 79:21, 79:22, 80:1, 80:4, 80:9, 80:10, 80:18, 80:20, 81:2, 81:3, 81:11, 81:12, 81:25, 82:1, 82:4, 82:8, 82:14, 82:25, 83:4, 83:10, 83:21, 84:5, 85:16, 85:19, 86:3, 86:8, 86:11, 86:13, 86:15, 87:2, 87:5, 87:23, 88:2, 89:15, 90:13, 90:23, 91:3, 91:6, 91:14, 93:3, 93:5, 93:8, 93:12, 93:15, 93:19, 93:21, 94:19, 95:1, 95:4, 95:8, 95:12, 97:2, 99:7, 100:13, 100:17, 100:21, 101:2, 101:16, 101:18, 101:22, 101:25, 102:5, 102:12, 102:15, 103:22, 104:4, 104:17, 106:15, 106:21, 106:25, 107:2, 107:5, 107:11, 107:13, 108:3, 108:6, 109:19, 110:1, 110:4, 110:7, 119:8, 137:10, 137:11, 137:18, 138:21, 139:8, 139:16, 139:19, 139:22, 140:9, 140:15, 140:19, 141:1, 141:4, 141:14, 141:21, 142:2, 142:10, 142:12, 142:14, 142:17, 142:21, 142:24, 143:2, 143:19, 144:7, 144:8, 144:12, 144:13, 144:17, 145:3, 145:4, 145:5, 145:7, 145:9, 145:10, 146:5,

146:6, 146:6, 146:8, 146:8
 **MS** [1] - 138:22
 **multi** [1] - 7:3
 **multi-story** [1] - 7:3
 **multiple** [2] - 110:18, 139:11
 **must** [12] - 37:14, 52:5, 96:10, 113:13, 113:18, 117:6, 119:16, 128:22, 130:14, 131:21, 131:25, 132:6
 **MYERS** [115] - 2:2, 3:6, 3:13, 3:15, 3:22, 3:25, 4:13, 5:1, 6:24, 8:12, 9:18, 11:12, 12:13, 14:15, 15:6, 16:24, 17:8, 17:19, 31:17, 31:23, 32:1, 39:17, 41:19, 42:6, 42:11, 43:5, 43:11, 50:9, 50:23, 51:19, 54:15, 55:6, 56:4, 56:15, 56:19, 59:5, 59:16, 65:3, 66:3, 68:17, 76:8, 78:12, 78:15, 79:22, 80:1, 80:10, 80:18, 80:20, 81:3, 81:12, 82:1, 82:8, 82:14, 82:25, 83:4, 83:10, 83:21, 84:5, 85:16, 85:19, 86:3, 86:8, 86:11, 86:13, 86:15, 87:2, 87:5, 87:23, 88:2, 89:15, 90:13, 90:23, 91:3, 91:6, 91:14, 93:3, 101:18, 101:22, 101:25, 102:5, 102:12, 102:15, 103:22, 104:4, 104:17, 106:15, 106:21, 106:25, 107:2, 107:5, 108:6, 110:1, 110:7, 137:11, 137:18, 139:8, 139:16, 139:19, 139:22, 140:9, 140:15, 141:14, 142:14, 142:17, 142:21, 142:24, 144:8, 144:13, 144:17, 145:4, 145:7, 145:9, 146:5, 146:6, 146:8
 **Myers** [15] - 1:17, 2:5, 22:17, 27:7, 38:4, 73:17, 76:23, 77:16, 79:5, 83:3, 98:4, 98:16, 99:15, 101:7, 108:1

## N

 **name** [53] - 4:10, 8:7, 8:10, 15:17, 16:10, 31:11, 31:14, 32:7, 33:3, 39:20, 39:22, 40:4, 42:21, 42:22, 42:23,

44:24, 46:9, 62:8, 64:23, 65:10, 65:13, 65:25, 66:4, 66:10, 67:3, 71:14, 71:17, 76:13, 88:23, 89:10, 92:1, 92:11, 99:21, 99:25, 113:16, 114:13, 116:15, 121:17, 123:21, 124:10, 124:24, 125:9, 126:17, 127:9, 128:16, 130:16, 130:20, 136:15, 138:5
 **named** [1] - 115:17
 **names** [7] - 65:12, 66:14, 66:15, 66:20, 66:24, 91:21
 **narrative** [2] - 95:14, 96:4
 **national** [1] - 48:23
 **nationality** [1] - 45:11
 **nationals** [2] - 45:20, 46:2
 **nature** [2] - 53:1, 128:23
 **near** [2] - 53:14, 53:15
 **necessarily** [4] - 90:1, 99:20, 133:6, 144:4
 **necessary** [1] - 102:7
 **need** [27] - 28:4, 29:8, 29:9, 31:8, 46:21, 73:7, 75:10, 76:17, 80:11, 82:24, 99:18, 99:23, 100:5, 113:5, 121:18, 125:6, 125:10, 139:7, 141:18, 143:8, 143:17, 143:18, 143:25, 144:3, 144:5
 **needed** [11] - 12:6, 12:8, 39:22, 42:4, 74:3, 119:2, 124:2, 127:13, 135:9, 137:6
 **needs** [5] - 29:11, 100:11, 143:11, 144:25
 **negatively** [2] - 46:19, 61:24
 **neutral** [1] - 108:21
 **never** [16] - 36:13, 41:14, 41:15, 46:20, 46:25, 47:2, 91:19, 102:17, 122:4, 122:7, 122:11, 127:20, 128:11, 131:4, 131:5, 137:15
 **new** [9] - 21:6, 38:16, 48:2, 71:9, 88:21, 92:2, 92:22, 102:6, 103:7
 **newly** [1] - 92:16
 **next** [7] - 13:20, 52:8, 63:3, 73:16, 76:6, 117:17, 122:14
 **nexus** [1] - 43:24
 **night** [7] - 20:22, 21:6,

38:15, 100:1, 105:25, 122:17, 132:16
 **nine** [1] - 108:8
 **nine-page** [1] - 108:8
 **NO** [1] - 1:5
 **nobody** [6] - 31:1, 31:3, 34:21, 37:8, 96:12, 120:20
 **non** [4] - 83:14, 85:4, 116:23, 125:13
 **non-custodial** [4] - 83:14, 85:4, 116:23, 125:13
 **none** [1] - 33:7
 **nonetheless** [1] - 136:22
 **normal** [4] - 34:7, 41:4, 46:8, 46:17
 **normally** [1] - 30:17
 **North** [2] - 128:25, 131:20
 **NORTHERN** [1] - 1:2
 **notations** [1] - 25:11
 **note** [6] - 3:6, 25:1, 92:19, 110:25, 118:14, 120:24
 **notebook** [1] - 54:8
 **noted** [1] - 111:3
 **notes** [2] - 54:9, 87:18
 **noteworthy** [2] - 106:18, 121:23
 **nothing** [14] - 40:24, 42:6, 90:24, 92:25, 93:3, 101:10, 104:9, 123:7, 133:19, 133:22, 134:13, 134:22, 145:9, 145:10
 **notice** [2] - 85:21, 88:11
 **noticed** [1] - 46:15
 **notification** [2] - 45:18, 75:5
 **notifications** [1] - 47:16
 **notified** [3] - 47:7, 47:22, 49:7
 **notify** [2] - 45:23, 77:7
 **noting** [3] - 115:6, 119:22, 123:3
 **notions** [1] - 84:21
 **November** [9] - 139:10, 139:14, 140:2, 140:6, 141:8, 141:10, 142:15, 142:18, 144:2
 **nowhere** [1] - 83:22
 **nuances** [1] - 60:25
 **Number** [4] - 2:4, 30:4, 77:16, 94:4
 **number** [13] - 22:21, 32:11, 32:14, 52:9, 68:21, 77:2, 93:18, 109:21, 110:21, 127:13, 127:14, 129:2, 130:4

**Number(s** [1] - 147:5
**numbers** [1] - 91:22

**O**

**oath** [3] - 4:5, 42:16, 138:1
**objection** [7] - 17:16, 40:1, 50:6, 51:13, 55:11, 59:3
**obligated** [2] - 45:10, 141:23
**obligation** [1] - 121:11
**obscures** [1] - 96:6
**observed** [1] - 49:2
**obtain** [2] - 45:5, 49:1
**obtained** [4] - 51:9, 60:9, 90:25, 128:5
**obviously** [16] - 31:21, 60:25, 92:3, 92:12, 97:3, 100:14, 106:5, 113:25, 114:14, 115:4, 115:14, 116:17, 121:9, 128:10, 132:14, 139:23
**occasion** [2] - 121:14, 122:3
**occasions** [3] - 32:21, 38:10, 121:6
**occurred** [14] - 25:14, 26:16, 27:25, 90:16, 96:14, 97:7, 97:20, 112:9, 117:16, 123:10, 130:15, 130:18, 131:11, 135:8
**occurring** [1] - 133:14
**October** [3] - 43:16, 143:22, 143:24
**odds** [1] - 124:7
**OF** [2] - 1:1, 1:4
**offended** [1] - 106:2
**offenses** [2] - 108:11, 110:18
**offensive** [2] - 84:20, 84:21
**offer** [4] - 56:15, 56:20, 143:11, 145:1
**offering** [1] - 56:14
**Office** [5] - 45:16, 117:19, 117:21, 122:15, 126:24
**office** [12] - 5:14, 10:21, 43:20, 47:4, 48:19, 49:5, 55:9, 72:1, 74:4, 98:14, 108:17, 116:10
**Officer** [12] - 26:16, 27:17, 29:1, 29:2, 29:4, 34:1, 34:10, 34:24, 36:5, 95:16, 95:21, 96:3
**officer** [12] - 34:1, 39:9,

46:13, 46:17, 46:23, 47:3, 68:20, 77:9, 77:11, 95:23, 97:17, 108:16
**officer's** [1] - 62:3
**officers** [9] - 6:2, 8:5, 35:13, 51:16, 89:16, 89:17, 93:25, 94:5, 108:14
**official** [1] - 147:8
**Official** [1] - 147:16
**officials** [1] - 112:18
**often** [1] - 115:11
**once** [2] - 19:21, 123:22
**One** [2] - 138:24, 139:3
**one** [70] - 2:16, 2:20, 3:7, 12:5, 13:24, 14:9, 14:23, 36:22, 39:1, 39:8, 41:22, 44:21, 45:2, 48:16, 49:6, 50:19, 53:20, 55:16, 56:10, 57:16, 58:3, 59:19, 59:20, 61:16, 61:19, 63:19, 66:1, 66:20, 67:2, 72:1, 82:10, 83:2, 84:14, 84:15, 87:3, 87:24, 91:13, 102:7, 105:19, 108:13, 111:4, 111:13, 112:23, 115:23, 116:20, 116:22, 117:14, 117:23, 120:7, 121:6, 121:9, 122:3, 122:10, 122:25, 127:14, 128:12, 130:19, 132:9, 139:17, 140:13, 140:14, 140:21, 140:24, 141:2, 141:3, 143:13
**one1** [1] - 77:17
**ones** [5] - 83:19, 105:7, 121:23, 128:2
**ongoing** [2] - 44:7, 105:9
**open** [5] - 28:11, 28:18, 28:19, 63:9, 120:20
**opened** [4] - 8:13, 8:15, 8:25, 72:1
**opening** [1] - 142:5
**operating** [1] - 62:5
**operation** [1] - 7:17
**operational** [1] - 7:16
**opinion** [1] - 122:21
**opportunity** [9] - 24:6, 28:2, 32:16, 32:17, 32:20, 32:22, 37:23, 44:10, 59:14
**opposite** [1] - 79:8
**option** [1] - 30:25
**oral** [4] - 129:17, 129:23, 131:1, 131:2
**orally** [2] - 97:25, 120:23
**order** [11] - 33:15, 81:4,

89:18, 109:16, 118:5, 124:6, 130:3, 139:9, 140:3, 142:19, 143:20
**ordered** [3] - 110:13, 137:9, 143:22
**ordinarily** [1] - 124:24
**organization** [1] - 82:19
**oriented** [1] - 122:24
**original** [4] - 45:3, 47:21, 73:13, 110:25
**originally** [1] - 58:10
**Ornelas** [1] - 114:1
**outline** [1] - 112:15
**outlining** [1] - 110:15
**outside** [17] - 9:5, 9:8, 11:25, 28:10, 28:12, 33:19, 33:22, 40:12, 41:22, 42:5, 43:8, 61:11, 84:17, 94:5, 98:2, 98:8, 118:23
**overbear** [1] - 105:2
**overborne** [1] - 134:13
**overcome** [1] - 135:20
**overruled** [1] - 51:18
**own** [1] - 88:19
**owned** [1] - 61:21

**P**

**p.m** [5] - 110:10, 141:7, 145:13
**PAGE** [1] - 146:3
**Page** [7] - 30:1, 56:9, 56:11, 73:11, 77:17, 86:16, 95:17
**page** [9] - 56:21, 73:11, 73:12, 73:16, 77:17, 77:23, 97:9, 108:8, 115:5
**pages** [4] - 77:24, 78:3, 115:4, 147:7
**pajama** [7] - 8:19, 10:7, 10:8, 27:10, 94:1, 118:10, 118:13
**Pakistan** [2] - 40:13, 40:15
**pants** [3] - 8:20, 10:7, 10:8
**paper** [2] - 52:1, 63:11
**papers** [3] - 44:25, 107:20, 107:21
**Paragraph** [9] - 56:8, 56:21, 57:2, 115:22, 116:11, 116:18, 116:20, 116:21, 116:22
**paragraph** [12] - 29:18, 29:24, 30:1, 30:6, 30:7, 56:10, 56:11, 56:22, 95:17, 97:9, 115:23, 116:13

**paragraphs** [1] - 73:22
**pardon** [1] - 97:17
**parked** [1] - 11:14
**parking** [4] - 11:14, 53:9, 53:23, 91:12
**part** [6] - 5:16, 21:6, 38:16, 99:2, 99:13, 99:15
**participate** [6] - 5:15, 11:4, 11:7, 12:23, 45:19, 118:20
**participated** [1] - 40:19
**participating** [2] - 45:22, 141:10
**participation** [1] - 53:11
**particular** [14] - 5:13, 25:7, 43:19, 45:14, 46:5, 94:25, 112:20, 114:5, 114:12, 116:11, 120:3, 132:10, 133:22, 136:13
**particularity** [2] - 113:13, 115:14
**particularly** [1] - 89:17
**parties** [3] - 137:18, 139:12, 139:23
**parts** [1] - 118:4
**passage** [2] - 104:20, 136:6
**passed** [1] - 91:15
**passenger** [4] - 28:9, 28:10, 33:21, 63:9
**passport** [25] - 5:5, 43:24, 44:19, 44:22, 44:23, 46:11, 46:12, 46:15, 46:18, 46:21, 46:25, 47:5, 47:6, 47:17, 47:18, 47:21, 49:20, 53:3, 59:20, 64:24, 65:1, 108:22, 110:18, 115:10
**passports** [1] - 45:5
**past** [2] - 25:2, 33:6
**paste** [1] - 73:25
**Patrol** [1] - 22:11
**pattern** [1] - 84:2
**pause** [2] - 96:9, 96:21
**Pelton** [1] - 133:11
**pending** [1] - 111:4
**people** [5] - 24:22, 30:17, 60:25, 110:2, 132:16
**per** [4] - 37:1, 74:1, 74:3, 88:12
**perceived** [1] - 106:2
**perception** [1] - 106:12
**perfect** [1] - 121:8
**period** [8] - 11:2, 31:12, 52:3, 52:6, 100:3, 104:21, 134:15, 134:18
**permitted** [2] - 5:10, 89:8
**perpetrator** [1] - 115:12

**persist** [1] - 53:23
**person** [22] - 23:11, 23:22, 24:5, 32:16, 32:18, 32:22, 33:2, 34:18, 39:10, 46:24, 74:16, 74:17, 77:8, 89:19, 106:1, 106:13, 106:14, 114:3, 117:1, 123:2, 127:14, 131:19
**personal** [1] - 116:4
**personally** [3] - 61:23, 71:7, 119:14
**perspective** [1] - 95:15
**pertaining** [1] - 2:24
**pertains** [2] - 2:18, 111:10
**pertinent** [4] - 83:9, 115:23, 117:11, 118:4
**photo** [1] - 117:1
**photographs** [1] - 7:17
**phraseology** [1] - 96:25
**physical** [1] - 134:11
**physically** [3] - 15:14, 32:17, 32:22
**pick** [2] - 126:15, 142:5
**picture** [2] - 109:10, 109:13
**pictures** [1] - 108:24
**piece** [4] - 63:11, 73:1, 92:25, 116:18
**pieces** [2] - 52:1, 92:25
**pile** [1] - 99:24
**pin** [2] - 113:17, 131:14
**placards** [2] - 6:7, 6:10
**place** [11] - 10:5, 11:18, 50:2, 50:8, 50:11, 71:23, 106:2, 113:13, 114:5, 114:12, 126:11
**placed** [8] - 4:5, 11:19, 42:16, 118:21, 120:1, 132:21, 138:1, 138:15
**places** [1] - 115:17
**plain** [1] - 63:12
**planned** [1] - 43:5
**play** [2] - 45:19, 89:13
**plea** [3] - 138:25, 139:2, 143:11
**pleasure** [1] - 110:3
**pled** [2] - 139:18, 140:7
**point** [67] - 10:12, 10:17, 11:24, 12:14, 15:10, 18:1, 20:12, 28:21, 30:25, 31:1, 31:3, 34:5, 34:17, 37:2, 46:21, 46:22, 47:3, 47:8, 47:15, 47:16, 48:4, 49:1, 49:4, 49:6, 49:12, 55:10, 58:7, 58:11, 59:22, 59:24, 61:19, 63:3, 64:6, 64:10, 64:18, 67:11, 67:13,

67:20, 70:3, 71:4, 71:8, 74:18, 76:2, 78:15, 82:6, 87:17, 91:9, 104:8, 115:17, 117:3, 118:20, 119:1, 119:3, 119:11, 119:15, 119:17, 121:1, 121:7, 121:18, 121:24, 125:18, 135:8, 135:14, 136:17, 139:11, 139:13, 139:24
**pointed** [3] - 13:19, 99:1, 120:24
**points** [7] - 63:12, 91:6, 115:1, 115:6, 118:2, 119:19, 126:2
**police** [8] - 6:7, 6:9, 11:13, 133:21, 134:16, 134:20, 135:21, 136:2
**Police** [1] - 61:20
**policy** [3] - 6:11, 9:2, 72:9
**port** [2] - 70:15, 72:8
**portion** [3] - 19:3, 94:25, 115:18
**pose** [2] - 100:8, 124:3
**posed** [3] - 123:17, 134:17, 137:2
**position** [6] - 61:1, 74:12, 89:9, 89:16, 103:2, 123:1
**possible** [4] - 74:14, 88:1, 139:17, 143:18
**possibly** [3] - 48:7, 91:23, 104:13
**post** [2] - 90:4, 111:12
**post-Miranda** [1] - 90:4
**potential** [5] - 60:2, 69:4, 90:5, 92:20, 94:5
**Powell** [1] - 129:9
**practice** [2] - 127:19, 144:25
**pre** [6] - 7:16, 90:5, 130:13, 130:14, 130:15, 130:18
**pre-Miranda** [5] - 90:5, 130:13, 130:14, 130:15, 130:18
**pre-operational** [1] - 7:16
**precise** [1] - 130:3
**precision** [1] - 113:25
**predicament** [1] - 123:4
**prefer** [5] - 3:22, 119:14, 140:16, 142:11, 142:12
**preferred** [1] - 129:11
**prefers** [1] - 110:4
**preliminarily** [1] - 110:11
**premises** [2] - 5:21,

115:21
**preoccupied** [1] - 126:25
**preparation** [1] - 40:19
**prepared** [8] - 3:17, 3:23, 27:4, 31:18, 31:19, 87:6, 97:20, 109:1
**preparing** [2] - 83:1, 87:11
**preponderance** [1] - 128:7
**presence** [11] - 10:24, 13:15, 14:2, 14:19, 52:3, 52:10, 58:4, 60:14, 62:14, 77:22, 119:13
**present** [12] - 2:14, 13:23, 16:20, 24:2, 31:4, 32:2, 41:6, 58:5, 61:11, 63:18, 64:1, 118:16
**presentation** [1] - 121:8
**presented** [8] - 47:9, 52:4, 52:10, 97:18, 108:7, 116:6, 117:12, 122:18
**president** [1] - 71:10
**President** [1] - 123:24
**president's** [1] - 71:14
**presume** [1] - 132:2
**pretrial** [3] - 140:2, 142:17, 144:19
**Pretrial** [1] - 72:7
**pretty** [3] - 46:7, 105:24, 122:12
**previous** [5] - 32:20, 32:21, 61:19, 74:20, 75:12
**previously** [13] - 13:2, 53:17, 54:16, 54:21, 55:9, 56:22, 66:14, 68:18, 107:1, 108:17, 109:11, 116:5, 121:10
**primarily** [1] - 43:24
**principle** [2] - 113:25, 114:22
**principles** [1] - 113:7
**Pringle** [1] - 114:14
**printed** [2] - 33:3, 75:12
**prison** [1] - 49:8
**prisoner** [4] - 10:3, 45:14, 46:19, 72:2
**prisoners** [2] - 45:11, 45:14
**prisons** [1] - 46:1
**probability** [1] - 114:11
**probable** [19] - 49:13, 55:1, 55:8, 64:8, 107:16, 108:10, 108:12, 108:15, 109:15, 112:12, 112:13, 112:17, 112:21, 113:4, 113:18, 113:24, 114:7,

114:24, 115:16
**probative** [3] - 122:2, 122:20, 122:21
**probed** [1] - 104:1
**problem** [6] - 43:6, 80:8, 97:4, 106:24, 123:8, 140:23
**problems** [1] - 94:5
**procedural** [1] - 103:4
**procedurally** [1] - 103:12
**procedure** [4] - 41:1, 46:8, 62:5, 131:25
**proceed** [4] - 3:17, 3:25, 78:16, 78:17
**proceeded** [1] - 46:17
**proceeding** [2] - 3:5, 137:21
**Proceedings** [1] - 145:13
**proceedings** [4] - 2:1, 110:13, 147:4, 147:8
**Process** [1] - 129:5
**process** [9] - 21:2, 21:20, 41:12, 69:21, 72:2, 86:25, 104:6, 106:16, 135:1
**processed** [3] - 27:13, 38:6, 47:5
**processing** [41] - 21:16, 38:9, 38:24, 59:7, 60:16, 60:23, 61:3, 61:6, 67:13, 70:15, 70:19, 72:3, 72:19, 72:21, 74:14, 83:12, 83:17, 83:20, 84:3, 88:15, 89:7, 91:8, 92:3, 98:24, 100:5, 101:4, 101:20, 102:2, 102:9, 104:7, 104:12, 104:21, 105:6, 105:11, 105:13, 117:20, 127:3, 127:13, 135:8, 135:16
**produce** [1] - 60:15
**product** [1] - 128:20
**proffer** [1] - 59:11
**program** [1] - 141:10
**progressing** [1] - 35:12
**promise** [1] - 18:11
**promised** [1] - 84:15
**promises** [2] - 69:13, 122:7
**prompted** [3] - 59:12, 102:22, 127:7
**promptly** [1] - 47:22
**pronounce** [1] - 128:12
**properly** [2] - 46:2, 136:23
**proposition** [8] - 114:7, 114:13, 129:3, 129:22, 130:5, 131:9, 132:25,

136:11
**prosecuting** [1] - 47:15
**prosecution** [10] - 44:19, 47:10, 47:11, 48:21, 55:4, 55:10, 108:19, 116:7, 116:9, 121:13
**prosecution's** [1] - 54:8
**prosecutors** [1] - 85:20
**protection** [2] - 5:6, 132:5
**protective** [8] - 9:10, 9:12, 11:4, 11:7, 62:1, 118:20, 125:20, 130:16
**protocol** [1] - 98:18
**prove** [3] - 64:8, 75:21, 99:15
**provide** [13] - 17:10, 17:14, 39:6, 51:25, 54:1, 57:24, 66:19, 67:3, 76:11, 84:25, 86:22, 103:7, 144:1
**provided** [12] - 17:21, 17:22, 25:23, 25:24, 40:13, 41:9, 49:11, 51:24, 52:8, 69:5, 130:7, 130:9
**provides** [3] - 5:4, 94:10, 112:21
**providing** [3] - 35:7, 69:2, 76:13
**provocative** [1] - 88:20
**proximate** [1] - 71:24
**prudence** [2] - 114:4, 145:6
**public** [2] - 120:13, 127:19
**pulled** [6] - 8:15, 10:24, 39:25, 40:3, 61:12, 118:12
**pulling** [1] - 9:4
**purported** [1] - 91:19
**purpose** [3] - 24:4, 62:3, 126:8
**pursuant** [3] - 6:10, 9:2, 112:10
**put** [17] - 3:8, 25:20, 26:15, 26:18, 28:2, 31:19, 39:4, 61:11, 70:24, 72:15, 73:8, 75:5, 77:18, 108:10, 121:16, 138:4, 143:11
**putting** [1] - 134:12

**Q**

**qualify** [1] - 19:16
**questioned** [12] - 23:22, 26:17, 28:3, 28:6, 28:8,

34:18, 39:10, 66:13, 66:14, 77:8, 85:5, 124:11
**questioning** [61] - 12:23, 13:11, 13:23, 13:24, 14:1, 15:1, 15:25, 16:13, 17:5, 17:6, 19:10, 19:16, 19:20, 19:21, 23:11, 23:16, 24:18, 25:15, 27:17, 27:25, 28:21, 29:7, 32:16, 32:23, 33:20, 35:8, 35:12, 37:5, 43:7, 46:17, 58:8, 58:14, 63:17, 63:18, 63:20, 64:10, 68:8, 68:10, 68:12, 70:2, 75:19, 84:19, 85:12, 96:14, 96:25, 98:17, 99:9, 99:22, 102:8, 102:11, 102:21, 102:24, 104:1, 119:10, 121:21, 121:23, 126:11, 133:2, 133:18, 136:18
**questions** [84] - 14:12, 14:22, 15:3, 16:21, 17:1, 17:10, 17:20, 21:22, 23:8, 24:15, 25:21, 27:7, 29:5, 29:22, 30:16, 31:10, 32:4, 34:6, 34:11, 34:15, 34:18, 34:22, 36:18, 37:10, 38:4, 38:23, 39:14, 39:19, 39:24, 40:2, 45:15, 46:9, 52:5, 57:3, 57:4, 57:5, 57:7, 61:10, 61:15, 62:14, 62:15, 64:12, 66:22, 67:11, 74:14, 74:15, 75:3, 76:15, 76:24, 78:9, 79:6, 83:21, 86:20, 87:4, 87:22, 87:25, 89:3, 94:15, 95:19, 96:11, 96:19, 96:20, 97:13, 97:23, 98:22, 102:15, 102:21, 103:2, 103:24, 103:25, 119:17, 120:8, 120:21, 121:11, 121:25, 122:5, 123:25, 125:22, 126:13, 131:8, 134:3, 134:5, 134:17
**quickly** [1] - 135:10
**quite** [2] - 129:2, 130:4
**quote** [2] - 129:14, 136:6

**R**

**R-085** [1] - 73:12
**R-Y-A-N** [1] - 4:11
**radar** [3] - 107:6, 125:17, 134:1

**raise** [6] - 4:4, 18:9, 42:15, 60:3, 69:10, 138:1
**raised** [5] - 59:6, 92:1, 94:16, 94:24, 116:25
**raising** [1] - 107:15
**ran** [2] - 48:6
**rather** [5] - 105:23, 121:21, 123:21, 128:21, 134:17
**re** [8] - 38:25, 88:16, 91:24, 98:24, 99:18, 100:6, 100:12, 124:2
**re-Mirandize** [1] - 99:18
**re-Mirandized** [6] - 38:25, 88:16, 98:24, 100:6, 100:12, 124:2
**re-reviewing** [1] - 91:24
**reach** [3] - 113:5, 113:9, 132:11
**read** [45] - 14:1, 14:20, 15:7, 15:16, 23:5, 32:16, 33:11, 33:16, 36:5, 36:7, 37:5, 44:25, 50:4, 51:10, 51:21, 51:23, 52:6, 52:13, 55:16, 63:11, 74:6, 75:11, 75:20, 76:5, 85:10, 85:24, 86:17, 94:2, 95:25, 96:7, 97:10, 104:18, 109:23, 114:5, 115:5, 115:25, 120:2, 120:17, 120:22, 124:14, 124:15, 126:2, 132:13, 135:24, 138:13
**readily** [3] - 113:4, 113:6, 115:2
**reading** [10] - 35:18, 61:7, 61:9, 62:15, 76:6, 96:3, 103:17, 108:20, 115:24, 136:9
**reads** [3] - 95:14, 95:17, 97:9
**readvise** [1] - 136:2
**readvised** [2] - 135:9, 137:1
**ready** [4] - 3:4, 77:18, 115:12, 144:1
**real** [9] - 18:21, 84:11, 84:24, 91:14, 100:3, 109:4, 112:4, 124:6, 130:11
**realize** [1] - 55:21
**really** [12] - 47:25, 71:12, 91:4, 92:24, 97:1, 99:17, 99:23, 104:1, 129:2, 130:23, 134:18, 142:8
**rear** [2] - 28:9, 33:21
**reason** [5] - 48:19, 70:25, 115:15, 115:18, 122:21

**reasonable** [1] - 114:4
**reasons** [2] - 92:24, 126:7
**rebuttal** [2] - 101:17, 109:18
**recalling** [1] - 43:4
**recap** [1] - 111:19
**receive** [1] - 47:6
**received** [2] - 8:4, 138:12
**receiving** [1] - 135:19
**recent** [1] - 132:24
**recently** [3] - 16:7, 89:2, 125:7
**recess** [7] - 76:18, 76:19, 110:8, 110:10, 141:5, 141:7, 145:11
**recite** [1] - 128:11
**recognize** [14] - 7:12, 7:15, 13:7, 14:10, 14:16, 22:20, 22:25, 26:5, 26:24, 27:2, 62:19, 62:21, 109:13, 116:25
**recognized** [3] - 7:16, 8:13, 131:17
**recollect** [1] - 61:1
**recollection** [13] - 6:3, 7:5, 9:14, 19:7, 39:20, 39:21, 56:7, 60:15, 60:24, 73:19, 73:20, 77:18, 87:16
**recollections** [3] - 40:7, 40:22, 87:8
**reconvene** [1] - 110:9
**record** [8] - 46:14, 56:13, 70:23, 70:24, 71:1, 138:5, 143:11, 144:25
**recorded** [3] - 19:1, 19:2, 147:3
**records** [4] - 92:15, 108:23, 108:24, 115:11
**recount** [1] - 125:10
**recounted** [3] - 115:7, 125:5, 127:10
**recounts** [2] - 115:19, 116:12
**recover** [1] - 109:17
**recovered** [3] - 66:16, 92:5, 92:7
**recross** [1] - 42:7
**rectify** [1] - 113:8
**redirect** [3] - 39:15, 78:11, 124:22
**REDIRECT** [2] - 39:16, 146:6
**reduce** [1] - 40:6
**refer** [3] - 115:3, 115:21, 116:10
**reference** [6] - 16:8,

26:3, 52:4, 52:11, 72:18, 116:18
**referenced** [2] - 101:13, 116:21
**referencing** [2] - 95:12, 97:3
**referred** [4] - 16:8, 44:21, 47:3, 68:19
**referring** [3] - 52:14, 77:3, 77:4
**refers** [2] - 44:17, 116:19
**refresh** [1] - 56:7
**refreshes** [1] - 77:18
**refusing** [2] - 76:10
**regard** [4] - 35:24, 79:16, 107:22, 135:2
**regarded** [1] - 133:17
**regarding** [6] - 25:15, 39:6, 40:4, 60:6, 73:17, 127:5
**regardless** [1] - 91:2
**regards** [9] - 60:4, 60:10, 60:21, 72:9, 82:14, 84:5, 87:13, 88:5, 92:3
**regional** [2] - 46:22, 47:3
**registration** [1] - 92:9
**reinitiation** [1] - 102:22
**reject** [1] - 145:1
**rejected** [1] - 129:12
**rejection** [1] - 55:19
**related** [1] - 72:24
**relating** [1] - 115:10
**relative** [1] - 49:8
**relatives** [1] - 67:1
**released** [1] - 49:8
**relevance** [6] - 50:6, 51:14, 51:15, 59:4, 72:23, 122:18
**relevancy** [1] - 99:14
**relevant** [11] - 50:7, 79:6, 90:17, 92:16, 99:15, 105:8, 120:25, 122:3, 130:1, 135:7, 136:16
**reliance** [1] - 94:12
**relinquish** [2] - 132:1, 132:4
**relinquished** [1] - 134:7
**relocate** [3] - 58:2, 58:3, 58:6
**rely** [5] - 82:1, 97:21, 101:2, 107:17, 112:18
**relying** [3] - 87:17, 96:4, 108:1
**remain** [22] - 13:21, 14:7, 14:8, 30:25, 36:20, 37:13, 37:20, 63:14,

68:4, 86:18, 89:2, 96:1, 96:12, 96:24, 97:12, 97:14, 102:17, 103:19, 121:24, 124:19, 127:20, 134:7
**remained** [3] - 67:9, 126:12, 126:18
**remaining** [1] - 96:12
**remark** [1] - 21:7
**remarks** [1] - 122:16
**remember** [8] - 15:10, 15:24, 20:14, 28:23, 29:9, 40:5, 61:8, 103:24
**remembered** [1] - 65:23
**remind** [1] - 144:16
**remiss** [1] - 137:12
**removed** [1] - 120:12
**render** [1] - 133:6
**renew** [1] - 47:17
**renewal** [1] - 47:21
**repeat** [4] - 8:7, 23:17, 125:6, 130:7
**repeated** [3] - 85:2, 89:24, 90:4
**repeats** [2] - 89:23, 90:8
**replied** [1] - 3:3
**reply** [2] - 108:2, 108:3
**report** [45] - 26:20, 29:13, 29:17, 30:22, 31:18, 31:20, 41:3, 50:12, 51:23, 51:24, 54:3, 59:8, 60:11, 71:25, 72:15, 72:17, 72:20, 73:6, 73:9, 73:11, 73:14, 74:1, 75:6, 75:7, 77:3, 77:4, 77:17, 77:21, 78:2, 86:4, 86:7, 86:16, 87:6, 87:14, 87:15, 92:6, 95:13, 95:17, 96:3, 96:5, 97:3, 97:8, 97:16, 97:19
**reported** [1] - 58:10
**Reported** [1] - 1:22
**reporter** [1] - 76:16
**Reporter** [1] - 147:16
**REPORTER'S** [1] - 147:1
**reports** [8] - 40:19, 49:23, 50:24, 51:5, 57:20, 72:10, 72:13, 87:18
**represent** [2] - 13:25, 63:20
**represents** [1] - 113:1
**request** [5] - 14:9, 14:25, 15:1, 74:1, 74:4
**require** [2] - 101:5, 114:9
**required** [11] - 84:15, 94:18, 94:20, 97:5, 119:18, 129:12, 129:18,

129:20, 135:21, 136:2
**requirement** [3] - 95:3, 95:5, 112:14
**requires** [4] - 85:15, 85:16, 117:5, 129:10
**requisite** [1] - 132:8
**rescued** [1] - 112:13
**research** [2] - 135:10, 144:4
**reserve** [2] - 110:11, 137:7
**residence** [14] - 2:21, 7:2, 9:13, 19:25, 20:1, 20:6, 50:15, 50:17, 54:18, 62:6, 72:25, 74:13, 111:14, 125:20
**residences** [1] - 115:13
**resident** [1] - 46:16
**resist** [1] - 69:20
**resolution** [1] - 48:22
**resolve** [1] - 128:3
**resources** [1] - 108:18
**respect** [5] - 2:20, 2:22, 81:23, 111:14, 112:4
**responded** [1] - 127:7
**response** [10] - 3:2, 3:19, 8:14, 66:19, 85:24, 88:19, 92:6, 107:24, 131:7, 144:3
**responsibilities** [1] - 6:16
**responsibility** [2] - 6:17, 114:23
**responsible** [2] - 7:22, 20:22
**responsive** [4] - 99:25, 123:18, 123:25, 136:15
**rest** [3] - 11:6, 74:7, 142:25
**restate** [2] - 130:14, 131:1
**restroom** [2] - 12:9, 119:2
**result** [3] - 69:6, 123:17, 134:7
**resulted** [1] - 49:15
**Resume** [3] - 76:19, 110:10, 141:7
**return** [1] - 12:14
**returned** [6] - 20:1, 20:3, 40:14, 41:22, 58:23, 109:3
**revealing** [1] - 123:2
**review** [8] - 57:19, 73:6, 113:9, 114:22, 114:25, 116:13, 118:4, 121:19
**reviewed** [4] - 51:5, 61:19, 113:3, 125:25
**reviewing** [3] - 91:24, 114:23, 117:6

**revoked** [1] - 47:18
**rewarn** [1] - 135:22
**rhetorical** [1] - 68:2
**ride** [3] - 20:8, 20:20, 122:14
**Rights** [1] - 52:3
**rights** [110] - 13:8, 14:5, 14:6, 14:20, 14:25, 15:7, 15:16, 23:5, 23:12, 23:20, 23:23, 24:1, 24:23, 32:9, 32:16, 32:18, 32:24, 35:18, 36:5, 36:7, 36:13, 36:17, 37:4, 37:8, 37:11, 50:4, 51:10, 51:21, 52:5, 52:6, 52:12, 57:13, 62:16, 63:4, 63:22, 63:25, 65:5, 65:6, 69:3, 74:6, 75:11, 75:12, 76:4, 76:6, 79:8, 79:9, 84:8, 84:25, 85:5, 85:10, 85:21, 85:24, 86:17, 86:21, 86:24, 88:11, 88:12, 93:24, 94:2, 94:3, 94:7, 94:13, 94:14, 94:22, 96:7, 96:16, 97:11, 97:25, 98:7, 98:11, 98:19, 98:25, 102:12, 102:19, 102:25, 103:11, 103:17, 103:20, 104:18, 119:10, 120:6, 124:10, 124:17, 124:18, 124:19, 125:15, 126:5, 126:9, 126:10, 128:9, 128:18, 130:12, 130:25, 131:1, 131:2, 131:6, 131:7, 131:12, 131:18, 132:1, 132:3, 132:5, 132:12, 132:13, 134:2, 134:14, 136:2, 136:24
**rigid** [1] - 114:8
**ripe** [1] - 91:18
**rise** [2] - 84:19, 137:25
**risk** [5] - 29:5, 29:22, 30:16, 95:19, 96:11
**road** [1] - 80:8
**role** [3] - 6:13, 7:25, 11:24
**rotate** [1] - 48:10
**rotates** [1] - 48:12
**roughly** [1] - 110:2
**route** [1] - 128:2
**routine** [1] - 89:12
**routine-type** [1] - 89:12
**routinely** [1] - 41:3
**row** [1] - 43:3
**RPR** [1] - 1:23
**Rule** [1] - 113:21
**rule** [3] - 91:2, 109:22, 144:1

**ruling** [1] - 137:3
**Ryan** [11] - 2:7, 4:1, 4:11, 60:13, 73:25, 76:5, 76:6, 93:15, 97:12, 111:22, 118:6
**RYAN** [2] - 4:6, 146:5

## S

**S.Ct** [1] - 129:25
**SA** [6] - 52:1, 52:3, 52:8, 52:9, 52:10
**safely** [1] - 61:3
**safety** [1] - 62:3
**sally** [2] - 70:15, 72:7
**Santiago** [5] - 51:1, 52:1, 52:3, 52:8, 52:9
**sat** [3] - 74:18, 75:23, 103:6
**satisfied** [3] - 113:4, 134:6, 138:19
**satisfies** [1] - 114:6
**satisfy** [4] - 116:7, 130:3, 130:10, 134:25
**saw** [1] - 47:24
**scene** [10] - 6:2, 35:14, 104:1, 117:15, 122:13, 124:13, 128:2, 131:11, 134:24, 136:24
**schedule** [1] - 140:21
**scheduled** [3] - 139:9, 139:11, 142:18
**scheduling** [4] - 139:9, 140:3, 142:19, 143:20
**Schmeckloth** [1] - 133:12
**screen** [1] - 73:8
**search** [47] - 2:19, 3:16, 3:18, 5:10, 5:18, 35:6, 41:22, 49:16, 54:6, 54:17, 54:19, 54:23, 55:17, 55:20, 56:8, 60:9, 62:3, 62:13, 66:17, 71:2, 72:25, 81:23, 82:11, 82:13, 82:17, 84:7, 87:10, 92:4, 92:7, 92:21, 107:10, 109:16, 111:11, 111:13, 111:17, 112:10, 112:11, 112:24, 113:3, 113:12, 114:21, 115:2, 115:18, 117:4, 117:7, 117:9, 120:25
**searched** [2] - 113:13, 113:20
**searches** [1] - 112:9
**Sears** [5] - 53:9, 53:12, 53:14, 53:17, 53:19
**seat** [16] - 2:14, 4:8, 11:19, 11:20, 11:21,

11:22, 20:10, 20:11, 28:7, 33:21, 42:19, 63:9, 70:11, 70:13, 126:25, 134:20
**second** [14] - 44:21, 49:20, 53:8, 53:22, 54:11, 56:21, 57:14, 57:23, 58:3, 58:8, 73:12, 91:11, 99:14, 141:2
**section** [2] - 24:4, 24:17
**Section** [7] - 52:11, 59:19, 110:19, 110:20, 110:21, 110:22, 110:23
**secured** [3] - 9:5, 75:1, 115:12
**security** [3] - 5:4, 46:22, 47:3
**Security** [18] - 2:6, 2:7, 4:1, 4:18, 4:22, 5:3, 5:4, 5:9, 13:8, 13:11, 16:1, 43:14, 75:10, 86:17, 96:8, 97:10, 110:21, 111:23
**see** [12] - 9:21, 9:23, 26:11, 29:19, 48:7, 48:19, 73:12, 77:19, 85:19, 99:25, 122:18, 135:11
**seeking** [1] - 105:17
**seeks** [2] - 2:18, 105:7
**seem** [2] - 18:17, 83:8
**seized** [1] - 113:14
**self** [2] - 64:22, 133:10
**self-determination** [1] - 133:10
**self-incriminate** [1] - 64:22
**seminal** [1] - 128:10
**sending** [1] - 143:7
**Seni** [1] - 132:23
**sense** [4] - 81:21, 82:21, 108:20, 114:9
**sent** [5] - 26:8, 40:10, 40:12, 60:18, 74:1
**sentence** [1] - 46:7
**sentences** [1] - 46:3
**sentencing** [1] - 140:21
**separate** [3] - 75:8, 82:19, 82:23
**separately** [2] - 82:24, 84:7
**separating** [1] - 38:15
**September** [3] - 1:11, 144:6, 147:5
**served** [1] - 98:9
**service** [3] - 4:24, 4:25, 48:13
**Service** [14] - 2:6, 4:2, 4:18, 4:23, 5:3, 5:4, 5:9, 13:8, 13:11, 16:2, 60:17,

64:11, 96:8, 111:23
**Services** [3] - 4:23, 45:25, 72:7
**serving** [3] - 28:4, 35:6, 139:19
**set** [9] - 85:10, 108:8, 109:12, 135:13, 139:17, 140:25, 142:20, 142:25, 143:2
**sets** [2] - 108:22, 109:6
**setting** [8] - 13:6, 70:6, 84:18, 85:5, 125:13, 126:8, 127:16, 133:22
**settled** [2] - 113:25, 114:22
**seven** [2] - 140:7, 141:9
**seven-day** [1] - 140:7
**several** [7] - 45:14, 46:6, 48:6, 75:13, 111:25, 117:10, 136:8
**Shanahan** [1] - 2:7
**shirt** [5] - 27:10, 28:3, 97:24, 118:10, 118:13
**shirtless** [3] - 8:19, 10:12, 94:1
**shocking** [1] - 84:20
**shockingly** [1] - 143:24
**shortcomings** [1] - 113:8
**shortly** [1] - 54:12
**show** [7] - 12:25, 22:19, 26:4, 26:23, 34:10, 106:13, 128:20
**showed** [2] - 47:1, 132:22
**showing** [3] - 13:3, 108:14, 108:24
**shown** [1] - 120:22
**shows** [2] - 85:22, 88:7
**sibling** [1] - 49:9
**siblings** [7] - 16:1, 16:3, 65:9, 65:16, 91:21, 91:22, 101:8
**sic** [1] - 59:24
**side** [4] - 4:4, 42:15, 117:23, 144:9
**sidearms** [1] - 6:8
**sides** [3] - 18:25, 91:5, 110:14
**sight** [1] - 63:12
**sign** [8] - 15:13, 15:14, 23:22, 33:2, 74:24, 75:4, 120:16, 120:17
**signature** [5] - 24:8, 24:11, 33:2, 33:3, 147:11
**signatures** [1] - 103:5
**signed** [7] - 52:7, 52:13, 116:23, 119:20, 119:21, 131:4, 131:5
**significant** [7] - 49:12,

116:17, 125:1, 125:3, 126:13, 133:25, 134:15
**signifies** [1] - 134:4
**silent** [26] - 13:21, 14:7, 14:8, 30:25, 36:20, 37:13, 37:20, 63:14, 67:9, 68:5, 86:18, 89:2, 96:1, 96:12, 96:13, 96:24, 97:12, 97:14, 102:17, 103:19, 121:24, 124:20, 126:12, 126:18, 127:21, 134:7
**silver** [2] - 2:22, 111:16
**similar** [3] - 57:5, 70:20, 83:23
**simply** [17] - 47:16, 64:10, 64:12, 67:25, 69:5, 71:5, 71:7, 72:24, 73:2, 74:15, 76:5, 78:2, 96:1, 97:14, 98:8, 100:17, 122:1
**simultaneous** [2] - 9:9, 11:9
**single** [2] - 115:5, 116:13
**sisters** [3] - 65:13, 65:17, 66:20
**sisters'** [1] - 65:11
**sit** [3] - 50:14, 74:21, 141:11
**sit-down** [1] - 50:14
**site** [1] - 115:3
**sitting** [6] - 10:1, 10:3, 20:10, 33:21, 63:8, 141:19
**situated** [1] - 126:8
**Six** [2] - 138:24, 139:3
**six** [4] - 57:16, 110:15, 121:3, 125:12
**six-count** [1] - 110:15
**Sixth** [1] - 94:8
**skip** [1] - 119:25
**sleep** [7] - 20:22, 21:6, 38:15, 100:1, 105:25, 122:17, 127:6
**slightly** [1] - 17:17
**small** [4] - 12:5, 87:13, 92:25
**snow** [1] - 10:11
**so-called** [1] - 89:12
**Social** [2] - 2:7, 110:20
**solve** [1] - 97:4
**someone** [8] - 24:9, 33:3, 85:2, 89:17, 89:18, 100:11, 105:22, 116:4
**sometime** [1] - 102:4
**sometimes** [2] - 24:25, 96:17
**somewhere** [1] - 98:6
**son** [1] - 109:9

**sons** [1] - 66:1
**soon** [8] - 37:3, 40:12, 40:13, 59:9, 74:14, 97:20, 143:15, 144:5
**SOP** [3] - 37:1, 75:15, 75:17
**sorry** [16] - 4:22, 8:7, 12:17, 25:21, 26:11, 26:25, 30:3, 37:14, 50:20, 56:5, 57:15, 61:10, 73:5, 93:14, 100:20, 121:7
**sort** [14] - 7:2, 21:19, 40:20, 82:18, 82:23, 84:2, 84:7, 85:2, 89:12, 90:6, 90:14, 91:11, 105:1, 105:5
**sorts** [2] - 104:14, 105:14
**sound** [1] - 70:9
**span** [2] - 117:22, 117:24
**spawned** [1] - 90:11
**Special** [70] - 2:6, 2:7, 4:1, 4:20, 7:21, 8:9, 12:14, 12:18, 12:22, 14:17, 15:25, 16:12, 16:13, 16:17, 17:9, 18:6, 18:23, 19:7, 19:11, 19:19, 20:21, 21:5, 22:1, 25:9, 26:8, 30:15, 31:10, 31:18, 31:19, 36:2, 39:18, 39:24, 40:2, 41:20, 41:21, 42:11, 43:2, 43:6, 49:17, 54:7, 54:16, 59:23, 60:13, 60:17, 60:21, 61:12, 69:24, 70:5, 70:16, 73:19, 74:2, 85:9, 86:3, 86:5, 86:19, 87:5, 87:9, 87:15, 88:22, 95:13, 95:20, 98:13, 102:21, 103:4, 105:10, 105:11, 108:16, 111:22, 111:24, 118:6
**special** [6] - 4:21, 5:8, 14:17, 43:18, 50:11
**specialized** [1] - 115:8
**specific** [3] - 32:14, 100:21, 115:9
**specifically** [7] - 65:18, 70:24, 71:12, 85:12, 86:5, 97:19, 115:21
**specifics** [3] - 13:6, 54:3, 74:15
**spell** [3] - 4:10, 8:10, 42:21
**spelled** [1] - 42:23
**spend** [1] - 83:7
**spoken** [2] - 44:11,

44:13
**SSA** [3] - 29:21, 95:18, 97:12
**St** [2] - 66:9, 116:25
**stage** [2] - 56:1, 98:25
**stairwell** [3] - 7:6, 8:16, 118:12
**stand** [11] - 4:4, 31:19, 42:15, 75:7, 79:1, 79:23, 80:23, 110:8, 114:7, 130:5, 145:11
**standard** [8] - 14:14, 62:5, 100:13, 100:18, 101:4, 108:12, 114:6, 114:8
**standards** [4] - 55:10, 108:19, 116:7, 116:8
**standing** [6] - 2:11, 28:10, 41:22, 70:22, 94:5, 133:3
**standpoint** [1] - 103:4
**start** [3] - 34:14, 142:8, 144:25
**started** [4] - 29:7, 92:9, 103:7, 105:16
**starting** [3] - 29:18, 73:16
**starts** [2] - 30:7, 94:17
**state** [4] - 4:9, 42:20, 133:10, 138:5
**State** [16] - 4:17, 5:5, 22:2, 22:3, 22:7, 22:10, 22:13, 22:16, 43:13, 46:16, 48:9, 75:14, 77:7, 94:10, 111:23
**Statement** [1] - 52:9
**statement** [30] - 55:14, 57:19, 60:15, 61:4, 61:20, 67:20, 67:25, 69:5, 74:19, 75:24, 78:23, 82:6, 82:7, 82:12, 84:22, 84:25, 86:23, 95:23, 95:24, 96:10, 116:23, 121:13, 127:15, 130:13, 130:14, 130:15, 130:19, 135:19, 136:5, 137:4
**statements** [105] - 2:24, 2:25, 3:7, 3:9, 10:23, 11:1, 13:19, 14:1, 20:19, 25:12, 30:19, 30:20, 38:5, 38:14, 41:2, 41:6, 41:16, 52:12, 54:1, 59:7, 59:12, 59:19, 60:3, 60:10, 60:12, 60:16, 60:22, 69:4, 70:8, 70:13, 70:17, 70:20, 72:18, 72:21, 73:17, 77:8, 77:22, 79:3, 79:20, 79:24, 80:15, 82:15,

82:17, 82:22, 82:23, 83:6, 83:9, 83:11, 83:12, 83:14, 83:15, 83:23, 84:9, 84:12, 85:7, 88:13, 88:15, 88:20, 88:24, 89:1, 89:4, 89:5, 89:24, 90:1, 90:3, 92:10, 92:16, 92:22, 99:19, 100:6, 101:3, 101:5, 101:6, 101:12, 102:17, 104:8, 105:7, 105:20, 106:9, 111:8, 117:10, 117:12, 117:14, 117:15, 117:18, 117:20, 117:25, 118:19, 121:18, 122:18, 122:20, 123:1, 123:11, 124:1, 127:24, 128:5, 133:6, 134:24, 135:2, 135:3, 136:16, 136:18, 142:5
**STATES** [2] - 1:1, 1:4
**States** [20] - 2:3, 4:17, 45:21, 46:20, 52:11, 59:19, 59:20, 107:20, 111:11, 111:22, 113:15, 113:21, 113:22, 114:1, 114:15, 128:14, 129:14, 129:24, 132:23, 135:24
**stating** [1] - 131:24
**status** [2] - 115:19, 134:22
**stay** [2] - 11:5, 11:24
**stayed** [2] - 11:25, 118:23
**stenographically** [1] - 147:4
**step** [4] - 42:9, 43:8, 78:13, 108:17
**stepping** [2] - 56:21, 73:5
**steps** [1] - 94:12
**still** [15] - 15:8, 15:12, 20:12, 28:24, 31:24, 36:25, 48:1, 100:18, 102:18, 135:3, 140:6, 140:12, 140:13, 140:25
**stop** [6] - 14:12, 34:6, 34:15, 94:17, 119:17, 121:23
**stopped** [4] - 16:13, 17:5, 35:8, 105:15
**store** [1] - 53:9
**story** [2] - 7:3, 124:6
**streams** [1] - 56:5
**street** [3] - 74:25, 120:13, 127:20
**Street** [1] - 1:24
**stressful** [1] - 132:15
**style** [2] - 110:12, 137:8
**subject** [55] - 7:11, 7:12, 8:4, 8:13, 8:16,

9:4, 9:20, 9:23, 11:10, 12:1, 15:20, 15:25, 16:2, 16:8, 16:20, 19:21, 20:11, 20:12, 20:20, 21:3, 21:8, 21:10, 29:7, 29:22, 31:10, 31:11, 33:21, 41:25, 44:10, 44:11, 46:24, 47:25, 49:21, 52:4, 52:6, 52:8, 52:10, 52:12, 52:14, 53:12, 56:23, 59:10, 61:19, 64:4, 64:5, 74:9, 86:19, 88:13, 89:5, 95:18, 96:13, 97:10, 97:13, 118:12, 118:23
**subject's** [1] - 64:16
**subjects** [2] - 13:12, 13:14
**submission** [1] - 3:17
**submissions** [2] - 110:14, 112:15
**submit** [2] - 107:21, 144:10
**submitted** [2] - 107:22, 108:23
**subsequent** [1] - 96:23
**subsequently** [1] - 49:14
**substance** [2] - 54:25, 122:9
**substances** [1] - 18:18
**substantial** [2] - 48:16, 114:24
**substantive** [1] - 21:19
**suffered** [1] - 47:14
**sufficiency** [1] - 94:25
**sufficient** [9] - 85:21, 88:11, 103:3, 103:11, 103:16, 104:19, 108:10, 114:3, 117:23
**sufficiently** [1] - 103:3
**suggest** [10] - 93:21, 95:14, 96:21, 99:2, 105:22, 106:1, 122:23, 126:14, 134:13, 143:23
**suggestion** [1] - 88:8
**suggests** [4] - 95:25, 98:8, 98:17, 134:23
**sum** [1] - 54:25
**summarizes** [2] - 109:3, 122:13
**summarizing** [2] - 54:22, 56:22
**summary** [3] - 73:18, 97:19, 101:1
**summer** [2] - 59:22, 59:24
**supermarket** [1] - 53:15
**superseding** [10] - 59:9, 59:11, 60:3, 92:17,

110:16, 137:13, 137:16, 138:12, 138:24, 139:4
**supervise** [2] - 43:21, 43:23
**supervised** [1] - 51:7
**supervising** [2] - 48:4, 57:21
**supervision** [1] - 125:15
**supervisor** [3] - 48:11, 60:14, 75:16
**supervisory** [2] - 7:21, 43:18
**Supervisory** [1] - 14:17
**supplemental** [2] - 2:23, 111:8
**support** [5] - 54:2, 54:19, 112:24, 114:12, 117:9
**supported** [3] - 112:11, 112:12, 113:18
**supporting** [2] - 57:24, 108:21
**supports** [4] - 89:17, 131:9, 134:5, 136:25
**supposed** [1] - 13:3
**suppress** [15] - 2:16, 2:24, 3:15, 56:6, 56:17, 59:14, 78:18, 78:23, 83:15, 111:4, 111:8, 111:10, 117:7, 130:14, 137:4
**suppressed** [1] - 130:18
**suppressing** [1] - 135:5
**suppression** [2] - 88:13, 89:6
**Supreme** [5] - 113:22, 114:1, 128:13, 129:9, 135:22
**surfaced** [3] - 116:1, 116:12, 125:7
**surprise** [4] - 106:19, 106:20, 107:7, 123:6
**surveillance** [1] - 72:11
**suspect** [1] - 131:25
**suspects** [1] - 135:22
**sustain** [1] - 17:17
**swab** [1] - 21:3
**swabbed** [2] - 104:5, 104:13
**swear** [1] - 4:7
**sweep** [10] - 9:10, 9:12, 11:4, 11:8, 11:11, 62:1, 118:20, 125:20, 130:16, 130:17
**SWORN** [3] - 4:6, 42:17, 138:2
**sworn** [2] - 5:9, 109:2
**system** [6] - 45:18,

47:17, 47:22, 72:10, 72:16, 73:1
**System** [1] - 72:14

**T**

**T-E-T-R-A-U-L-T** [2] - 8:11, 42:24
**table** [4] - 10:4, 48:9, 49:14, 54:8
**Tamar** [1] - 39:2
**task** [1] - 114:25
**team** [10] - 6:15, 7:25, 9:7, 9:10, 10:14, 11:5, 11:6, 11:10, 118:6
**teams** [1] - 6:13
**tend** [1] - 99:18
**term** [1] - 34:25
**terminate** [2] - 68:11, 85:12
**terminated** [9] - 19:19, 19:21, 58:14, 58:15, 67:11, 68:10, 88:6, 102:8, 102:11
**terminates** [1] - 105:10
**terminating** [1] - 67:14
**terms** [7] - 57:4, 78:16, 83:12, 90:19, 103:1, 103:8, 125:10
**territory** [1] - 45:9
**test** [2] - 72:6, 133:11
**tested** [1] - 129:13
**testified** [26] - 8:22, 9:19, 10:5, 12:19, 25:15, 27:7, 31:21, 54:21, 56:23, 58:24, 59:22, 68:10, 87:1, 87:7, 96:4, 97:17, 99:5, 111:25, 116:16, 118:11, 120:2, 120:5, 120:10, 124:7, 125:19, 127:4
**testify** [14] - 60:19, 79:4, 79:5, 79:7, 79:11, 79:17, 79:19, 80:6, 80:13, 80:14, 80:22, 81:6, 81:16
**testimony** [47] - 27:23, 28:22, 32:3, 33:19, 38:8, 49:11, 53:20, 54:16, 60:21, 68:20, 70:6, 80:25, 81:5, 83:23, 85:9, 86:4, 87:9, 87:14, 87:21, 88:7, 90:2, 93:22, 94:2, 95:20, 98:4, 98:16, 98:23, 98:25, 103:18, 109:4, 111:21, 118:2, 118:5, 121:4, 121:15, 122:6, 124:8, 124:9, 125:4, 127:22, 130:8,

130:19, 131:4, 131:6, 142:8
**Tetrault** [66] - 2:6, 7:21, 8:9, 12:14, 12:18, 12:23, 15:25, 16:12, 16:13, 16:17, 18:7, 19:8, 19:11, 19:19, 20:21, 21:5, 25:9, 26:8, 26:17, 27:5, 27:17, 29:1, 29:2, 29:4, 29:21, 30:15, 31:11, 31:19, 33:22, 34:1, 34:11, 34:24, 36:3, 36:5, 39:24, 40:2, 41:11, 41:21, 42:12, 42:22, 42:23, 49:17, 54:7, 76:23, 85:10, 86:5, 87:6, 87:15, 95:18, 95:21, 95:22, 97:17, 98:3, 98:13, 100:23, 101:13, 103:4, 105:10, 108:16, 111:24, 115:7, 119:5, 119:13, 120:2, 120:10, 126:22
**TETRAULT** [2] - 42:17, 146:7
**Tetrault's** [9] - 14:18, 18:24, 43:6, 86:3, 95:13, 95:15, 119:22, 125:4, 125:15
**Thanksgiving** [1] - 141:11
**that'd** [1] - 142:11
**THE** [264] - 1:1, 1:1, 2:9, 2:13, 3:11, 3:14, 3:20, 3:24, 4:3, 4:7, 4:8, 4:11, 4:22, 4:24, 4:25, 6:21, 6:23, 8:7, 8:9, 8:10, 8:11, 9:16, 9:17, 10:7, 11:7, 11:9, 12:11, 12:12, 12:17, 14:11, 14:13, 14:22, 14:24, 15:2, 15:4, 16:5, 16:19, 16:20, 16:22, 16:23, 16:25, 17:2, 17:17, 21:23, 22:21, 22:23, 24:21, 24:22, 26:25, 28:18, 28:19, 29:3, 29:10, 29:12, 29:24, 30:2, 30:5, 30:9, 31:7, 31:13, 31:15, 31:16, 31:21, 31:24, 32:2, 32:6, 33:10, 33:13, 33:15, 33:17, 35:17, 37:14, 37:17, 37:18, 37:19, 39:15, 40:25, 41:4, 41:8, 41:9, 41:11, 41:13, 41:14, 41:15, 42:7, 42:9, 42:13, 42:14, 42:18, 42:19, 42:22, 42:25, 43:8, 45:2, 45:16, 45:18, 48:12, 50:7, 50:17, 50:19, 51:14,

51:18, 54:5, 54:10, 54:12, 55:3, 55:5, 55:15, 55:23, 56:2, 56:13, 56:18, 57:15, 59:4, 59:15, 64:14, 64:15, 65:20, 65:22, 65:23, 65:25, 66:2, 68:14, 68:15, 75:4, 75:5, 76:16, 76:20, 78:1, 78:11, 78:13, 78:14, 78:19, 78:24, 79:10, 79:13, 79:15, 79:25, 80:3, 80:7, 80:11, 80:19, 80:21, 81:4, 81:13, 81:14, 81:15, 81:17, 81:18, 82:3, 82:5, 82:9, 82:18, 83:2, 83:5, 83:18, 84:4, 85:14, 85:18, 86:1, 86:7, 86:9, 86:12, 86:14, 87:1, 87:3, 87:20, 87:24, 89:9, 90:9, 90:14, 90:24, 91:4, 91:13, 93:2, 93:4, 93:7, 93:10, 93:14, 93:17, 93:20, 94:15, 94:23, 95:2, 95:7, 95:10, 96:17, 99:6, 99:17, 100:16, 100:20, 101:1, 101:14, 101:17, 101:21, 101:24, 102:3, 102:10, 102:14, 103:21, 103:23, 104:11, 105:19, 106:18, 106:24, 107:1, 107:4, 107:9, 107:12, 107:24, 108:5, 109:18, 109:20, 110:2, 110:6, 110:8, 110:11, 119:9, 137:15, 137:22, 137:25, 138:3, 138:4, 138:6, 138:7, 138:9, 138:10, 138:11, 138:12, 138:14, 138:15, 138:17, 138:18, 138:23, 139:1, 139:2, 139:5, 139:6, 139:7, 139:15, 139:17, 139:21, 140:6, 140:11, 140:18, 140:23, 141:2, 141:5, 141:8, 141:20, 141:23, 142:4, 142:11, 142:15, 142:19, 142:23, 143:4, 143:24, 144:9, 144:14, 144:21, 145:6, 145:8, 145:11
**theft** [2] - 43:25, 110:22
**thefts** [1] - 46:6
**themselves** [3] - 121:18, 123:15, 133:17
**theoretically** [2] - 88:1, 143:17
**thereafter** [1] - 54:12
**therefore** [1] - 112:17
**they've** [2] - 46:4, 75:10

**thinking** [3] - 82:18, 106:14, 109:20
**thinks** [1] - 82:20
**third** [7] - 7:8, 30:1, 30:6, 30:7, 95:16, 117:20, 123:10
**Thomas** [2] - 66:9, 116:25
**Thompkins** [3] - 128:13, 131:13, 135:19
**thorough** [2] - 47:9, 48:3
**threaten** [1] - 18:7
**threatened** [1] - 122:7
**threats** [1] - 133:16
**three** [19] - 9:15, 9:16, 9:17, 21:18, 47:23, 77:17, 77:23, 77:24, 78:2, 82:19, 82:23, 83:16, 89:6, 91:7, 100:22, 117:14, 118:17, 132:17, 135:19
**Three** [3] - 119:7, 138:24, 139:3
**three-minute** [3] - 83:16, 89:6, 91:7
**three-page** [2] - 77:17, 77:23
**threshold** [2] - 8:16, 47:11
**throw** [1] - 106:6
**thrust** [1] - 123:16
**Thursday** [1] - 26:9
**tight** [1] - 12:5
**time-tested** [1] - 129:13
**Title** [2] - 52:11, 59:18
**title** [2] - 4:19, 43:17
**today** [10] - 3:5, 9:21, 9:24, 54:22, 60:19, 80:22, 80:25, 81:6, 81:8, 111:20
**today's** [2] - 81:5, 87:15
**together** [1] - 41:17
**took** [10] - 10:5, 11:13, 48:18, 50:8, 52:1, 72:4, 80:22, 94:12, 100:4, 126:11
**top** [6] - 26:10, 27:1, 34:3, 34:12, 75:5, 119:22
**topics** [2] - 57:11, 85:5
**totality** [7] - 84:16, 98:20, 100:18, 100:20, 102:5, 114:10, 132:7
**touched** [1] - 91:22
**toward** [1] - 63:8
**towards** [1] - 19:8
**trained** [7] - 22:13, 23:1, 23:7, 23:10, 23:14, 24:14, 25:5
**training** [3] - 23:3, 23:4,

115:8
**transcribed** [1] - 147:8
**transcript** [6] - 80:15, 81:5, 81:7, 110:13, 137:8, 147:8
**transferred** [2] - 47:24, 59:24
**transpired** [2] - 126:23, 133:8
**transpiring** [1] - 134:6
**transport** [7] - 38:6, 38:23, 64:4, 70:14, 74:9, 75:2, 105:12
**transportation** [5] - 20:16, 20:18, 59:7, 60:22, 70:5
**transported** [3] - 20:5, 74:13, 117:19
**transporting** [2] - 64:10, 70:7
**treated** [2] - 45:12, 46:2
**treaties** [1] - 45:19
**trial** [28] - 79:4, 79:18, 80:14, 80:16, 80:22, 80:23, 81:1, 81:6, 81:8, 81:10, 83:9, 83:13, 83:22, 83:25, 89:8, 90:2, 93:1, 99:14, 139:9, 140:6, 140:7, 140:10, 141:10, 141:17, 141:18, 142:24, 143:1, 144:23
**trials** [1] - 144:4
**true** [20] - 27:14, 31:11, 47:13, 48:8, 48:24, 49:7, 49:10, 65:15, 66:5, 66:10, 67:16, 67:21, 71:1, 97:17, 108:24, 109:8, 109:13, 116:1, 117:1
**Trump** [6] - 21:6, 21:11, 38:16, 38:19, 71:19, 123:24
**truncated** [1] - 98:11
**truthful** [12] - 29:5, 29:22, 30:15, 30:23, 31:10, 74:22, 76:12, 78:6, 95:18, 96:10, 96:18, 96:19
**truthfully** [1] - 121:12
**try** [5] - 12:9, 80:16, 127:23, 135:10, 140:21
**trying** [2] - 95:22, 123:16
**Tuesday** [3] - 1:11, 141:17, 142:8
**turn** [6] - 62:18, 107:9, 108:1, 117:10, 125:4, 135:13
**turning** [1] - 61:9
**turns** [2] - 48:23,

130:23

**twice** [5] - 57:10, 57:13, 85:4, 90:12, 121:3

**twin** [2] - 64:19, 64:20

**Two** [2] - 138:24, 139:3

**two** [45] - 2:15, 2:19, 7:5, 19:13, 38:22, 47:23, 48:2, 48:5, 48:10, 48:12, 48:14, 51:7, 51:16, 52:1, 56:6, 73:22, 77:5, 79:8, 94:4, 94:15, 98:18, 101:12, 101:19, 105:16, 111:1, 111:4, 111:10, 111:18, 111:21, 112:10, 115:17, 117:24, 123:4, 125:11, 126:22, 127:14, 128:18, 130:8, 131:4, 135:16, 136:4, 136:12, 140:13, 144:11

**two-and-a-half** [6] - 101:19, 105:16, 117:24, 135:16, 136:4, 136:12

**type** [5] - 25:14, 43:22, 72:13, 89:12, 103:25

**typed** [1] - 73:15

**types** [1] - 43:22

## U

**U.S** [32] - 1:23, 48:19, 49:4, 74:4, 110:20, 112:5, 113:7, 113:8, 113:21, 114:1, 114:14, 114:15, 114:17, 114:18, 116:9, 117:21, 125:8, 128:13, 128:14, 128:15, 128:16, 129:1, 129:9, 131:14, 131:17, 131:20, 131:23, 132:8, 133:11, 133:12, 135:18

**unable** [11] - 16:9, 16:21, 16:22, 17:9, 17:10, 17:14, 66:22, 67:4, 67:6, 109:12, 133:13

**unaware** [4] - 16:2, 16:7, 17:3, 100:21

**uncle** [1] - 49:9

**uncoerced** [1] - 132:7

**uncomfortable** [1] - 74:11

**uncontroverted** [1] - 131:6

**uncooperative** [1] - 58:9

**uncovering** [1] - 48:17

**under** [34] - 2:18, 4:5, 5:10, 12:7, 18:17, 23:19, 24:9, 24:11, 41:4, 42:16,

44:24, 69:15, 71:17, 85:21, 88:23, 92:11, 93:24, 94:7, 102:18, 107:15, 107:18, 110:21, 110:22, 113:7, 114:10, 120:13, 122:9, 125:14, 127:9, 129:5, 133:15, 133:21, 135:3, 138:1

**understandably** [1] - 122:24

**understood** [30] - 14:6, 14:25, 15:17, 23:11, 27:16, 27:22, 28:22, 35:24, 37:18, 38:8, 41:10, 52:6, 52:12, 53:1, 85:23, 86:18, 86:21, 94:13, 95:9, 95:20, 97:11, 98:4, 120:6, 122:2, 124:18, 126:3, 126:9, 126:14, 131:7, 132:12

**undertook** [1] - 114:25

**unduly** [2] - 132:20, 133:22

**unfamiliar** [1] - 16:2

**unfortunate** [1] - 64:16

**unfortunately** [3] - 48:9, 48:21, 140:24

**unfounded** [1] - 117:5

**uniform** [1] - 10:3

**unit** [2] - 43:21, 47:24

**UNITED** [2] - 1:1, 1:4

**United** [20] - 2:2, 4:17, 45:20, 46:20, 52:11, 59:18, 59:20, 107:20, 111:11, 111:22, 113:15, 113:21, 113:22, 114:1, 114:15, 128:14, 129:14, 129:23, 132:23, 135:24

**unless** [4] - 79:18, 80:12, 90:2, 128:7

**unprompted** [1] - 38:13

**unreasonable** [2] - 112:17, 144:10

**unseasonably** [2] - 10:10, 118:11

**unsolicited** [2] - 123:11, 127:4

**unwilling** [2] - 16:22, 16:23

**up** [26] - 7:6, 20:22, 21:5, 21:12, 23:18, 27:13, 29:17, 33:10, 38:19, 49:11, 53:6, 71:5, 72:1, 72:13, 79:1, 88:21, 91:17, 99:3, 100:1, 105:4, 105:25, 122:17, 123:14, 132:16, 141:12, 144:3

**update** [1] - 60:11

**upheld** [1] - 136:7

**uphold** [1] - 130:21

**upset** [1] - 122:25

**upwards** [1] - 134:20

**US** [26] - 20:6, 20:25, 22:11, 22:20, 27:13, 43:13, 45:5, 45:9, 45:11, 45:16, 45:23, 46:1, 46:12, 46:15, 59:21, 60:16, 64:24, 64:25, 65:2, 66:8, 67:13, 70:23, 77:22, 125:8

**USA** [1] - 147:4

**USC** [6] - 69:6, 110:19, 110:20, 110:21, 110:22, 110:23

**useful** [1] - 82:21

**uses** [1] - 94:10

## V

**valid** [1] - 113:12

**vehicle** [21] - 2:22, 10:21, 11:25, 12:15, 20:3, 20:4, 27:23, 28:13, 33:20, 39:1, 63:9, 75:1, 94:1, 94:11, 111:16, 115:21, 117:18, 118:22, 118:23, 120:12

**vehicles** [2] - 46:6, 115:13

**verbatim** [1] - 73:23

**verbiage** [1] - 75:20

**verify** [1] - 50:19

**version** [1] - 98:11

**versus** [1] - 2:3

**vicinity** [1] - 53:16

**view** [5] - 70:3, 100:7, 108:18, 121:1, 134:6

**violation** [3] - 90:7, 110:19, 110:20

**violations** [1] - 109:17

**Virgin** [2] - 66:8, 112:5

**visa** [2] - 5:6, 43:24

**visit** [3] - 45:10, 46:14

**visiting** [1] - 125:8

**voice** [1] - 69:10

**voices** [1] - 18:9

**volition** [1] - 88:19

**voluntarily** [9] - 85:8, 86:22, 93:23, 94:7, 94:21, 96:16, 98:12, 128:9, 130:12

**voluntariness** [12] - 3:7, 3:9, 3:21, 84:12, 84:22, 103:25, 104:7, 104:15, 122:6, 122:21, 129:5, 135:1

**voluntariness-type** [1]

- 103:25

**voluntary** [5] - 84:10, 85:3, 88:13, 128:20, 134:4

**volunteered** [6] - 100:7, 123:11, 124:1, 135:4, 136:15, 136:17

**vote** [10] - 21:10, 21:12, 38:20, 71:15, 71:17, 90:11, 99:20, 99:24, 123:21

**voted** [17] - 21:8, 21:11, 21:13, 38:11, 38:17, 38:18, 38:19, 71:18, 71:19, 88:23, 99:10, 123:19, 123:22, 123:23, 123:24, 127:8, 136:14

**voter** [6] - 72:24, 72:25, 92:8, 110:23, 111:2

**voting** [9] - 39:7, 60:4, 60:6, 60:10, 88:23, 92:7, 92:11, 104:2, 136:21

## W

**W-I-L-S-O-N** [1] - 4:11

**wait** [4] - 29:10, 31:7, 37:14, 102:2

**waive** [6] - 24:1, 32:23, 36:13, 36:17, 63:25, 126:5

**waived** [10] - 84:25, 86:22, 93:24, 96:16, 97:22, 104:20, 128:9, 128:17, 130:12, 131:6

**waiver** [16] - 85:7, 86:2, 86:23, 88:1, 88:3, 88:12, 102:25, 128:20, 130:25, 131:2, 131:3, 131:9, 131:18, 131:22, 131:25, 135:21

**waives** [3] - 94:14, 94:21, 98:12

**waiving** [1] - 94:7

**WALSH** [78] - 2:10, 17:16, 21:25, 25:4, 28:20, 29:16, 29:25, 30:3, 30:7, 30:10, 32:8, 33:18, 37:22, 40:1, 42:8, 43:1, 50:6, 51:13, 51:15, 55:11, 55:13, 55:21, 55:25, 59:3, 76:22, 78:22, 79:1, 79:11, 79:14, 79:21, 80:4, 80:9, 81:2, 81:11, 81:25, 82:4, 93:5, 93:8, 93:12, 93:15, 93:19, 93:21, 94:19, 95:1, 95:4, 95:8, 95:12, 97:2, 99:7, 100:13, 100:17, 100:21, 101:2,

101:16, 107:11, 107:13, 108:3, 109:19, 110:4, 119:8, 137:10, 138:21, 140:19, 141:1, 141:4, 141:21, 142:2, 142:10, 142:12, 143:2, 143:19, 144:7, 144:12, 145:3, 145:5, 145:10, 146:6, 146:8

**Walsh** [5] - 1:19, 2:11, 60:14, 74:3, 138:18

**WALSH-LITTLE** [78] - 2:10, 17:16, 21:25, 25:4, 28:20, 29:16, 29:25, 30:3, 30:7, 30:10, 32:8, 33:18, 37:22, 40:1, 42:8, 43:1, 50:6, 51:13, 51:15, 55:11, 55:13, 55:21, 55:25, 59:3, 76:22, 78:22, 79:1, 79:11, 79:14, 79:21, 80:4, 80:9, 81:2, 81:11, 81:25, 82:4, 93:5, 93:8, 93:12, 93:15, 93:19, 93:21, 94:19, 95:1, 95:4, 95:8, 95:12, 97:2, 99:7, 100:13, 100:17, 100:21, 101:2, 101:16, 107:11, 107:13, 108:3, 109:19, 110:4, 119:8, 137:10, 138:21, 140:19, 141:1, 141:4, 141:21, 142:2, 142:10, 142:12, 143:2, 143:19, 144:7, 144:12, 145:3, 145:5, 145:10, 146:6, 146:8

**Walsh-Little** [3] - 1:19, 2:11, 138:18

**wants** [1] - 78:16

**warm** [2] - 10:10, 118:11

**warning** [6] - 102:6, 116:23, 129:11, 135:20, 136:3, 136:7

**Warning** [1] - 52:9

**warnings** [24] - 22:14, 25:11, 28:16, 29:2, 29:6, 30:14, 38:24, 74:20, 96:6, 100:25, 101:5, 120:4, 129:7, 129:8, 129:10, 129:13, 129:17, 129:21, 129:22, 130:6, 130:9, 136:5, 136:8, 136:9

**warnings'** [1] - 130:3

**warrant** [51] - 2:16, 3:16, 6:13, 28:4, 35:6, 49:16, 54:6, 54:23, 55:17, 55:20, 56:8, 60:9, 62:4, 62:13, 66:17,

78:18, 81:24, 82:2, 82:12, 82:13, 82:17, 84:7, 87:10, 92:4, 92:7, 92:22, 98:9, 99:20, 107:10, 107:14, 107:16, 107:18, 108:11, 108:21, 109:17, 111:5, 111:10, 111:17, 112:14, 113:3, 113:11, 113:12, 114:3, 114:21, 115:2, 115:17, 115:18, 117:4, 117:9, 120:25

**warrants** [25] - 2:19, 3:18, 5:11, 5:16, 5:19, 5:21, 5:24, 6:2, 6:5, 6:6, 8:1, 44:9, 54:17, 54:19, 58:19, 89:19, 109:16, 111:11, 111:13, 112:10, 112:11, 112:16, 112:18, 112:25, 117:7

**Washington** [4] - 5:14, 10:21, 43:20, 47:4

**watch** [1] - 41:24

**watching** [2] - 63:16, 118:23

**ways** [2] - 90:15, 109:21

**weapon** [2] - 133:1, 133:3

**weapons** [6] - 8:24, 69:22, 118:14, 126:22, 133:1, 133:20

**wearing** [7] - 6:4, 6:6, 6:9, 8:18, 8:19, 10:2, 10:3

**weather** [1] - 10:8

**Wednesday** [1] - 141:17

**week** [3] - 141:17, 141:19, 144:18

**weeks** [1] - 144:11

**Weis** [1] - 53:15

**welfare** [5] - 12:4, 42:5, 45:12, 46:1, 118:24

**well-being** [1] - 118:24

**Wellman** [1] - 114:18

**West** [1] - 1:24

**whatsoever** [1] - 124:25

**Whereof** [1] - 147:10

**whichever** [1] - 3:22

**white** [1] - 52:2

**whole** [5] - 17:4, 32:3, 38:2, 125:1, 130:23

**wife** [4] - 58:5, 58:11, 61:20, 118:18

**Wilhelm** [1] - 107:20

**Williams** [2] - 114:15, 114:16

**willing** [8] - 15:2, 24:1, 32:23, 63:24, 74:19, 87:4, 126:5, 127:15

**willingly** [1] - 94:14

**Wilson** [58] - 4:1, 4:11, 4:14, 17:9, 30:11, 31:18, 39:18, 41:20, 43:3, 54:17, 60:13, 60:17, 61:12, 63:10, 69:24, 70:6, 70:16, 71:9, 71:15, 73:25, 75:16, 76:5, 76:6, 83:6, 86:19, 87:1, 88:22, 93:15, 95:16, 96:4, 97:12, 99:9, 100:8, 102:21, 105:12, 105:20, 111:22, 118:6, 118:19, 118:23, 119:1, 119:13, 120:5, 120:7, 120:18, 121:15, 122:4, 122:12, 122:15, 123:17, 124:9, 125:23, 126:25, 127:8, 136:14, 136:18, 136:20, 137:2

**WILSON** [2] - 4:6, 146:5

**Wilson's** [5] - 60:21, 73:19, 87:9, 87:20, 106:12

**window** [2] - 28:18, 48:15

**wings** [1] - 7:6

**wish** [8] - 18:2, 37:12, 37:20, 79:11, 81:16, 101:14, 121:21, 122:22

**wished** [8] - 14:7, 14:8, 36:20, 68:4, 68:7, 68:11, 124:19, 127:20

**wishes** [1] - 80:6

**withdrawn** [1] - 111:7

**withdrew** [2] - 58:11, 58:12

**WITNESS** [45] - 4:6, 4:7, 4:11, 4:24, 6:23, 8:9, 8:11, 9:17, 11:9, 12:12, 14:13, 14:24, 15:4, 16:20, 16:23, 17:2, 24:22, 28:19, 29:12, 31:13, 31:16, 32:6, 33:13, 33:17, 37:17, 37:19, 41:4, 41:9, 41:13, 41:15, 42:17, 42:18, 42:22, 45:18, 50:19, 54:12, 55:5, 64:15, 65:22, 65:25, 68:15, 75:5, 78:14, 146:5, 146:7

**Witness** [1] - 147:10

**witness** [13] - 3:8, 4:4, 23:15, 40:24, 42:15, 51:16, 54:9, 59:6, 78:10, 97:12, 119:5, 141:15, 142:6

**witnessed** [1] - 86:19

**witnesses** [4] - 78:23, 111:21, 139:20, 140:10

**WITNESSES** [1] - 146:4

**wits** [1] - 106:1

**word** [4] - 35:10, 99:8, 122:24, 123:12

**words** [8] - 40:25, 82:11, 120:11, 123:15, 127:1, 131:10, 131:19

**works** [1] - 140:5

**worry** [1] - 141:19

**worth** [3] - 106:6, 115:6, 123:3

**worthwhile** [1] - 47:15

**write** [4] - 24:6, 25:14, 40:21, 41:3

**writing** [9] - 13:6, 14:18, 14:19, 25:20, 26:15, 26:19, 39:4, 40:7, 94:13

**written** [9] - 3:17, 25:11, 31:8, 96:18, 129:17, 129:23, 131:2, 131:3

**wrote** [2] - 49:24, 143:21

# Y

**year** [12] - 5:19, 26:1, 26:2, 40:8, 40:11, 54:13, 58:18, 58:21, 90:16, 123:7, 133:25, 138:7

**years** [11] - 22:11, 46:7, 47:7, 47:23, 48:10, 48:12, 48:14, 75:10, 108:9, 112:8, 116:2

**yourself** [5] - 7:9, 25:10, 25:14, 33:4, 90:7

# Z

**Zach** [2] - 38:14, 73:17

**Zachary** [2] - 1:17, 2:5

**Zajac** [3] - 1:23, 147:3, 147:15

**zip** [1] - 50:22